MICHAEL JAY BERGER (State Bar # 100291)
LAW OFFICES OF MICHAEL JAY BERGER
9454 Wilshire Blvd. 6th Floor
Beverly Hills, CA 90212-2929
Telephone:     (310) 271-6223
Facsimile:     (310) 271-9805
E-mail:        michael.berger@bankruptcypower.com

Counsel for Debtor
David Levesque

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>David Levesque<br><br>                                    Debtor.<br><br>In re<br><br>SONAPHI, LLC; RESONANT TECHNOLOGIES GROUP, LLC, and MARK HINDS,<br><br>                          Plaintiffs,<br><br>          vs.<br><br>DAVID LEVESQUE,<br><br>                          Defendant. | Adv. Proc. No. 5:23-ap-05006<br><br>BK Case No. 5:22-bk-51048<br><br>Chapter 7<br><br>**DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 APPROVING NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT BETWEEN DEBTOR DAVID LEVESQUE AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, AND MARK HINDS; DECLARATION OF DAVID LEVESQUE IN SUPPORT THEREOF** |

**THE HONORABLE STEPHEN L. JOHNSON, UNITED STATES**

**BANKRUPTCY CHIEF JUDGE; PLAINTIFFS SONAPHI, LLC, RESONANT**

1

NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT BETWEEN DEBTOR DAVID LEVESQUE, AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, AND MARK HINDS; DECLARATION OF DAVID LEVESQUE IN SUPPORT THEREOF

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 1 of 146

**TECHNOLOGIES GROUP, LLC, AND MARK HINDS; THE UNITED STATES TRUSTEE; AND ALL OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that David Levesque, the debtor herein ("Debtor") in the above Chapter 7 Bankruptcy case, hereby moves this Court for an Order approving the Settlement Agreement and Mutual Release between David Levesque, Debtor, on the one hand, and plaintiffs: (1) Sonaphi, LLC ("Sonaphi"); (2) Resonant Technologies Group, LLC ("RTG"); (3) and Mark Hinds ("Hinds") (collectively, the "Plaintiffs"), on the other hand.

On November 19, 2022, Debtor filed a voluntary bankruptcy petition commencing the Chapter 7 bankruptcy case designated as *In re David Levesque*, Case No. 5:22-bk-51048-SJ (the "Bankruptcy Case") in the above-mentioned Bankruptcy Court.

On February 13, 2023, the Plaintiffs filed their *Complaint for: (I) Objection to Discharge Pursuant to 11 U.S.C. § 727, and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* (the "Complaint") [Adv. Docket No. 16]. On April 6, 2023, the Plaintiffs timely filed their *First Amended Complaint* and the Debtor responded by timely filing his *Motion to Dismiss First Amended Complaint With Prejudice* [Adv. Docket No. 18] (the "Motion to Dismiss"). The Parties stipulated to continue the Status Conference and Litigation Deadlines on April 21, 2023 [Adv. Docket No. 21], which was granted by Court order on April 25, 2023 [Adv. Docket No. 23]. The Parties stipulated again to continue the Status Conference and Litigation Deadlines on May 15, 2023 [Adv. Docket No. 24], and again on June 6, 2023 [Adv. Docket No. 26].

Debtor and Plaintiffs have negotiated a settlement agreement entitled Settlement Agreement and Mutual Release (hereinafter the "Settlement Agreement") which contemplates the global settlement of the entire adversary proceeding dispute between the Parties with no money changing hands between the Parties. Debtor and Plaintiffs seek an Order of this Court approving the Settlement Agreement which resolves the pending litigation between the Parties.

2

This Motion is supported by this Notice of Motion, by the Memorandum of Points and Authorities, and by the Declaration of David Levesque in support of the Motion.

Wherefore, the Debtor requests the Court issue its Order approving the Settlement Agreement between the Debtor and the Plaintiffs, and for any other relief deemed necessary and proper.

Dated: June 28, 2023          **LAW OFFICES OF MICHAEL JAY BERGER**

By: _Michael Jay Berger_
Michael Jay Berger
Attorney for Debtor
David Levesque

NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT BETWEEN DEBTOR DAVID LEVESQUE, AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, AND MARK HINDS; DECLARATION OF DAVID LEVESQUE IN SUPPORT THEREOF

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF FACTS

On November 19, 2022, Debtor filed a voluntary bankruptcy petition commencing the Chapter 7 bankruptcy case designated as *In re David Levesque*, Case No. 5:22-bk-51048-SJ (the "Bankruptcy Case").

Summary of Debtor's Bankruptcy Proofs of Claim and Objections Thereto

No proofs of claim have been filed in the Debtor's Bankruptcy Case.

A. Procedural Summary of the Adversary Proceeding

On February 13, 2023, the Plaintiffs filed their *Complaint for: (I) Objection to Discharge Pursuant to 11 U.S.C. § 727, and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* (the "Complaint") [BK Docket No. 16]. On April 6, 2023, the Plaintiffs timely filed their *First Amended Complaint* and the Debtor responded by timely filing his *Motion to Dismiss First Amended Complaint With Prejudice* [Adv. Docket No. 18] (the "Motion to Dismiss"). The Parties stipulated to continue the Status Conference and Litigation Deadlines on April 21, 2023 [Adv. Docket No. 21], which was granted by Court order on April 25, 2023 [Adv. Docket No. 23]. The Parties stipulated again to continue the Status Conference and Litigation Deadlines on May 15, 2023 [Adv. Docket No. 24], and again on June 6, 2023 [Adv. Docket No. 26].

The Parties have negotiated a settlement agreement entitled Settlement Agreement and Mutual Release (hereinafter the "Settlement Agreement") which contemplates the global settlement of the entire dispute between the Parties. Debtor and the Plaintiffs seek an Order of this Court approving the Settlement Agreement.

///

///

///

NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT BETWEEN DEBTOR DAVID LEVESQUE, AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, AND MARK HINDS; DECLARATION OF DAVID LEVESQUE IN SUPPORT THEREOF

## II. **MATERIAL TERMS OF THE SETTLEMENT AGREEMENT**

Through the Settlement Agreement, the Parties agree as follows:

a) There will be no monetary consideration exchanged with respect to the terms of the settlement;

b) Parties to the Settlement Agreement shall execute the *Joint Stipulation Between Sonaphi, LLC, Resonant Technologies Group, LLC, and Mark Hinds (collectively, "Plaintiffs") and Debtor David Levesque for the Dismissal with Prejudice of the Plaintiffs' Claims Under 11 US.C. § 727 and 11 U.S.C. § 523* (the "Stipulation") within five (5) business days following the Court's approval of this Motion;

c) As partial consideration for the settlement, Debtor shall not claim any equity or other interest in Sonaphi and shall amend Schedule A/B to remove any such claimed interest in Sonaphi;

d) Within (5) five business days following the Court Order approving the Settlement Agreement, Debtor shall execute a Notice of Dismissal, dismissing the California Labor Commissioner's Office complaint against Sonaphi, LLC, Mark Hinds, and Jennifer Linder State Case No. WC-CM-886714;

e) Neither the Plaintiffs nor the Defendant shall be deemed to be a prevailing party, and each Party shall bear its own attorneys' fees and costs in connection with any action;

f) Neither the Plaintiffs nor the Defendants admit to any liability;

g) Debtor David Levesque shall execute a declaration under penalty of perjury for the Plaintiffs to file as may be necessary in the State Court Action Case No. 21STCV28812 currently pending where both Debtor and Sonaphi, LLC, Resonant Technologies Group, LLC, and Mark Hinds are co-defendants.

5

NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT BETWEEN DEBTOR DAVID LEVESQUE, AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, AND MARK HINDS; DECLARATION OF DAVID LEVESQUE IN SUPPORT THEREOF

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 5 of 146

A true and correct copy of the Settlement Agreement is attached as **Exhibit 1** to the Declaration of David Levesque.

## III. ARGUMENT

### THE SETTLEMENT SHOULD BE APPROVED

**A. The Creditors Have Received Sufficient Notice of the Settlement Agreement**

Rule 9019 of the Federal Rules of Bankruptcy Procedure authorizes the Court to approve a settlement agreement following notice and an opportunity for a hearing. In the case at bar, the introduction of this Motion, which summarizes the relief sought by the Debtor, is served upon the Trustee, all creditors of the bankruptcy estate, the Office of the United States Trustee, as well as any party who have requested special notice.

**B. The Bankruptcy Rules Allow the Court to Approve Compromise of Controversy**

Rule 9019 states that "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The "may" language of Rule 9019 indicates that the approval or disapproval of the Settlement Agreement lies within the sound discretion of the Court. For the reasons set forth below, the Court should approve the Settlement Agreement.

**C. Case Law Supports Approval of the Stipulation**

It is well-established that, as a matter of public policy, settlements are favored over continued litigation. *See, e.g., In re A & C Properties*, 784 F.2d 1377 (9th Cir. 1986); *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976); *In re Heissenger Resources*, Ltd., 67 B.R. 378, 382 (C.D. Ill. 1986).

The focus of inquiry in reviewing and approving compromises is whether the Settlement is reasonable under the particular circumstances of the case. *See In re General Store of Beverly Hills*, 11 B.R. 539 (9th Cir. BAP 1981). Among the factors to be considered in determining whether a settlement is fair, equitable, and reasonable are the following:

6

1    (a) the probability of success in the litigation;

2    (b) any impediments to collection;

3    (c) the complexity, expense, inconvenience and delay of litigation; and

4    (d) the interest of creditors with deference to their reasonable opinions.

5  *See A & C Properties*, 784 F.2d at 1381.

6    From an analysis of the foregoing factors to the facts of this case, the Court should

7  conclude that the terms of the Settlement Agreement are fair and equitable, and well

8  within the range of reasonableness.

9    a. <u>Probability Of Success In The Litigation</u>

10    The Settlement Agreement successfully resolves the Creditor's claims against the

11  Debtor and Debtor's estate. The Debtor, along with the Creditor, seek to eliminate the

12  costs and delay associated with potential future disputes in the Bankruptcy Case. The

13  Settlement removes the risks, provides certainty for the Debtor in retaining its assets, and

14  avoids the inevitable costs of litigation by Creditor.

15

16    b. <u>Any Impediments to Collection</u>

17    Resolution of the Adversary Proceeding litigation by Plaintiffs *Sonaphi, LLC,*

18  *Resonant Technologies Group, LLC, and Mark Hind* against the Debtor *David Levesque*

19  allows the Debtor to move forward on the path towards entry of the discharge. There is

20  no monetary exchange between the Parties to satisfy the settlement. Accordingly, the

21  impediment of collection factor, to the extent applicable, weighs in favor of approving

22  the Motion.

23    c. <u>Complexity, Expense, Inconvenience and Delay of Litigation</u>

24    The Settlement Agreement effectively resolves Creditor's claims against the

25  Debtor and the Debtor's estate without further litigation and the expense and delay

26  associated therewith. Based on the foregoing, the Debtor respectfully submits that this

27  factor also weighs in favor of approving the Settlement Agreement.

28

NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT
BETWEEN DEBTOR DAVID LEVESQUE, AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, AND
MARK HINDS; DECLARATION OF DAVID LEVESQUE IN SUPPORT THEREOF

d. Interests of Creditors

As noted above, the Settlement Agreement will result in resolution of the Creditor's claims against the Debtor and the Debtor's estate, without further litigation and the expense and delay associated therewith. There is no monetary settlement exchange. This resolution directly inures to the benefit of all creditors and the Debtor by avoiding costly and protracted litigation.

Based on the foregoing, the Debtor respectfully submits that the Settlement Agreement is in the best interests of the estate, and requests that the Court approve the Settlement Agreement.

## IV.   CONCLUSION

WHEREFORE, the Debtor and Joint Debtor respectfully request that the Court enter an order:

(1) Granting the Motion in its entirety;

(2) Finding that the notice of the Motion was proper;

(3) Approving the Settlement Agreement; and

(4) Granting any further or additional relief deemed warranted by the Court.

Dated: June 28, 2023      **LAW OFFICES OF MICHAEL JAY BERGER**

By: _Michael Jay Berger_
Michael Jay Berger
Attorney for Debtor
David Levesque

8

## DECLARATION OF DAVID LEVESQUE

I, David Levesque, declare and state as follows:

1.      I am the Debtor and Debtor-in-Possession in the above-captioned chapter 7 Bankruptcy Case. I have personal knowledge of the facts stated herein and, if called upon to testify thereto, I could and would do so competently and truthfully.

2.      On November 19, 2022, I filed a voluntary bankruptcy petition commencing the Chapter 7 bankruptcy case designated as *In re David Levesque*, Case No. 5:22-bk-51048-SJ (the "Bankruptcy Case").

3.      On February 13, 2023, Sonaphi, LLC ("Sonaphi"), Resonant Technologies Group, LLC ("RTG"), and Mark Hinds ("Hinds") (collectively, the "Plaintiffs") filed their *Complaint for: (I) Objection to Discharge Pursuant to 11 U.S.C. § 727, and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* (the "Complaint") [Adv. Docket No. 1]. On April 6, 2023, the Plaintiffs filed their *First Amended Complaint* and I responded by filing my *Motion to Dismiss First Amended Complaint With Prejudice* [Adv. Docket No. 18] (the "Motion to Dismiss"). The Parties stipulated to continue the Status Conference and Litigation Deadlines on April 21, 2023 [Adv. Docket No. 21], which was granted by Court order on April 25, 2023 [Adv. Docket No. 23]. The Parties stipulated again to continue the Status Conference and Litigation Deadlines on May 15, 2023 [Adv. Docket No. 24], and again on June 6, 2023 [Adv. Docket No. 26].

4.      The Plaintiffs and I have negotiated a settlement entitled Settlement Agreement and Mutual Release (hereinafter the "Settlement Agreement") which contemplates the global settlement of the entire adversary proceeding dispute between the Plaintiffs and I. A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit 1**. The Plaintiffs and I seek an Order of this Court approving the Settlement Agreement. The Settlement Agreement resolves the pending adversary proceeding litigation.

NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT BETWEEN DEBTOR DAVID LEVESQUE, AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, AND MARK HINDS; DECLARATION OF DAVID LEVESQUE IN SUPPORT THEREOF

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 9 of 146

5. Through the Settlement Agreement, the Parties agree as follows:

a. There will be no monetary consideration exchanged with respect to the terms of the settlement;

b. Parties to the Settlement Agreement shall execute the *Joint Stipulation Between Sonaphi, LLC, Resonant Technologies Group, LLC, and Mark Hinds (collectively, "Plaintiffs") and Debtor David Levesque for the Dismissal with Prejudice of the Plaintiffs' Claims Under 11 US.C. § 727 and 11 U.S.C. § 523* (the "Stipulation") within five (5) business days following the Court's approval of this Motion;

c. As partial consideration for the settlement, Debtor shall not claim any equity or other interest in Sonaphi and shall amend schedule A/B to remove any such claimed interest in Sonaphi;

d. Within (5) five business days following the Court Order approving the Settlement Agreement, Debtor shall execute a Notice of Dismissal, dismissing the California Labor Commissioner's Office complaint against Sonaphi, LLC, Mark Hinds, and Jennifer Linder State Case No. WC-CM-886714;

e. Neither the Plaintiffs nor the Defendant shall be deemed to be a prevailing party, and each Party shall bear its own attorneys' fees and costs in connection with any action;

f. Neither the Plaintiffs nor the Defendants admit to any liability;

g. Debtor David Levesque shall execute a declaration under penalty of perjury for the Plaintiffs to file as may be necessary in the State Court Action currently pending where both Debtor and Sonaphi, LLC, Resonant Technologies Group, LLC, and Mark Hinds are co-defendants.

A true and correct copy of the Settlement Agreement is attached as **Exhibit 1**.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on June 28, 2023 in Pflugerville, Texas.

By: _____
David Levesque

NOTICE OF MOTION AND MOTION PURSUANT TO F.R.B.P. 9019 TO APPROVE SETTLEMENT AGREEMENT
BETWEEN DEBTOR DAVID LEVESQUE AND SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP LLC, AND

# EXHIBIT 1

DocuSign Envelope ID: 7E4A4AE4-627A-4AD3-A67B-CA662DBB697A

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Agreement") is made and entered into as of June 20, 2023 by and among plaintiffs Sonaphi, LLC ("Sonaphi"), Resonant Technologies Group, LLC ("RTG"), and Mark Hinds ("Hinds") (collectively, the "Plaintiffs"), on the one hand, and defendant David Levesque (the "Defendant"), on the other hand. The Plaintiffs and the Defendant will collectively be referred to as the "Parties", and each individually, a "Party."

## RECITALS

A.      The Defendant, was the sole owner and CEO of vBio, Inc. a Delaware corporation that operated in San Jose, California ("vBio"). The Defendant dissolved vBio in 2021. Before dissolving vBio, on or about September 22, 2020, the Defendant, in his capacity as CEO, caused vBio to enter into a *Contractor and Business Development Agreement* (the "Sonaphi Agreement") with Sonaphi. Under the terms of the Sonaphi Agreement, vBio was to provide services to Sonaphi regarding the development of vocal analysis technology for the detection of COVID-19. Per the Sonaphi Agreement, Sonaphi agreed to pay to vBio an operations budget of $155,000 per month for all operations.

B.      As CEO of vBio, the Defendant contracted with approximately fifteen individuals to perform services for vBio (the "vBio Team Members"). After entering into the Sonaphi Agreement, the Defendant negotiated consulting contracts between vBio and the vBio Team Members (the "vBio Consulting Contracts") based on the expected funding from the Sonaphi Agreement.

C.      On or about March 1, 2021, the Defendant terminated the vBio Consulting Contracts. Thereafter, vBio Team Members retained counsel regarding the termination of the vBio Consulting Contracts. On or about August 4, 2021, certain vBio Team Members filed a lawsuit in the Superior Court of California, County of Los Angeles against vBio, the Defendant, Sonaphi, RTG, and Hinds, captioned *Marissa Land, et al. v. VBIO, Inc.*, LASC Case No. 21STCV28812 (the "State Court Action").

D.      The complaint in the State Court Action alleges that vBio breached the vBio Consulting Contracts and seeks the compensation due and owing on said contracts. The plaintiffs in the State Court Action further assert that Sonaphi, RTG, and Hinds assumed the vBio Consulting Contracts, and therefore, the Plaintiffs are liable for vBio's failure to pay the vBio Team Members under the terms of the vBio Consulting Contracts.

E.      On November 19, 2022, the Defendant filed a voluntary bankruptcy petition commencing the chapter 7 bankruptcy case designated as *In re David Levesque*, Case No. 5:22-bk-51048-SJ (Bankr. N.D. Cal. 2022) (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court").

F.      On or about June 1, 2022, the Defendant filed a complaint with the California Labor Commissioner's Office against Sonaphi, Hinds, and Jennifer Linder initiating State Case No. WC-CM-886714 (the "Labor Action"), alleging that he was a misclassified employee of Sonaphi and seeking approximately $185,121.31 in allegedly unpaid minimum wages, overtime, unreimbursed business expenses, and waiting time penalties.

1

G.       On February 13, 2023, the Plaintiffs filed in good faith their *Complaint for: (I) Objection to Discharge Pursuant to 11 U.S.C. § 727, and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* [Adv. Docket No. 1] (the "Complaint") against the Defendant initiating the adversary proceeding designated as *Sonaphi, LLC, Resonant Technologies Group, LLC, and Mark Hinds v. Levesque (In re Levesque)*, Adv. No. 5:22-ap-05006-SJ (Bankr. N.D. Cal. 2023) (the "Adversary Proceeding").

H.       On January 14, 2023, the Defendant filed an *Amended Schedule A/B: Property* [Docket No. 18] in the Bankruptcy Case scheduling an ownership interest in Sonaphi, which Sonaphi disputes the Defendant earned (the "Disputed Ownership Claim"). Specifically, the amended schedules state that the Defendant "believes he earned 410,201 shares [of Sonaphi] but the shares [were] never issued to [the Defendant]."

I.       On April 6, 2023, the Plaintiffs timely filed their *First Amended Complaint for: (I) Objection to Discharge Pursuant to 11 U.S.C. § 727, and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* [Adv. Docket No. 16] (the "First Amended Complaint"). The Defendant responded by filing his *Motion to Dismiss First Amended Complaint With Prejudice* [Adv. Docket No. 18] (the "Motion to Dismiss") seeking to dismiss the First Amended Complaint under Rule 7012 of the Federal Rules of Bankruptcy Procedure for the failure to state a claim upon which relief can be granted.

J.       The Defendant does not wish to dispute that the Plaintiffs filed the Complaint and the First Amended Complaint in good faith.

K.       To avoid incurring additional attorneys' fees and costs and the uncertainties, costs, and burdens of litigation, and without admitting the truth of any claims or allegations, the Parties now wish to settle any and all claims that they may have against each other pursuant to the terms of this Agreement and the performance of the obligations contained herein.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing recitals, each of which is incorporated into this Agreement, and the mutual covenants, conditions, promises, and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

**1.       Recitals.**

1.1.       The Recitals are incorporated herein by this reference and the Parties agree that the information recited above is true and correct. In the event of litigation concerning the interpretation or enforcement of this Agreement, the Recitals set forth above shall constitute admissions by each of the Parties. The Parties agree that each of the Recitals is true and accurate. Each Party further agrees that the making of any statement that disputes or contradicts any of the Recitals shall constitute a material breach of this Agreement.

## 2. Terms of Settlement.

2.1. <u>Scope of the Settlement</u>. The settlement consists of the settlement of (i) all claims asserted by the Plaintiffs against the Defendant in the Adversary Proceeding, (ii) all claims asserted by the Defendant in the Labor Action, and (iii) the Disputed Ownership Claim (the "Settlement").

2.2. <u>Settlement Consideration</u>.

2.2.1. The Parties agree that there will be no monetary consideration exchanged with respect to the terms of this Settlement. None of the Parties shall pay any sums, money, or consideration to any other party in connection with the Settlement of the claims under this Agreement.

2.2.2. As partial consideration for the Settlement, the Plaintiffs shall dismiss their claims with prejudice asserted in the Adversary Proceeding and the Defendant shall dismiss his claims with prejudice asserted in the Labor Action.

2.2.3. As partial consideration for the Settlement, the Defendant shall execute under penalty of perjury a Declaration in the form attached hereto as Exhibit A for the Plaintiffs to file as may be necessary in the State Court Action.

2.2.4. As partial consideration for the Settlement, the Defendant acknowledges and agrees that he does not have any equity or other interest in Sonaphi. Further, the Defendant agrees to forever relinquish his claimed interest in Sonaphi as a result of any alleged verbal or written agreement(s) promising the Defendant any form of equity or equity-like compensation or equity interest in Sonaphi. Within five (5) business following the Effective Date (as defined below), the Defendant shall file an Amended Schedule A/B in the Bankruptcy Case removing as an asset his alleged interest in Sonaphi.

2.2.5. Neither the Plaintiffs nor the Defendant shall be deemed to be a prevailing party, and each Party shall bear its own attorneys' fees and costs in connection with the Bankruptcy Case, the Adversary Proceeding, the State Court Action, and the Labor Action.

2.3. <u>No Admission of Liability</u>. This Agreement is for the sole purpose of settling the matters described herein. It is expressly understood and agreed that this Agreement does not constitute and is not evidence of any admission by any of the Parties hereto of any liability or the truth of any allegations whatsoever. It is expressly understood and agreed that this Agreement is being made solely for the purpose of avoiding the expense and inconvenience of further litigation of the matters described herein.

2.4. <u>Effective Date of the Settlement</u>. Within five (5) business days following the date of execution of this Agreement, the Defendant shall file a motion seek approval of the Settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Settlement Motion"). The Settlement shall become effective on the date that the order of the Bankruptcy Court approving the Settlement Motion becomes final and non-appealable (the "**Effective Date**"). If any of the orders approving this Agreement are stayed on appeal or otherwise, then the Parties shall meet and confer in good faith on whether to waive the finality requirements of this Paragraph 2.4.

BN 76409142v3

DocuSign Envelope ID: 7E4A4AE4-627A-4AD3-A67B-CA662DBB697A

**3.      Dismissal of the Adversary Proceeding.**

3.1.      Dismissal of the Adversary Proceeding.  Concurrently with the execution of this Agreement, the Plaintiffs and the Defendant shall execute the *Joint Stipulation Between Plaintiffs Sonaphi, LLC, Resonant Technologies Group, LLC, and Mark Hinds and Defendant David Levesque for the Dismissal with Prejudice of the Plaintiffs' Claims Under 11 U.S.C. § 727 and 11 U.S.C. § 523* (the "Stipulation") substantially in the form attached hereto as **Exhibit B**.  The Plaintiffs and the Defendant agree to and approve of the form and substance of the Stipulation. Within five (5) business days following the Effective Date of this Agreement, the Plaintiffs shall file the fully executed Stipulation in the Adversary Proceeding and shall seek dismissal of the Adversary Proceeding and, in particular the section 727 objection to discharge claims, in accordance with Rule 7041 of the Federal Rules of Bankruptcy Procedure.

**4.      Dismissal of the Labor Action.**

4.1.      Dismissal of the Labor Action.  Concurrently with the execution of this Agreement, the Defendant shall execute a Notice of Dismissal, substantially in the form attached hereto as **Exhibit C**, dismissing the Labor Action with prejudice.  The Plaintiffs and the Defendant hereby agree to and approve of the form and substance of the Stipulation.  Within five (5) business days from the Effective Date of this Agreement, the Defendant shall file the executed Notice of Dismissal in the Labor Action, which shall constitute his consent to dismissal of the Labor Action with prejudice in accordance with the terms of this Agreement.

**5.      Representations and Warranties.**

5.1.      Authority to Execute Agreement.  The Parties have full power and authority to sign and enter into this Agreement and related settlement documents, to undertake and consummate the transactions contemplated hereby, and to pay, perform and observe all of the conditions, covenants, agreements, and obligations contained herein.

5.2.      Advice of Counsel.  The Parties acknowledge and represent to each other that they have the advice of attorneys of their own choosing in connection with the evaluation and execution of this Agreement.

5.3.      No Prior Transfers of Released Items.  Each Party represents and warrants that it has not heretofore sold, assigned, transferred, conveyed, or otherwise disposed of, including by way of subrogation, any of the charges, claims, complaints, actions, causes of action, liabilities, obligations, promises, benefits, agreements, controversies, rights, damages, debts, costs, losses of services, attorneys' fees, expenses, costs and compensation of any nature whatsoever released in this Agreement.

5.4.      Reliance on Independent Investigation.  The Parties acknowledge that they have entered into this Agreement in reliance on their own independent investigations and analysis of the facts underlying the subject matter of this Agreement, no representations, warranties, or promises of any kind have been made directly or indirectly to induce them to execute this Agreement other than those that are expressly set forth herein.

BN 76409142v3

DocuSign Envelope ID: 7E4A4AE4-627A-4AD3-A67B-CA662DBB697A

5.5. <u>No Frustration of Purpose</u>. Each Party represents and warrants that it has not taken and will not take any action, which would tend to defeat the intent, purposes, or provisions of this Settlement Agreement.

5.6. <u>Covenant Not to Pursue Further Litigation</u>. Each of the Parties represents and warrants that it has no present intent to pursue any further claims concerning either the Defendant Released Claims (as defined below) or the Plaintiffs Released Claims (as defined below), as the case may be. The Defendant covenants that any claims for malicious prosecution have been released in connection with this Agreement. The Defendant covenants that he will not induce any third party to pursue any claims against the Sonaphi Parties (as defined below).

**6. Release by the Defendant.**

6.1. Except for obligations under this Agreement, in consideration for the settlement and other obligations made herein, the Defendant, on behalf of himself/herself/itself and the Defendant's assigns, and all persons and entities claiming by, through or under the Defendant, including, without limitation, the Defendant's respective assigns, successors, transferees, purchasers, investors, subrogees, administrators, executors, heirs, beneficiaries, agents, officers, directors, employees, managers, affiliates, owners, shareholders, partners, members, guarantors, professionals, attorneys, trustees, and representatives (the "Defendant Parties"), hereby release and forever discharge the Plaintiffs, and their respective agents, servants, employees, accountants, attorneys, shareholders, subsidiaries, officers, directors, heirs, executors, administrators, insurers, successors and assigns from any and all claims, demands, liabilities, accounts, obligations, costs, expenses, liens, actions, causes of action, rights to indemnity (legal or equitable), rights to subrogation, rights to contribution and remedies of any nature whatsoever, known or unknown, which the Defendant Parties had, now have, or have acquired, individually or jointly, arising from any facts, actions or inactions occurring at any time prior to the date of the execution of this Agreement, including specifically, but not exclusively, and without limiting the generality of the foregoing, any and all of the claims, damages, demands and causes of action, known or unknown, suspected or unsuspected by the Defendant Parties (collectively, the "Defendant Released Claims").

6.2. The Defendant Parties expressly waive and relinquish all rights and benefits afforded by Section 1542 of the California Civil Code, and do so understanding and acknowledging the significance and consequences of such specific waiver of Section 1542, which provides as follows:

> *"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or the released party."*

6.3. The Defendant Parties further acknowledge and agree that they may hereafter discover facts in addition to or different from those which they now know or believes to be true with respect to the Defendant Released Claims they may have, but that nonetheless it is the Defendant Parties' intention to fully, finally and forever settle and release all claims, whether

BN 76409142v3

known, unknown, fixed, contingent, suspected, unsuspected, or otherwise as to the Defendant Released Claims.

## 7. Release by the Sonaphi Parties.

7.1. In consideration for the settlement and other obligations contained herein, the Plaintiffs, on behalf of themselves and their representatives, agents, assigns, members, managers and officers, (the "Sonaphi Parties") hereby release and forever discharge the Defendant, and each of his successors and assigns, and his agents, employees, accountants, attorneys, shareholders, affiliates, subsidiaries, officers, directors and insurers, from any and all claims, demands, liabilities, accounts, obligations, costs, expenses, liens, actions, causes of action, rights to indemnity (legal or equitable), rights to subrogation, rights to contribution and remedies of any nature whatsoever, known or unknown, which the Sonaphi Parties had, now have, or have acquired, individually or jointly, arising from any facts, actions or inactions occurring at any time prior to the date of the execution of this Agreement, including specifically, but not exclusively, and without limiting the generality of the foregoing, any and all of the claims, damages, demands and causes of action, known or unknown, suspected or unsuspected by the Sonaphi Parties (collectively, the "Sonaphi Parties Released Claims").

7.2. The Sonaphi Parties expressly waive and relinquish all rights and benefits afforded by Section 1542 of the California Civil Code, and do so understanding and acknowledging the significance and consequences of such specific waiver of Section 1542, which provides as follows:

*"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or the released party."*

7.3. The Sonaphi Parties further acknowledge and agree that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the Sonaphi Parties Released Claims they may have, but that nonetheless it is their intention to fully, finally and forever settle and release all claims, whether known, unknown, fixed, contingent, suspected, unsuspected, or otherwise as to the Sonaphi Parties Released Claims.

## 8. Notice of Default and Cure Period.

8.1. Upon any material breach of this Agreement by a Party (the "Breaching Party"), the other Party (the "Non-Breaching Party") shall have the right to give the Breaching Party notice specifying the nature of such material breach. If the breach of this Agreement is curable, then the Breaching Party shall have a period of ten (10) business days from the date of receipt of the notice (the "Cure Period") to cure such material breach in a manner that effectively remedies the harm to the Non-Breaching Party caused by the material breach.

BN 76409142v3

## 9. Attorneys' Fees and Costs.

9.1. Each Party shall bear its own attorneys' fees and costs in connection with the Bankruptcy Case, the Adversary Proceeding, the Defendant Released Claims, the Sonaphi Parties Released Claims, and the preparation of this Agreement. In the event of any default or breach of this Agreement that is not cured in accordance with Paragraph 8.1, or any action brought to interpret or enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs incurred in any such action.

## 10. Governing Law and Jurisdiction.

10.1. This Agreement shall be governed by the laws of the State of California without regard to the principles of choice of law or conflicts of law of that state or of any other jurisdiction. The forum for the resolution of any dispute arising out of this Agreement shall be in the Bankruptcy Court.

## 11. Confidentiality.

11.1. The Parties each agree that this Agreement, and the terms and conditions hereof and thereof will be kept confidential and that neither they nor any of their affiliates, attorneys, accountants, employees, directors, members, managers, agents or other agents or advisors (collectively, "Representatives") will disclose any of such terms and conditions in any manner whatsoever; provided, however, that (i) the Defendant may file the Stipulation with the Bankruptcy Court in order to obtain approval of the dismissal of the Adversary Proceeding; (ii) the Defendant and his Representatives may disclose only the existence, provisions and contents of the Stipulation to any person; (iii) a Party may disclose any such terms and conditions with the other Party's prior written consent; (iv) such terms and conditions may be disclosed as required by applicable law or regulation; and (v) such terms and conditions may be disclosed by the Parties to their representatives who need to know such information for the sole purpose of carrying out the transactions contemplated hereby, who also agree to keep such terms and conditions confidential pursuant to the terms hereof.

## 12. Enforcement of Agreement.

12.1. The Parties specifically agree that, unless this Agreement is void *ab initio*: (1) this Agreement is admissible as evidence and subject to disclosure in any enforcement proceedings if enforcement is necessary; (2) all of the material terms of the settlement are set forth herein; (3) this Agreement is enforceable under Rule 58 of the Federal Rules of Civil Procedure, California Code of Civil Procedure § 644.6 or other similar state laws, and the court, upon motion of either Party, may enter judgment pursuant to the terms hereof; and (4) neither Party shall oppose a motion under Rule 58 of the Federal Rules of Civil Procedure, California Code of Civil Procedure § 644.6 or other similar state laws to enter judgment pursuant to the terms of this Agreement on the ground that this Agreement is confidential or otherwise privileged.

12.2. The failure by any Party to enforce any term or provision of this Agreement shall not constitute a waiver of the right to enforce the same term or provision, or any other term or provision, thereafter. No waiver by any Party of any term or provision of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not

DocuSign Envelope ID: 7E4A4AE4-627A-4AD3-A67B-CA662DBB697A

similar, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

### 13. Miscellaneous Provisions.

13.1. <u>Survival</u>. The covenants, releases, and indemnifications contained in this Agreement shall survive the full performance of this Agreement. In the event that any provision of this Agreement should be held to be void, voidable, unlawful, or for any reason unenforceable, the remaining provisions or portion of this Agreement shall remain in full force and effect, unless such portion of the Agreement is so material that its deletion would violate the purpose and intent of the Parties.

13.2. <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under all applicable laws and regulations. If, however, any provision of this Agreement shall be prohibited by or invalid under any such law or regulation in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such law or regulation, or, if for any reason it is not deemed so modified, it shall be ineffective and invalid only to the extent of such prohibition or invalidity without affecting the remaining provisions of this Agreement, or the validity or effectiveness of such provision in any other jurisdiction.

13.3. <u>Successors and Assigns</u>. This Agreement, including the general releases contained herein, shall inure to the benefit and be binding on the Parties and, as applicable, their assigns, and their successors in interest, including successors in interest whether by purchase, merger, assignment, or otherwise.

13.4. <u>Further Assurances</u>. The Parties, and each of them, agree without further consideration to execute and deliver such other documents and to take such other action as may be necessary to consummate the purposes of this Agreement.

13.5. <u>Entire Agreement</u>. This Agreement sets forth the entire understanding of the parties in connection with the subject matter hereof. None of the parties hereto has made any statement, representation, or warranty in connection herewith which has been relied upon by any other party hereto or which has been an inducement for any party to enter into this Agreement, except as expressly set forth herein. It is expressly understood and agreed that this Agreement may not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a writing duly executed by authorized representatives of the parties hereto. The Parties agree that they will make no claim at any time that this Agreement has been altered or modified or otherwise changed by oral communication of any kind or character.

13.6. <u>No Modification</u>. This Agreement may not be amended or supplemented, nor may any rights hereunder be waived, except in a writing signed by each of the Parties hereto.

13.7. <u>No Prejudice to Drafter</u>. Each Party has had a full and ample opportunity to review this Agreement and to make suggestions or changes to it. Accordingly, the Parties understand and agree that this Agreement is deemed to have been drafted jointly by the Parties, and the Parties agree that the common-law principles of construing ambiguities against the drafter shall have no

BN 76409142v3

application hereto. This Agreement should be construed fairly and not in favor of or against one Party as the drafter hereof.

13.8. <u>Time is of the Essence</u>. The Parties hereto agree that time is of the essence for this Agreement and that it is of the utmost importance that all of the obligations hereunder be fully performed in strict accordance with the dates and times set forth herein.

13.9. <u>Cumulative Remedies</u>. Any specific right or remedy set forth in this Agreement, legal, equitable, or otherwise, shall not be exclusive, but shall be cumulative with all other rights or remedies set forth herein or allowed or allowable by law.

13.10. <u>Headings</u>. The Parties have inserted the section and paragraph titles in this Agreement only as a matter of convenience and for reference, and the titles in no way define, limit, extend, or describe the scope of this Agreement or the intent of the Parties in including any particular provision in this Agreement.

13.11. <u>Counterparts; Facsimile</u>. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally as effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or electronic mail shall deliver a manually executed counterpart of this Agreement, but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

13.12. <u>Electronic Signatures</u>. The Parties shall be bound by their affixed signatures hereto which may be transmitted by facsimile or electronic mail (in .pdf format) as if such signatures were original "ink" signatures, in which case each one shall constitute an original.

**[SIGNATURE PAGE FOLLOWS]**

BN 76409142v3

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

DAVID LEVESQUE

By: _____
David Levesque, an individual

RESONANT TECHNOLOGIES GROUP, LLC

By: _____Mark Hinds_____
Name: Mark Hinds

Its: CEO

SONAPHI, LLC

By: _____Mark Hinds_____
Mark Hinds, Authorized Representative

MARK HINDS

By: _____Mark Hinds_____
Mark Hinds, an individual

**Approved as to form:**
LAW OFFICES OF MICHAEL JAY BERGER

By: _____
            Michael Jay Berger, Esq.

Counsel for Defendant
DAVID LEVESQUE

**Approved as to form:**
BUCHALTER, a Professional Corporation

By: _____
            Anthony J. Napolitano, Esq.

Counsel for Plaintiffs
SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, and MARK HINDS

10

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

DAVID LEVESQUE

By: _____
David Levesque, an individual

RESONANT TECHNOLOGIES GROUP,
LLC


By: _____
Name: _____
Its: _____


**Approved as to form:**
LAW OFFICES OF MICHAEL JAY BERGER

By: _____
　　　　Michael Jay Berger, Esq.

Counsel for Defendant
DAVID LEVESQUE

SONAPHI, LLC

By: _____
Jennifer Linder, Authorized Representative

MARK HINDS


By: _____a_____
Mark Hinds, an individual


**Approved as to form:**
BUCHALTER, a Professional Corporation

By: _____
　　　　Anthony J. Napolitano, Esq.

Counsel for Plaintiffs
SONAPHI, LLC, RESONANT TECHNOLOGIES
GROUP, LLC, and MARK HINDS

BN 76409142v3

DocuSign Envelope ID: 7E4A4AE4-627A-4AD3-A67B-CA662DBB697A

# EXHIBIT A

## [Declaration of David Levesque]

BN 76409142v3

BUCHALTER, a Professional Corporation
PETER G. BERTRAND (SBN: 87883)
425 Market Street, Suite 2900
San Francisco, CA 94105
Telephone: (415) 227-0900
Facsimile: (415) 227-0770
Email: pbertrand@buchalter.com

BUCHALTER, a Professional Corporation
JOSHUA MIZRAHI (SBN: 227639)
GRAHAM LAMBERT (SBN: 303056)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Facsimile: (213) 896-0400
Email: jmizrahi@buchalter.com
          glambert@buchalter.com

Attorneys for Defendants Sonaphi, LLC, Mark Hinds,
and Resonant Technologies Group, LLC

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES - STANLEY MOSK COURTHOUSE

| | |
|---|---|
| MARISSA LAND, an individual; JAMIL HOUSTON, an individual; AYESHA KHAN, an individual; LUCAS NYABERO, an individual; ASTRID STUCKELBERGER; an individual; and FIRAS ABRAS, an individual,<br><br>        Plaintiffs,<br><br>        vs.<br><br>VBIO INC., a Delaware Corporation; SONAPHI, LLC, a Nevada Limited Liability Company; RESONANT TECHNOLOGIES GROUP, LLC; a Delaware Limited Liability Company; DAVID LEVESQUE, an individual dba GONOGO; DAVID LEVESQUE, an individual; MARK HINDS, an individual; and DOES 1 through 50, inclusive,<br><br>        Defendants. | CASE NO.: 21STCV28812<br><br>Assigned to Honorable Christopher K. Lui<br>Department: 76<br><br>**DECLARATION OF DAVID LEVESQUE** |

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES
BN 76501219v3

1

DECLARATION OF DAVID LEVESQUE

## DECLARATION OF DAVID LEVESQUE

I, David Levesque, declare as follows:

1. I was the founder, Chief Executive Officer, and sole owner of vBio, Inc., a Delaware corporation ("vBio") until its corporate dissolution. The facts set forth herein are true of my own personal knowledge, except where stated on information and belief, and as to those facts, I believe them to be true. If called as a witness, I could and would testify to the facts stated herein. I am over 18 years of age.

2. As part of my duties at vBio, I was one of the custodians of the books, correspondence, agreements, records, files, and other documents maintained by vBio. In the ordinary course of its business and consistent with its policies and procedures, a record of all contracts, agreements and correspondence to which vBio or its employees, independent contractors, or agents is a party is maintained by vBio (collectively, the "Records").

3. I am informed and believe that (i) the Records constitute writings taken or made and kept in the course of the regularly conducted business activity of vBio; (ii) it is the regular practice of vBio to have these Records made, kept, and preserved; (iii) such Records are made at or near the time of the acts or events recorded, by employees, agents, or contractors of vBio with a business duty to do so; and (iv) the Records are made by, or are made from information transmitted by, employees, agents, or contractors of vBio who have personal knowledge of the acts and events recorded in such Records and with a business duty to so record such acts and events. This information is maintained by and retrieved from computers, which are programmed for the above purposes. vBio operated in reliance upon these procedures and the accuracy of the written records generated thereby.

4. I have access to vBio's Records, either through vBio's computer systems or in hard-copy files maintained in my office or other storage locations.

5. Based upon my employment at vBio and my duties and responsibilities as its CEO, I am sufficiently acquainted with the method and manner of preparation and maintenance of the Records for the relevant time period. As of the date of this Declaration, I have reviewed the Records relating to vBio's dealings with (i) Marissa Land, Jamil Houston, Ayesha Khan, Lucas Nyabero,

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

1
DECLARATION OF DAVID LEVESQUE

Astrid Stuckelberger, and Firas Abras, the plaintiffs in the above-captioned action (collectively, the "Plaintiffs"), and (ii) Sonaphi, LLC ("Sonaphi"), Resonant Technologies Group, LLC ("RTG"), or Mark Hinds, who are co-defendants in the above-captioned action (collectively, the "Sonaphi Defendants").

6. Based on reviewing the Records pertaining to the Plaintiffs and the Sonaphi Defendants, I affirm that (i) the documents referred to herein and attached as exhibits to be authentic Records of vBio, and (ii) that the following factual statements are true and complete.

7. On or about July 13, 2020, I founded vBio for the purpose of offering management services to vocal biomarker companies. While vBio was operational, vBio retained each of the Plaintiffs as independent contractors:

a. Plaintiff Lucas Nyabero was retained by vBio in August 2020. True and complete copy of Nyabero's first independent contractor agreement with vBio is attached hereto as **Exhibit 1**. At the time of signing the first independent contractor agreement, the software was referencing vBio as the GoNoGo project due to technical issues. Plaintiff was retained by vBio. To the best of my knowledge, before working with vBio, Lucas was the owner of a company offering personalized medicine services. During the working relationship with vBio, Lucas moved from Arizona to Africa to teach at a college and start a BioBank in January of 2021.

b. Plaintiff Firas Abras was retained by vBio in August 2020. True and complete copy of Abras's first independent contractor agreement with vBio is attached hereto as **Exhibit 2**. At the time of signing the first independent contractor agreement, the software was referencing vBio as the GoNoGo project due to technical issues. Plaintiff was retained by vBio. To the best of my knowledge, before working with vBio, Firas Abras was a business and software consultant and an investor in a health industry related startup. During the working relationship with vBio, Firas Abras continued to be a business and software consultant, and continued his work on a health industry related startup.

c. Plaintiff Astrid Stuckelberger was retained by vBio in August 2020. True and complete copy of Stuckelberger's first independent contractor agreement with vBio is attached hereto as **Exhibit 3**. At the time of signing the first independent contractor agreement, the software was referencing vBio as the GoNoGo project due to technical issues. Plaintiff was retained by vBio. To the best of my knowledge, before working with vBio, Astrid was a college professor, medical consultant and a researcher. During the working relationship with vBio, Astrid also continued to be a college professor, a medical consultant and a researcher.

d. Plaintiff Ayesha Khan was retained by vBio in July 2020. True and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

DECLARATION OF DAVID LEVESQUE

complete copy of Khan's first independent contractor agreement with vBio is attached hereto as **Exhibit 4**. At the time of signing the first independent contractor agreement, the software was referencing vBio as the GoNoGo project due to technical issues. Plaintiff was retained by vBio. To the best of my knowledge, before working with vBio, Ayesha was a college student. I do not know whether Ayesha Khan continued the college studies during the working relationship with vBio or had any other occupation or ongoing projects.

       e.     Plaintiff Jamil Houston was retained by vBio in August 2020. True and complete copy of Houston's first independent contractor agreement with vBio is attached hereto as **Exhibit 5**. At the time of signing the first independent contractor agreement, the software was referencing vBio as the GoNoGo project due to technical issues. Plaintiff was retained by vBio. To the best of my knowledge, before working with vBio, Jamil had several independent clients for her branding company. During the working relationship with vBio, I am not aware whether Jamil Houston worked on anything else besides vBio.

       f.     Plaintiff Marissa Land was retained by vBio in October 2020. True and complete copy of Land's first independent contractor agreement with vBio is attached hereto as **Exhibit 6.** At the time of signing the first independent contractor agreement, the software was referencing vBio as the GoNoGo project due to technical issues. Plaintiff was retained by vBio. To the best of my knowledge, before working with vBio, Marissa was unemployed. I am not aware whether Marissa worked on anything else besides vBio.

      8.     At all relevant times, vBio is and was a separate legal entity and not an alter ego of either Sonaphi, RTG, or Mark Hinds. At all relevant times, vBio and Sonaphi never merged, attempted to merge, or take any other action to alter their status as separate and distinct legal entities. Similarly, at all relevant times, vBio and RTG never merged, attempted to merge, or take any other action to alter their status as separate and distinct legal entities.

      9.     At all relevant times, Sonaphi and RTG had never assumed any of vBio's liabilities, and are not and were not successors, assignees, indemnitors, or guarantors of any of vBio's rights, interests or liabilities, as the case may be.

      10.    Mark Hinds never had any ownership interest in vBio or held any position or role in vBio as an officer, director, employee, agent or otherwise.

      11.    On or about September 22, 2020, Sonaphi and vBio entered into a *Contractor and Business Development Agreement* in which vBio was to provide services to Sonaphi regarding the development of vocal analysis technology for the detection of COVID-19 (the "Sonaphi Agreement"). I represented to Mark Hinds that I had a plug-and-play team ready to take Sonaphi's

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

product to market. However, none of the vBio team members, including myself, had prior experience bringing a vocal biomarker app to market. I had no prior experience as a CEO managing a large team, and had only limited experience in clinical trials and algorithm development. I had little experience in the vocal biomarker industry.

12. Before offering their services to Sonaphi under the Sonaphi Agreement, Plaintiffs worked on a project of mine called GoNoGo, which aimed to develop a 60-second voice-based Covid-19 test. Before the Sonaphi Agreement, the plaintiffs performed work for vBio but were not compensated for that work. The events triggering compensation did not occur.

13. I am informed and believe that Sonaphi and RTG are not shell companies. I have been informed and understand that RTG operates a technology company accelerator business and that Sonaphi is one of the companies within RTG's accelerator program.

14. Neither Mark Hinds nor anyone at Sonaphi or RTG directed the duties of the Plaintiffs or anyone else at vBio, supervised their work, nor did Sonaphi or RTG provide instruments, or a physical location to Plaintiffs. Plaintiffs used their own personal laptops.

15. As CEO of vBio, I had the sole authority and discretion to contract with anyone on behalf of vBio. Accordingly, I contracted with the Plaintiffs without any input from Sonaphi, RTG, or Hinds. The Plaintiffs signed their first respective independent contractor agreements with vBio before vBio and Sonaphi ever entered into the Sonaphi Agreement.

16. Sonaphi, RTG, and Hinds were not involved in the negotiation of any part of the first or second sets of independent contractor agreements between vBio and Plaintiffs. Accordingly, Sonaphi, RTG, and Hinds were each unaware of the terms of the first set of independent contractor agreements signed between vBio and Plaintiffs, and the second set of independent contractor agreements signed between vBio and Plaintiffs in November and December of 2020, including without limitation, the terms of compensation.

17. As CEO of vBio, I also had the sole authority and discretion to terminate members of the vBio team, including the Plaintiffs. Accordingly, I made the decision to terminate the Plaintiffs' independent contractor agreements with vBio. The Plaintiffs' independent contractor agreements with vBio were terminated due to inter-team disagreements, lack of performance, and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

failure to provide the deliverables. At the group meeting on or about March 8, 2021, I announced to all of vBio's personnel that vBio will be transitioning. Thereafter, contracts with all of vBio's personnel were terminated. Lucas Nyabero, Marissa Land, Firas Abras, Astrid Stuckelberger and Jamil Houston received termination emails. True and correct copies of emails are attached hereto as **Exhibits 7, 8, 9, 10 and 11,** respectively. After the group meeting of March 8, 2021, Ari Levitt, Mark Sojka and Ayesha Khan were told to stop working until further notice. Plaintiff Ayesha Khan never received a notice to resume services for vBio. vBio ceased to exist in July of 2021. I terminated all of vBio contracts on March 8, 2021 regardless of the individuals' race, national origin, skin color, or any other protected trait.

18.     On or about December 1, 2020, I engaged Joyce Anastasia, a leadership consultant and senior business manager/analyst to provide services regarding improving communication, workflow and work product of the vBio team, including Plaintiffs. I videorecorded each and every session between Joyce Anastasia and the vBio team. Miss Anastasia also created a report of findings attached hereto as **Exhibit 12**.

19.     Mark Hinds was not heavily involved with the creation of the pitch deck that vBio presented to Sonaphi. The pitch deck that vBio presented to Sonaphi included a significant amount of information from a pitch deck that I had created on behalf of GoNoGo project. I started GoNoGo on or about July 7, 2020 for the purpose of demonstrating the concept of a voice-based COVID test.

20.     As previously noted, the Plaintiffs were independent contractors of vBio. Accordingly, I intended to create an independent contractor relationship with the Plaintiffs. I understood that the Plaintiffs intended to do the same.

21.     While the Plaintiffs performed services under the Agreement, I am informed that the some of the Plaintiffs operated their own separate and distinct businesses or projects. vBio did not provide any vBio independent contractor with tools, instruments, or a place to work. However, vBio was responsible for making payments to the Plaintiffs for their services.

22.     Any payment that Sonaphi made directly to the Plaintiffs was done on behalf of vBio and at the direction of vBio and myself. Any such payment was not intended to create any

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

sort of relationship, employment or otherwise, between the Plaintiffs or Sonaphi, or RTG. The reason that Sonaphi made such payments to the Plaintiffs was because vBio did not have a business bank account and therefore could not make the payments itself. At my request, Sonaphi made a deposit into my personal account. My personal account could not process the payments in a timely manner and also could not transfer payments to the international plaintiffs, such as, Lucas Nyabero, Astrid Stuckelberger, and Firas Abras. Thus, at my request and the request of the vBio team, Sonaphi agreed to make payments directly.

23.     At no time did Sonaphi, RTG, or Mark Hinds assume any vBio contract, including the independent contractor agreements between vBio and the Plaintiffs. Accordingly, the Plaintiffs were never employees, agents or independent contractors of either Sonaphi, RTG, or Hinds.

24.     In or about December 2020, vBio and the Plaintiffs entered into new consulting contracts with vBio. Sonaphi, RTG, and Hinds did not participate in the negotiations or drafting of these new consulting contracts, and did not know what compensation vBio had agreed to pay vBio's independent contractors. According to the December 2020 independent contractor agreements, the compensation to independent contractors was agreed to be as follows: a) $12,500.00 monthly to Lucas Nyabero, b) $12,500.00 monthly to Jamil Houston, c) $12,500.00 monthly to Aram Soghikian, d) $12,500.00 monthly to Astrid Stuckelberger, e) $3,125.00 monthly to Firas Abras, f) $12,083.00 to Mark Sojka, g) $11,250.00 to Marissa Land, h) $10,833.00 to Ayesha Khan, i) $1,083.00 monthly to Shane Early. True and complete copies of the Plaintiffs' consulting contracts are attached hereto as **Exhibit 13** for Firas Abras, **Exhibit 14** for Astrid Stuckelberger, **Exhibit 15** for Jamil Houston, **Exhibit 16** for Ayesha Khan, **Exhibit 17** for Lucas Nyabero, **Exhibit 18** for Marissa Land.

25.     No contracts between vBio and RTG or Mark Hinds have ever existed.

26.     The Plaintiffs' August 2020 first set of independent contractor agreements with vBio offered them equity in vBio, not in Sonaphi. However, the conditions necessary to trigger the transfer of equity in vBio to the Plaintiffs never occurred. Therefore, the Plaintiffs were never entitled to any equity in vBio. The Plaintiffs' December 2020 second set of independent contractor agreements with vBio also offered them equity in vBio, not in Sonaphi. However, the conditions

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

1    necessary to trigger the transfer of equity in vBio to the Plaintiffs never occurred. Therefore, the

2    Plaintiffs were never entitled to any equity in vBio.

3            27.     vBio dissolved on July 28, 2021 and no longer exists.

4            28.     It is my understanding that there were business discussions about the proposed

5    contracts between the Plaintiffs and Sonaphi offering equity to the Plaintiffs. I do not know of any

6    contracts that were ever executed between Sonaphi and the Plaintiffs entitling Plaintiffs to equity

7    in Sonaphi.

8            29.     I know that some of the Plaintiffs worked on numerous other projects while they

9    performed services under vBio's agreement with Sonaphi. Accordingly, certain Plaintiffs could

10   not and did not consistently dedicate 40 hours per week to vBio. To the best of my knowledge,

11   Firas Abras, Astrid Stuckelberger and Lucas Nyabero did not dedicate 40 hours per week

12   consistently to vBio. For instance, while working for vBio, Plaintiff Firas Abras was working as a

13   CTO of a software company in Dubai at the same time as working for vBio. Meanwhile, Plaintiff

14   Stuckelberger was a professor and researcher for a myriad of academic and health institutions.

15   Additionally, Plaintiff Lucas Nyabero was an executive for several companies and a professor for

16   several different academic institutions.

17           30.     Below is a summary of how I met each of the Plaintiffs, their role with vBio:

18            a.      Jamil Houston (Creative Director/Chief Branding Officer for vBio).
   Jamil found vBio on Gusher.

19

20            b.      Marissa Land (Senior Marketing Director for vBio). Marissa was
   recruited by Jamil.

21            c.       Firas Abras (Chief Product Officer/Chief Technology Officer for

22    vBio). Firas was recruited by Samina.

23            d.      Ayesha Khan (UI/UX Designer for vBio). Ayesha was recruited by
   Jamil.

24            e.       Astrid Stuckelberger (Head of Research for vBio). Astrid was

25    recruited by me through the AAPM Hackathon.

26            f.       Lucas Nyabero (Chief Sales Officer and Head of Operations for
   vBio). I met Lucas through the AAPM hackathon in June 2020.

27           31.     As independent contractors, each of the Plaintiffs exercised significant discretion

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

7

DECLARATION OF DAVID LEVESQUE

and independent judgment in carrying out their assigned duties for vBio. Accordingly, the Plaintiffs only received general supervision from vBio and they worked remotely from their own locations.

32.     In addition to the Plaintiffs, vBio also hired the following individuals as independent contractors while it was operational:

       a.    Dr. Ari Levitt (Chief Medical Officer for vBio), who, while he was under contract with vBio, was the founder-owner and director of a dance instruction studio in Seattle, Washington. Dr. Levitt did not have any clinical trial experience at the time that I had recruited him for vBio;

       b.    Muzammil Jawed (Chief Financial Officer for vBio), who, while he was under contract with vBio, was a high school student. Muzammil was recruited by Samina Qazi;

       c.    Samina Qazi (Chief Technical Officer for vBio), who, while she was under contract with vBio, was a full-time employee at Wal-Mart. Samina was recruited by me through the AAPM hackathon;

       d.    Aram Soghikian (Audio Scientist for vBio); I am not aware of other projects Aram was engaged in while working for vBio;

       e.    Mark Sojka (Graphic Designer for vBio); I am not aware of other projects Mark was engaged in while working for vBio;

       f.    Shane Early (Software Developer for vBio); who, while he was under contract with vBio, was also a software developer for a health startup.

33.     I am informed and believe that Plaintiff Abras worked remotely from the United Arab Emirates and was not physically present in California during the period of his contract with vBio.

34.     I am informed and believe that Plaintiff Stuckelberger worked remotely from Switzerland and was not physically present in California during the period of his contract with vBio.

35.     I am informed and believe that Plaintiff Nyabero worked remotely from various locations outside California including Arizona and Kenya, and was not physically present in California during the period of his contract with vBio.

36.     The Plaintiffs never complained to me that vBio, Sonaphi, and RTG were violating state and federal wage and hour law before I terminated their contracts with vBio.

37.     The Plaintiffs never complained to me that they were misclassified independent

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

Case: 23-05006   Doc# 30   Filed: 06/29/23   Entered: 06/29/23 16:45:27   Page 33 of 146

contractors and were actually employees before I terminated their contracts with vBio.

38. The Plaintiffs never complained to me that Sonaphi and RTG misclassified them as independent contractors and that they were actually employees of Sonaphi and RTG before I terminated their contracts with vBio. Nor could they have, they were not contracted by Sonaphi or RTG.

39. The Plaintiffs never complained to me that they were divested of equity in vBio.

40. I am not aware of the Plaintiffs' actual entitlement to any equity in Sonaphi. I do not know of any contracts that were ever executed between the Sonaphi Defendants and the Plaintiffs entitling Plaintiffs to equity in Sonaphi as a form of compensation. I am not aware of any divestment in such equity by Plaintiffs.

41. Plaintiff Nyabero never complained to me regarding an alleged violation of HIPAA laws before I terminated his contract with vBio.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 19th day of June 2023 in Pflugerville, Texas.

DAVID LEVESQUE

BUCHALTER NEMER

# EXHIBIT 1

# EQUITY SHARING AGREEMENT

THIS EQUITY SHARING AGREEMENT (this "**Agreement**"), is entered into by and between GoNoGo , a Delaware Corporation (the "**Start-Up**"), and Lucas Nyabero , an Individual, and United States resident ("**Entrepreneur**"), as of 09 Dec 2020 (the "**Effective Date**"). Start-Up and Entrepreneur may each hereafter be individually referred to as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Start-Up and Entrepreneur are members of Gusher, a web-based collaboration platform for early-stage companies ("**Gusher**"); and

WHEREAS, in connection with the commercial launch of Start-Up (the "**Launch**"), Start-Up desires to engage various entrepreneurs to perform services for Start-Up in exchange for a portion of Start-Up's equity upon the Launch; and

WHEREAS, Start-Up desires to engage Entrepreneur, through Gusher, to complete the Project (as defined below), and Entrepreneur desires to complete the Project, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the adequacy of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

**1.      Project.**

**1.1     Scope of Project**. During the Term of this Agreement, Entrepreneur shall

1.1.1 Develop sales system
; 1.1.2 Train sales team; 1.1.3 Develop pricing strategy
; 1.1.4 Collaborate and work with team as needed; 1.1.5 Be on time for all meetings; 1.1.6 Complete tasks on time; 1.1.7 Target $100k in revenue one month after study completion; 1.1.8 Attend weekly team meetings on time; 1.1.9 Work with marketing to generate enough revenue to be cash flow positive in 12 months;

for Start-Up (the "**Project**").

EAST\109559361.10

Doc ID: 716dd1bf970e01d3a3ddeb68cbddf6a51592ef25

**1.2   Equity Award**.  Upon the Launch, Start-up shall issue to Entrepreneur, two point five zero zero zero (2.500%) of Start-Up's issued and outstanding common stock, on a fully-diluted basis (the "**Equity Award**"), subject to commercially reasonable restrictions on transferability.

**2.   Confidentiality and Non-Use; Improvements.**

**2.1   Confidentiality and Non-Use**.  In connection with the Project, Start-Up has disclosed or may disclose to Entrepreneur certain non-public information, including, without limitation, information relating to Start-Up's business plans, technology, product plans, products, developments, inventions, processes, designs, drawings, formulae, markets, software (including source and object code), hardware, agreements with third parties, services, customers, marketing or finances, whether in tangible or intangible form (collectively, "**Confidential Information**").  Entrepreneur shall use the Confidential Information solely in connection with the Project and shall not without the express written permission of Start-Up reverse engineer, reverse compile or otherwise attempt to derive the composition or underlying information, structure or ideas of any Confidential Information.  Entrepreneur shall hold the Confidential Information in strict confidence and shall not disclose any Confidential Information to any person or entity; provided, that Confidential Information may be disclosed to Gusher Co. and to those employees or contractors of Entrepreneur who (a) have a need to know the Confidential Information in connection with the Project, and (b) are bound in writing by obligations of confidentiality at least as restrictive as the obligations hereunder.  Entrepreneur shall promptly notify Start-Up of any unauthorized release of, access to, or use of Confidential Information.

**2.2   Equitable Relief**.  Entrepreneur acknowledges and agrees that due to the unique nature of the Confidential Information, any breach of this agreement may cause irreparable harm to Start-Up for which damages are not an adequate remedy, and, accordingly, Start-up shall be entitled to seek equitable relief in addition to all other remedies available at law.  Entrepreneur further agrees that no bond or other security shall be required in obtaining any equitable relief.

**2.3   No License; Improvements**.  All right, title, and interest in and to the Confidential Information, including all intellectual property rights thereto and therein, are owned by Start-Up and nothing in this Agreement shall grant Entrepreneur any ownership rights in or to the Confidential Information.  Any and all enhancements, improvements, discoveries, derivatives and modifications, data and work product, whether or not patentable, made by Entrepreneur in performance of its obligations under this Agreement or made to the Confidential Information, exclusively or with any other person or entity ("**Improvements**"), shall be solely owned by Start-Up.  Start-Up's ownership of the Improvements include all intellectual property rights, including any patents and the right to pursue the same. Entrepreneur hereby assigns all right, title, and interest in the Improvements to Start-Up.  Entrepreneur shall reasonably assist Start-Up in recording and perfecting Start-Up's rights in and to the Improvements.  Notwithstanding the foregoing, and for clarity, any technology owned or controlled by Entrepreneur prior to the Effective Date of this Agreement and not based

EAST\109559361.10

Doc ID: 716dd1bf970e01d3a3ddeb68cbddf6a51592ef25

on or derived from any Confidential Information ("**Pre-existing Technology**") shall remain Entrepreneur's property and Start-Up shall have no rights or interests in such Pre-existing Technology.

## 3. Term and Termination.

**3.1 Term**. The term of this Agreement shall begin on the Effective Date and shall continue until the Project is complete (the "**Term**") unless earlier terminated pursuant to Section 3.2.

**3.2 Termination**. This Agreement may be terminated as follows:

**(a)** by Start-Up, immediately upon providing written notice to Entrepreneur, in the event that Entrepreneur fails to complete the Project substantially as contemplated by this Agreement; or

**(b)** by Entrepreneur or Start-Up upon ten (10) days' written notice to the other Party, provided that the Project is not substantially complete as of the time such written notice is provided.

In the event of a termination pursuant to this Section 3.2, Start-Up shall have no obligation to issue the Equity Award.

**3.3 Survival**. In the event this Agreement is terminated, (a) the provisions of Section 1.2, Section 2.2, Section 2.3, and Articles 3 – 4, inclusive, shall survive indefinitely, and (b) the provisions of Section 2.1 shall survive for two (2) years following such termination. The termination of this Agreement shall not impair any right or obligation of any party accruing prior to the effective date of such expiration or termination.

## 4. Miscellaneous.

**4.1 Representations and Warranties**.

**(a)** Entrepreneur hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to complete the Project hereunder.

**(b)** Start-Up hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to grant the Equity Award as contemplated by this Agreement.

**4.2 Independent Contractor**. The Parties shall not be considered partners, co-venturers, agents, employees or representatives of each other. The Parties shall remain in all respects independent contractors, and neither Party shall have any right or authority to make or undertake any promise, warranty or representation, to execute any contract or otherwise to assume any obligation in the name of or on behalf of the other Party. Neither Party's employees are, nor shall they be deemed to be, employees of the other Party.

EAST\109559361.10

Doc ID: 716dd1bf970e01d3a3ddeb68cbddf6a51592ef25

**4.3    Notices**. All notices and other communications required or permitted hereunder shall be in writing and deemed to have been given when hand delivered, sent by facsimile or email, with confirmation of receipt, or mailed by registered or certified mail or overnight courier with tracking capabilities, as follows or as a Party may otherwise notify to the other in accordance with this Section 4.3 (provided that such notice of change of address or recipient shall be deemed given only when received):

If to Startup-Up:

GoNoGo

3507 Palmilla Drive

Suite 3155

San Jose, CA 95134

davidcares33@gmail.com

Attn: David Levesque

If to Entrepreneur:

Lucas Nyabero

9718 East Gelding Drive

Scottsdale, AZ 85260

DrNyabero@ElaraWellness.com

Attn: Lucas Nyabero

**4.4    Start-Up Property; Return**. Promptly upon the expiration or termination of this Agreement, and earlier if requested by Start-Up, Entrepreneur shall deliver to Start-Up (and shall not keep in Entrepreneur's possession or deliver to anyone else) all Confidential Information of Start-Up (including all embodiments thereof) and all software, documentation, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, or any other work product whatsoever, developed by Entrepreneur as part of or in connection with the Project or otherwise belonging to Start-Up.

**4.5    Assignment; No Third Party Beneficiaries**. No Party may assign this Agreement without the prior written consent of the other Party. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer on any person or entity other than the parties hereto or their respective successors, heirs, and permitted assigns, any benefits, rights or remedies.

**4.6    Governing Law, Jurisdiction and Attorney Fees**. This Agreement shall be governed by and interpreted in accordance with laws of the State of Delaware without giving effect to any conflict of laws provisions. Any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement shall be brought in any court of general jurisdiction in the State of Delaware. The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover its reasonable attorneys' fees and costs.

**4.7    Entire Agreement, Amendment and Waiver**. This Agreement contains the sole agreement between the Parties with respect to the subject matter hereof and it supersedes all prior agreements and understandings with respect thereto, whether oral or written. No amendment, supplement or other

modification to any provision of this Agreement shall be binding unless in writing and signed by the Parties. No waiver of any rights under this Agreement shall be effective unless in writing signed by the Party to be charged. A waiver of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

**4.8    Severability**.   If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

**4.9    Headings**.   The headings in this Agreement are intended solely for convenience or reference and shall be given no effect in the construction or interpretation of this Agreement.

**4.10    Counterparts**.   This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have duly executed this Agreement as of the Effective Date.

GoNoGo                                              Lucas Nyabero

_____        _____
Authorized Signature                               Authorized Signature

Name:  David Levesque                          Name:  Lucas Nyabero

Title:   Founder                                    Title:   Chief Revenue Officer

EAST\109559361.10

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 40 of 146
Doc ID: 716dd1bf970e01d3a3ddeb68cbddf6a51592ef25


| | |
|---|---|
| **TITLE** | Gusher ESA - Startup and Entrepreneur |
| **FILE NAME** | Gusher Equity Sha... Entrepreneur.pdf |
| **DOCUMENT ID** | 716dd1bf970e01d3a3ddeb68cbddf6a51592ef25 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was signed on gusher.co**

## Document History

| | | |
|---|---|---|
| **SENT** | **12 / 09 / 2020** 15:52:30 UTC | Sent for signature to David Levesque (davidcares33@gmail.com) and Lucas Nyabero (DrNyabero@ElaraWellness.com) from tech@gusher.co IP: 3.231.211.84 |
| **VIEWED** | **12 / 09 / 2020** 15:52:31 UTC | Viewed by David Levesque (davidcares33@gmail.com) IP: 73.231.146.21 |
| **SIGNED** | **12 / 09 / 2020** 15:52:54 UTC | Signed by David Levesque (davidcares33@gmail.com) IP: 73.231.146.21 |
| **VIEWED** | **12 / 10 / 2020** 13:14:12 UTC | Viewed by Lucas Nyabero (drnyabero@elarawellness.com) IP: 95.31.50.154 |
| **SIGNED** | **12 / 10 / 2020** 19:49:59 UTC | Signed by Lucas Nyabero (drnyabero@elarawellness.com) IP: 172.58.139.162 |
| **COMPLETED** | **12 / 10 / 2020** 19:49:59 UTC | The document has been completed. |

Powered by ▼ HELLOSIGN

# EXHIBIT 2

# EQUITY SHARING AGREEMENT

THIS EQUITY SHARING AGREEMENT (this "**Agreement**"), is entered into by and between GoNoGo , a Delaware Corporation (the "**Start-Up**"), and Firas Abras , an Individual, and United Arab Emirates resident ("**Entrepreneur**"), as of 04 Aug 2020 (the "**Effective Date**"). Start-Up and Entrepreneur may each hereafter be individually referred to as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Start-Up and Entrepreneur are members of Gusher, a web-based collaboration platform for early-stage companies ("**Gusher**"); and

WHEREAS, in connection with the commercial launch of Start-Up (the "**Launch**"), Start-Up desires to engage various entrepreneurs to perform services for Start-Up in exchange for a portion of Start-Up's equity upon the Launch; and

WHEREAS, Start-Up desires to engage Entrepreneur, through Gusher, to complete the Project (as defined below), and Entrepreneur desires to complete the Project, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the adequacy of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

1. **Project.**

1.1 **Scope of Project**. During the Term of this Agreement, Entrepreneur shall

1.1.1 Define product features; 1.1.2 Define product priorities; 1.1.3 Manage the product team; 1.1.4 Evaluate technical and financial options; 1.1.5 Support sales teams; 1.1.6 Support customers; 1.1.7 Lead customer implementation process; 1.1.8 Work with the team as needed;

for Start-Up (the "**Project**").

EAST\109559361.10

Doc ID: d3c460e001b26ed349812592751ef7c0169eb159

**1.2     Equity Award**.  Upon the Launch, Start-up shall issue to Entrepreneur, two point five zero zero zero (2.500%) of Start-Up's issued and outstanding common stock, on a fully-diluted basis (the "**Equity Award**"), subject to commercially reasonable restrictions on transferability.

**2.     Confidentiality and Non-Use; Improvements.**

**2.1     Confidentiality and Non-Use**.  In connection with the Project, Start-Up has disclosed or may disclose to Entrepreneur certain non-public information, including, without limitation, information relating to Start-Up's business plans, technology, product plans, products, developments, inventions, processes, designs, drawings, formulae, markets, software (including source and object code), hardware, agreements with third parties, services, customers, marketing or finances, whether in tangible or intangible form (collectively, "**Confidential Information**").  Entrepreneur shall use the Confidential Information solely in connection with the Project and shall not without the express written permission of Start-Up reverse engineer, reverse compile or otherwise attempt to derive the composition or underlying information, structure or ideas of any Confidential Information.  Entrepreneur shall hold the Confidential Information in strict confidence and shall not disclose any Confidential Information to any person or entity; provided, that Confidential Information may be disclosed to Gusher Co. and to those employees or contractors of Entrepreneur who (a) have a need to know the Confidential Information in connection with the Project, and (b) are bound in writing by obligations of confidentiality at least as restrictive as the obligations hereunder.  Entrepreneur shall promptly notify Start-Up of any unauthorized release of, access to, or use of Confidential Information.

**2.2     Equitable Relief**.  Entrepreneur acknowledges and agrees that due to the unique nature of the Confidential Information, any breach of this agreement may cause irreparable harm to Start-Up for which damages are not an adequate remedy, and, accordingly, Start-up shall be entitled to seek equitable relief in addition to all other remedies available at law.  Entrepreneur further agrees that no bond or other security shall be required in obtaining any equitable relief.

**2.3     No License; Improvements**.  All right, title, and interest in and to the Confidential Information, including all intellectual property rights thereto and therein, are owned by Start-Up and nothing in this Agreement shall grant Entrepreneur any ownership rights in or to the Confidential Information.  Any and all enhancements, improvements, discoveries, derivatives and modifications, data and work product, whether or not patentable, made by Entrepreneur in performance of its obligations under this Agreement or made to the Confidential Information, exclusively or with any other person or entity ("**Improvements**"), shall be solely owned by Start-Up.  Start-Up's ownership of the Improvements include all intellectual property rights, including any patents and the right to pursue the same. Entrepreneur hereby assigns all right, title, and interest in the Improvements to Start-Up.  Entrepreneur shall reasonably assist Start-Up in recording and perfecting Start-Up's rights in and to the Improvements.  Notwithstanding the foregoing, and for clarity, any technology owned or controlled by Entrepreneur prior to the Effective Date of this Agreement and not based

Doc ID: d3c460e001b26ed349812592751ef7c0169eb159

on or derived from any Confidential Information ("**Pre-existing Technology**") shall remain Entrepreneur's property and Start-Up shall have no rights or interests in such Pre-existing Technology.

**3.**      **Term and Termination.**

**3.1**      **Term**.  The term of this Agreement shall begin on the Effective Date and shall continue until the Project is complete (the "**Term**") unless earlier terminated pursuant to Section 3.2.

**3.2**      **Termination**.  This Agreement may be terminated as follows:

**(a)**      by Start-Up, immediately upon providing written notice to Entrepreneur, in the event that Entrepreneur fails to complete the Project substantially as contemplated by this Agreement; or

**(b)**      by Entrepreneur or Start-Up upon ten (10) days' written notice to the other Party, provided that the Project is not substantially complete as of the time such written notice is provided.

In the event of a termination pursuant to this Section 3.2, Start-Up shall have no obligation to issue the Equity Award.

**3.3**      **Survival**.  In the event this Agreement is terminated, (a) the provisions of Section 1.2, Section 2.2, Section 2.3, and Articles 3 – 4, inclusive, shall survive indefinitely, and (b) the provisions of Section 2.1 shall survive for two (2) years following such termination.  The termination of this Agreement shall not impair any right or obligation of any party accruing prior to the effective date of such expiration or termination.

**4.**      **Miscellaneous.**

**4.1**      **Representations and Warranties**.

**(a)**      Entrepreneur hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to complete the Project hereunder.

**(b)**      Start-Up hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to grant the Equity Award as contemplated by this Agreement.

**4.2**      **Independent Contractor**.  The Parties shall not be considered partners, co-venturers, agents, employees or representatives of each other.  The Parties shall remain in all respects independent contractors, and neither Party shall have any right or authority to make or undertake any promise, warranty or representation, to execute any contract or otherwise to assume any obligation in the name of or on behalf of the other Party.  Neither Party's employees are, nor shall they be deemed to be, employees of the other Party.

EAST\109559361.10

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 45 of 146
Doc ID: d3c460e001b26ed349812592751ef7c0169eb159

**4.3** **Notices**. All notices and other communications required or permitted hereunder shall be in writing and deemed to have been given when hand delivered, sent by facsimile or email, with confirmation of receipt, or mailed by registered or certified mail or overnight courier with tracking capabilities, as follows or as a Party may otherwise notify to the other in accordance with this Section 4.3 (provided that such notice of change of address or recipient shall be deemed given only when received):

If to Startup-Up:

GoNoGo

3507 Palmilla Drive

Suite 3155

San Jose, CA 95134

davidcares33@gmail.com

Attn: David Levesque

If to Entrepreneur:

Firas Abras

Wasl Business Center

Suite 901

Dubai, United Arab Emirates

f_abras@yahoo.com

Attn: Firas Abras

**4.4** **Start-Up Property; Return**. Promptly upon the expiration or termination of this Agreement, and earlier if requested by Start-Up, Entrepreneur shall deliver to Start-Up (and shall not keep in Entrepreneur's possession or deliver to anyone else) all Confidential Information of Start-Up (including all embodiments thereof) and all software, documentation, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, or any other work product whatsoever, developed by Entrepreneur as part of or in connection with the Project or otherwise belonging to Start-Up.

**4.5** **Assignment; No Third Party Beneficiaries**. No Party may assign this Agreement without the prior written consent of the other Party. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer on any person or entity other than the parties hereto or their respective successors, heirs, and permitted assigns, any benefits, rights or remedies.

**4.6** **Governing Law, Jurisdiction and Attorney Fees**. This Agreement shall be governed by and interpreted in accordance with laws of the State of Delaware without giving effect to any conflict of laws provisions. Any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement shall be brought in any court of general jurisdiction in the State of Delaware. The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover its reasonable attorneys' fees and costs.

**4.7** **Entire Agreement, Amendment and Waiver**. This Agreement contains the sole agreement between the Parties with respect to the subject matter hereof and it supersedes all prior agreements and understandings with respect thereto, whether oral or written. No amendment, supplement or other

EAST\109559361.10

Doc ID: d3c460e001b26ed349812592751ef7c0169eb159

modification to any provision of this Agreement shall be binding unless in writing and signed by the Parties. No waiver of any rights under this Agreement shall be effective unless in writing signed by the Party to be charged. A waiver of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

**4.8 Severability**. If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

**4.9 Headings**. The headings in this Agreement are intended solely for convenience or reference and shall be given no effect in the construction or interpretation of this Agreement.

**4.10 Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have duly executed this Agreement as of the Effective Date.

GoNoGo

_David Levesque_

_____
Authorized Signature

Name: David Levesque
Title: Founder

Firas Abras

_____
Authorized Signature

Name: Firas Abras
Title: Chief Product Officer

EAST\109559361.10

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 47 of 146
Doc ID: d3c460e001b26ed349812592751ef7c0169eb159


| TITLE | Gusher ESA - Startup and Entrepreneur |
|---|---|
| FILE NAME | Gusher Equity Sha... Entrepreneur.pdf |
| DOCUMENT ID | d3c460e001b26ed349812592751ef7c0169eb159 |
| AUDIT TRAIL DATE FORMAT | MM / DD / YYYY |
| STATUS | • Completed |

**This document was signed on gusher.co**

## Document History

| | | |
|---|---|---|
| SENT | **08 / 04 / 2020**<br>18:35:16 UTC | Sent for signature to David Levesque (davidcares33@gmail.com) and Firas Abras (f_abras@yahoo.com) from tech@gusher.co<br>IP: 3.228.220.225 |
| VIEWED | **08 / 04 / 2020**<br>18:35:17 UTC | Viewed by Firas Abras (f_abras@yahoo.com)<br>IP: 2.48.230.210 |
| SIGNED | **08 / 04 / 2020**<br>18:38:26 UTC | Signed by Firas Abras (f_abras@yahoo.com)<br>IP: 2.48.230.210 |
| VIEWED | **08 / 04 / 2020**<br>19:17:17 UTC | Viewed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| SIGNED | **11 / 30 / 2020**<br>19:15:56 UTC | Signed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| COMPLETED | **11 / 30 / 2020**<br>19:15:56 UTC | The document has been completed. |

# EXHIBIT 3

**EQUITY SHARING AGREEMENT**

THIS EQUITY SHARING AGREEMENT (this "**Agreement**"), is entered into by and between GoNoGo , a Delaware Corporation (the "**Start-Up**"), and astrid Stuckelberger , an Individual, and Switzerland resident ("**Entrepreneur**"), as of  10 Sep 2020 (the "**Effective Date**").  Start-Up and Entrepreneur may each hereafter be individually referred to as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Start-Up and Entrepreneur are members of Gusher, a web-based collaboration platform for early-stage companies ("**Gusher**"); and

WHEREAS, in connection with the commercial launch of Start-Up (the "**Launch**"), Start-Up desires to engage various entrepreneurs to perform services for Start-Up in exchange for a portion of Start-Up's equity upon the Launch; and

WHEREAS, Start-Up desires to engage Entrepreneur, through Gusher, to complete the Project (as defined below), and Entrepreneur desires to complete the Project, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the adequacy of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

1. **Project.**

1.1 **Scope of Project**.  During the Term of this Agreement, Entrepreneur shall

1.1.1 Monitor research and standards of care in our clinical areas of interest; 1.1.2 Work with Chief medical officer on clinical content development; 1.1.3 Develop new research topics; 1.1.4 Collaborate and work with team as needed; 1.1.5 Be on time for all meetings; 1.1.6 Complete tasks on time; 1.1.7 Design and implement clinical trials; 1.1.8 Work with external vendors; 1.1.9 Write trial summaries and readouts; 1.1.10 Present trial results at conferences, webinars; 1.1.11 Manage the regulatory process in each country; 1.1.12 Support communication with clinicians;

for Start-Up (the "**Project**").

**1.2 Equity Award**. Upon the Launch, Start-up shall issue to Entrepreneur, two point zero zero zero zero (2.0000%) of Start-Up's issued and outstanding common stock, on a fully-diluted basis (the "**Equity Award**"), subject to commercially reasonable restrictions on transferability.

**2. Confidentiality and Non-Use; Improvements.**

**2.1 Confidentiality and Non-Use**. In connection with the Project, Start-Up has disclosed or may disclose to Entrepreneur certain non-public information, including, without limitation, information relating to Start-Up's business plans, technology, product plans, products, developments, inventions, processes, designs, drawings, formulae, markets, software (including source and object code), hardware, agreements with third parties, services, customers, marketing or finances, whether in tangible or intangible form (collectively, "**Confidential Information**"). Entrepreneur shall use the Confidential Information solely in connection with the Project and shall not without the express written permission of Start-Up reverse engineer, reverse compile or otherwise attempt to derive the composition or underlying information, structure or ideas of any Confidential Information. Entrepreneur shall hold the Confidential Information in strict confidence and shall not disclose any Confidential Information to any person or entity; provided, that Confidential Information may be disclosed to Gusher Co. and to those employees or contractors of Entrepreneur who (a) have a need to know the Confidential Information in connection with the Project, and (b) are bound in writing by obligations of confidentiality at least as restrictive as the obligations hereunder. Entrepreneur shall promptly notify Start-Up of any unauthorized release of, access to, or use of Confidential Information.

**2.2 Equitable Relief**. Entrepreneur acknowledges and agrees that due to the unique nature of the Confidential Information, any breach of this agreement may cause irreparable harm to Start-Up for which damages are not an adequate remedy, and, accordingly, Start-up shall be entitled to seek equitable relief in addition to all other remedies available at law. Entrepreneur further agrees that no bond or other security shall be required in obtaining any equitable relief.

**2.3 No License; Improvements**. All right, title, and interest in and to the Confidential Information, including all intellectual property rights thereto and therein, are owned by Start-Up and nothing in this Agreement shall grant Entrepreneur any ownership rights in or to the Confidential Information. Any and all enhancements, improvements, discoveries, derivatives and modifications, data and work product, whether or not patentable, made by Entrepreneur in performance of its obligations under this Agreement or made to the Confidential Information, exclusively or with any other person or entity ("**Improvements**"), shall be solely owned by Start-Up. Start-Up's ownership of the Improvements include all intellectual property rights, including any patents and the right to pursue the same. Entrepreneur hereby assigns all right, title, and interest in the Improvements to Start-Up. Entrepreneur shall reasonably assist Start-Up in recording and perfecting Start-Up's rights in and to the Improvements. Notwithstanding the foregoing, and for clarity, any technology owned or controlled by Entrepreneur prior to the Effective Date of this Agreement and not based

Doc ID: afcf0e4604c2c7694412a9d7b0e5ce68da229040

on or derived from any Confidential Information ("**Pre-existing Technology**") shall remain Entrepreneur's property and Start-Up shall have no rights or interests in such Pre-existing Technology.

## 3. Term and Termination.

**3.1 Term**. The term of this Agreement shall begin on the Effective Date and shall continue until the Project is complete (the "**Term**") unless earlier terminated pursuant to Section 3.2.

**3.2 Termination**. This Agreement may be terminated as follows:

**(a)** by Start-Up, immediately upon providing written notice to Entrepreneur, in the event that Entrepreneur fails to complete the Project substantially as contemplated by this Agreement; or

**(b)** by Entrepreneur or Start-Up upon ten (10) days' written notice to the other Party, provided that the Project is not substantially complete as of the time such written notice is provided.

In the event of a termination pursuant to this Section 3.2, Start-Up shall have no obligation to issue the Equity Award.

**3.3 Survival**. In the event this Agreement is terminated, (a) the provisions of Section 1.2, Section 2.2, Section 2.3, and Articles 3 – 4, inclusive, shall survive indefinitely, and (b) the provisions of Section 2.1 shall survive for two (2) years following such termination. The termination of this Agreement shall not impair any right or obligation of any party accruing prior to the effective date of such expiration or termination.

## 4. Miscellaneous.

**4.1 Representations and Warranties**.

**(a)** Entrepreneur hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to complete the Project hereunder.

**(b)** Start-Up hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to grant the Equity Award as contemplated by this Agreement.

**4.2 Independent Contractor**. The Parties shall not be considered partners, co-venturers, agents, employees or representatives of each other. The Parties shall remain in all respects independent contractors, and neither Party shall have any right or authority to make or undertake any promise, warranty or representation, to execute any contract or otherwise to assume any obligation in the name of or on behalf of the other Party. Neither Party's employees are, nor shall they be deemed to be, employees of the other Party.

EAST\109559361.10

Case: 23-05006   Doc# 30   Filed: 06/29/23   Entered: 06/29/23 16:45:27   Page 52 of 146
Doc ID: afcf0e4604c2c7694412a9d7b0e5ce68da229040

**4.3** **Notices**. All notices and other communications required or permitted hereunder shall be in writing and deemed to have been given when hand delivered, sent by facsimile or email, with confirmation of receipt, or mailed by registered or certified mail or overnight courier with tracking capabilities, as follows or as a Party may otherwise notify to the other in accordance with this Section 4.3 (provided that such notice of change of address or recipient shall be deemed given only when received):

If to Startup-Up:

GoNoGo
3507 Palmilla Drive
Suite 3155
San Jose, CA 95134
davidcares33@gmail.com
Attn: David Levesque

If to Entrepreneur:

astrid Stuckelberger
16 rue Butini

1202 Geneva, Switzerland
asdiams@gmail.com
Attn: astrid Stuckelberger

**4.4** **Start-Up Property; Return**. Promptly upon the expiration or termination of this Agreement, and earlier if requested by Start-Up, Entrepreneur shall deliver to Start-Up (and shall not keep in Entrepreneur's possession or deliver to anyone else) all Confidential Information of Start-Up (including all embodiments thereof) and all software, documentation, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, or any other work product whatsoever, developed by Entrepreneur as part of or in connection with the Project or otherwise belonging to Start-Up.

**4.5** **Assignment; No Third Party Beneficiaries**. No Party may assign this Agreement without the prior written consent of the other Party. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer on any person or entity other than the parties hereto or their respective successors, heirs, and permitted assigns, any benefits, rights or remedies.

**4.6** **Governing Law, Jurisdiction and Attorney Fees**. This Agreement shall be governed by and interpreted in accordance with laws of the State of Delaware without giving effect to any conflict of laws provisions. Any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement shall be brought in any court of general jurisdiction in the State of Delaware. The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover its reasonable attorneys' fees and costs.

**4.7** **Entire Agreement, Amendment and Waiver**. This Agreement contains the sole agreement between the Parties with respect to the subject matter hereof and it supersedes all prior agreements and understandings with respect thereto, whether oral or written. No amendment, supplement or other

Doc ID: afcf0e4604c2c7694412a9d7b0e5ce68da229040

modification to any provision of this Agreement shall be binding unless in writing and signed by the Parties. No waiver of any rights under this Agreement shall be effective unless in writing signed by the Party to be charged. A waiver of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

**4.8 Severability**. If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

**4.9 Headings**. The headings in this Agreement are intended solely for convenience or reference and shall be given no effect in the construction or interpretation of this Agreement.

**4.10 Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have duly executed this Agreement as of the Effective Date.

GoNoGo                                                astrid Stuckelberger

*David Levesque*                        *astrid Stuckelberger*

_____        _____
Authorized Signature                        Authorized Signature

Name:  David Levesque                      Name:  astrid Stuckelberger
Title:    Founder                                   Title:    Head of Clinical Research

EAST\109559361.10

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 54 of 146
Doc ID: afcf0e4604c2c7694412a9d7b0e5ce68da229040


| | |
|---|---|
| **TITLE** | Gusher ESA - Startup and Entrepreneur |
| **FILE NAME** | Gusher Equity Sha... Entrepreneur.pdf |
| **DOCUMENT ID** | afcf0e4604c2c7694412a9d7b0e5ce68da229040 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was signed on gusher.co**

## Document History

| | | |
|---|---|---|
| **SENT** | **09 / 10 / 2020**<br>17:08:26 UTC | Sent for signature to David Levesque (davidcares33@gmail.com) and astrid Stuckelberger (asdiams@gmail.com) from tech@gusher.co<br>IP: 35.153.145.16 |
| **VIEWED** | **09 / 10 / 2020**<br>17:08:29 UTC | Viewed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| **SIGNED** | **09 / 10 / 2020**<br>17:09:19 UTC | Signed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| **VIEWED** | **09 / 10 / 2020**<br>17:10:01 UTC | Viewed by astrid Stuckelberger (asdiams@gmail.com)<br>IP: 31.165.93.11 |
| **SIGNED** | **09 / 10 / 2020**<br>17:11:23 UTC | Signed by astrid Stuckelberger (asdiams@gmail.com)<br>IP: 31.165.93.11 |
| **COMPLETED** | **09 / 10 / 2020**<br>17:11:23 UTC | The document has been completed. |

# EXHIBIT 4

**EQUITY SHARING AGREEMENT**

THIS EQUITY SHARING AGREEMENT (this "**Agreement**"), is entered into by and between GoNoGo , a Delaware Corporation (the "**Start-Up**"), and Ayesha Khan , an Individual, and United States resident ("**Entrepreneur**"), as of 01 Sep 2020 (the "**Effective Date**"). Start-Up and Entrepreneur may each hereafter be individually referred to as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Start-Up and Entrepreneur are members of Gusher, a web-based collaboration platform for early-stage companies ("**Gusher**"); and

WHEREAS, in connection with the commercial launch of Start-Up (the "**Launch**"), Start-Up desires to engage various entrepreneurs to perform services for Start-Up in exchange for a portion of Start-Up's equity upon the Launch; and

WHEREAS, Start-Up desires to engage Entrepreneur, through Gusher, to complete the Project (as defined below), and Entrepreneur desires to complete the Project, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the adequacy of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

**1.     Project.**

**1.1     Scope of Project**.  During the Term of this Agreement, Entrepreneur shall

1.1.1 Support marketing team in creating consistent branding across all mediums: website, app, slide decks, whitepapers, etc.; 1.1.2 Create remarkable, clickable visuals for ads and presentations; 1.1.3 Create stories that move people: video, audio, photo, text; 1.1.4 Use human centered design strategies; 1.1.5 Design with human nature in mind - psychology, biology, hierarchy of needs; 1.1.6 Continuous learning about sales and marketing and graphic design; 1.1.7 Work with the team as needed; 1.1.8 Be on time for all meetings
;

for Start-Up (the "**Project**").

EAST\109559361.10

*AK   DL*

Doc ID: 21cf803778b9f6652a1b0032c2e5e543ff6628e4

**1.2  Equity Award**.  Upon the Launch, Start-up shall issue to Entrepreneur, one point zero zero zero zero ($1.000$%) of Start-Up's issued and outstanding common stock, on a fully-diluted basis (the "**Equity Award**"), subject to commercially reasonable restrictions on transferability.

**2.  Confidentiality and Non-Use; Improvements.**

**2.1  Confidentiality and Non-Use**.  In connection with the Project, Start-Up has disclosed or may disclose to Entrepreneur certain non-public information, including, without limitation, information relating to Start-Up's business plans, technology, product plans, products, developments, inventions, processes, designs, drawings, formulae, markets, software (including source and object code), hardware, agreements with third parties, services, customers, marketing or finances, whether in tangible or intangible form (collectively, "**Confidential Information**").  Entrepreneur shall use the Confidential Information solely in connection with the Project and shall not without the express written permission of Start-Up reverse engineer, reverse compile or otherwise attempt to derive the composition or underlying information, structure or ideas of any Confidential Information.  Entrepreneur shall hold the Confidential Information in strict confidence and shall not disclose any Confidential Information to any person or entity; provided, that Confidential Information may be disclosed to Gusher Co. and to those employees or contractors of Entrepreneur who (a) have a need to know the Confidential Information in connection with the Project, and (b) are bound in writing by obligations of confidentiality at least as restrictive as the obligations hereunder.  Entrepreneur shall promptly notify Start-Up of any unauthorized release of, access to, or use of Confidential Information.

**2.2  Equitable Relief**.  Entrepreneur acknowledges and agrees that due to the unique nature of the Confidential Information, any breach of this agreement may cause irreparable harm to Start-Up for which damages are not an adequate remedy, and, accordingly, Start-up shall be entitled to seek equitable relief in addition to all other remedies available at law.  Entrepreneur further agrees that no bond or other security shall be required in obtaining any equitable relief.

**2.3  No License; Improvements**.  All right, title, and interest in and to the Confidential Information, including all intellectual property rights thereto and therein, are owned by Start-Up and nothing in this Agreement shall grant Entrepreneur any ownership rights in or to the Confidential Information.  Any and all enhancements, improvements, discoveries, derivatives and modifications, data and work product, whether or not patentable, made by Entrepreneur in performance of its obligations under this Agreement or made to the Confidential Information, exclusively or with any other person or entity ("**Improvements**"), shall be solely owned by Start-Up.  Start-Up's ownership of the Improvements include all intellectual property rights, including any patents and the right to pursue the same. Entrepreneur hereby assigns all right, title, and interest in the Improvements to Start-Up.  Entrepreneur shall reasonably assist Start-Up in recording and perfecting Start-Up's rights in and to the Improvements.  Notwithstanding the foregoing, and for clarity, any technology owned or controlled by Entrepreneur prior to the Effective Date of this Agreement and not based

Case: 23-05006   Doc# 30   Filed: 06/29/23   Entered: 06/29/23 16:45:27   Page 58 of 146
Doc ID: 21cf803778b9f6652a1b0032c2e5e543ff6628e4

on or derived from any Confidential Information ("**Pre-existing Technology**") shall remain Entrepreneur's property and Start-Up shall have no rights or interests in such Pre-existing Technology.

## 3. Term and Termination.

**3.1 Term**. The term of this Agreement shall begin on the Effective Date and shall continue until the Project is complete (the "**Term**") unless earlier terminated pursuant to Section 3.2.

**3.2 Termination**. This Agreement may be terminated as follows:

**(a)** by Start-Up, immediately upon providing written notice to Entrepreneur, in the event that Entrepreneur fails to complete the Project substantially as contemplated by this Agreement; or

**(b)** by Entrepreneur or Start-Up upon ten (10) days' written notice to the other Party, provided that the Project is not substantially complete as of the time such written notice is provided.

In the event of a termination pursuant to this Section 3.2, Start-Up shall have no obligation to issue the Equity Award.

**3.3 Survival**. In the event this Agreement is terminated, (a) the provisions of Section 1.2, Section 2.2, Section 2.3, and Articles 3 – 4, inclusive, shall survive indefinitely, and (b) the provisions of Section 2.1 shall survive for two (2) years following such termination. The termination of this Agreement shall not impair any right or obligation of any party accruing prior to the effective date of such expiration or termination.

## 4. Miscellaneous.

**4.1 Representations and Warranties**.

**(a)** Entrepreneur hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to complete the Project hereunder.

**(b)** Start-Up hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to grant the Equity Award as contemplated by this Agreement.

**4.2 Independent Contractor**. The Parties shall not be considered partners, co-venturers, agents, employees or representatives of each other. The Parties shall remain in all respects independent contractors, and neither Party shall have any right or authority to make or undertake any promise, warranty or representation, to execute any contract or otherwise to assume any obligation in the name of or on behalf of the other Party. Neither Party's employees are, nor shall they be deemed to be, employees of the other Party.

**4.3    Notices**.  All notices and other communications required or permitted hereunder shall be in writing and deemed to have been given when hand delivered, sent by facsimile or email, with confirmation of receipt, or mailed by registered or certified mail or overnight courier with tracking capabilities, as follows or as a Party may otherwise notify to the other in accordance with this Section 4.3 (provided that such notice of change of address or recipient shall be deemed given only when received):

If to Startup-Up:

GoNoGo

3507 Palmilla Drive

Suite 3155

San Jose, CA 95134

davidcares33@gmail.com

Attn: David Levesque

If to Entrepreneur:

Ayesha Khan

1296 S Blaney Ave

San Jose

San Jose, CA 95129

ayeshakay786@gmail.com

Attn: Ayesha Khan

**4.4    Start-Up Property; Return**.  Promptly upon the expiration or termination of this Agreement, and earlier if requested by Start-Up, Entrepreneur shall deliver to Start-Up (and shall not keep in Entrepreneur's possession or deliver to anyone else) all Confidential Information of Start-Up (including all embodiments thereof) and all software, documentation, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, or any other work product whatsoever, developed by Entrepreneur as part of or in connection with the Project or otherwise belonging to Start-Up.

**4.5    Assignment; No Third Party Beneficiaries**.  No Party may assign this Agreement without the prior written consent of the other Party.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer on any person or entity other than the parties hereto or their respective successors, heirs, and permitted assigns, any benefits, rights or remedies.

**4.6    Governing Law, Jurisdiction and Attorney Fees**.  This Agreement shall be governed by and interpreted in accordance with laws of the State of Delaware without giving effect to any conflict of laws provisions.  Any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement shall be brought in any court of general jurisdiction in the State of Delaware.  The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover its reasonable attorneys' fees and costs.

**4.7    Entire Agreement, Amendment and Waiver**.  This Agreement contains the sole agreement between the Parties with respect to the subject matter hereof and it supersedes all prior agreements and understandings with respect thereto, whether oral or written.   No amendment, supplement or other

modification to any provision of this Agreement shall be binding unless in writing and signed by the Parties. No waiver of any rights under this Agreement shall be effective unless in writing signed by the Party to be charged. A waiver of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

**4.8    Severability**. If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

**4.9    Headings**. The headings in this Agreement are intended solely for convenience or reference and shall be given no effect in the construction or interpretation of this Agreement.

**4.10   Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have duly executed this Agreement as of the Effective Date.

GoNoGo

*David Levesque*

_____
Authorized Signature

Name:  David Levesque

Title:   Founder

Ayesha Khan

*Ayesha Khan*

_____
Authorized Signature

Name:  Ayesha Khan

Title:   UI/UX Designer

Doc ID: 21cf803778b9f6652a1b0032c2e5e543ff6628e4


| | |
|---|---|
| **TITLE** | Gusher ESA - Startup and Entrepreneur |
| **FILE NAME** | Gusher Equity Sha... Entrepreneur.pdf |
| **DOCUMENT ID** | 21cf803778b9f6652a1b0032c2e5e543ff6628e4 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was signed on gusher.co**

## Document History

| | | |
|---|---|---|
| ⤴ SENT | **09 / 01 / 2020** 18:09:56 UTC | Sent for signature to David Levesque (davidcares33@gmail.com) and Ayesha Khan (ayeshakay786@gmail.com) from tech@gusher.co IP: 3.228.220.225 |
| 👁 VIEWED | **09 / 01 / 2020** 18:09:58 UTC | Viewed by Ayesha Khan (ayeshakay786@gmail.com) IP: 73.162.77.112 |
| ✍ SIGNED | **09 / 01 / 2020** 18:11:05 UTC | Signed by Ayesha Khan (ayeshakay786@gmail.com) IP: 73.162.77.112 |
| 👁 VIEWED | **09 / 01 / 2020** 21:12:01 UTC | Viewed by David Levesque (davidcares33@gmail.com) IP: 35.132.142.183 |
| ✍ SIGNED | **09 / 01 / 2020** 21:12:39 UTC | Signed by David Levesque (davidcares33@gmail.com) IP: 35.132.142.183 |
| ☑ COMPLETED | **09 / 01 / 2020** 21:12:39 UTC | The document has been completed. |

Powered by ▽ **HELLOSIGN**

# EXHIBIT 5

# EQUITY SHARING AGREEMENT

THIS EQUITY SHARING AGREEMENT (this "**Agreement**"), is entered into by and between GoNoGo _____, a Delaware Corporation (the "**Start-Up**"), and Jamil Houston _____, an Individual, and United States resident ("**Entrepreneur**"), as of   03 Aug 2020 _____ (the "**Effective Date**").   Start-Up and Entrepreneur may each hereafter be individually referred to as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Start-Up and Entrepreneur are members of Gusher, a web-based collaboration platform for early-stage companies ("**Gusher**"); and

WHEREAS, in connection with the commercial launch of Start-Up (the "**Launch**"), Start-Up desires to engage various entrepreneurs to perform services for Start-Up in exchange for a portion of Start-Up's equity upon the Launch; and

WHEREAS, Start-Up desires to engage Entrepreneur, through Gusher, to complete the Project (as defined below), and Entrepreneur desires to complete the Project, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the adequacy of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

**1.     Project.**

**1.1     Scope of Project**.  During the Term of this Agreement, Entrepreneur shall

1.1.1 Develop UI/UX design and implementation; 1.1.2 Develop brand appearance - colors, shapes, messaging; 1.1.3 Understand the effect of design on behavior; 1.1.4 Collaborate and work with team as needed; 1.1.5 Be on time for all meetings; 1.1.6 Complete tasks on time; 1.1.7 Wear the sales hat whenever the opportunity arises. ;

for Start-Up (the "**Project**").

EAST\109559361.10

Doc ID: 266c44483a676bbc6960b436535750bb3b4afa99

**1.2   Equity Award**.  Upon the Launch, Start-up shall issue to Entrepreneur, two point zero zero zero zero (2.000%) of Start-Up's issued and outstanding common stock, on a fully-diluted basis (the "**Equity Award**"), subject to commercially reasonable restrictions on transferability.

**2.   Confidentiality and Non-Use; Improvements.**

**2.1   Confidentiality and Non-Use**.  In connection with the Project, Start-Up has disclosed or may disclose to Entrepreneur certain non-public information, including, without limitation, information relating to Start-Up's business plans, technology, product plans, products, developments, inventions, processes, designs, drawings, formulae, markets, software (including source and object code), hardware, agreements with third parties, services, customers, marketing or finances, whether in tangible or intangible form (collectively, "**Confidential Information**").  Entrepreneur shall use the Confidential Information solely in connection with the Project and shall not without the express written permission of Start-Up reverse engineer, reverse compile or otherwise attempt to derive the composition or underlying information, structure or ideas of any Confidential Information.  Entrepreneur shall hold the Confidential Information in strict confidence and shall not disclose any Confidential Information to any person or entity; provided, that Confidential Information may be disclosed to Gusher Co. and to those employees or contractors of Entrepreneur who (a) have a need to know the Confidential Information in connection with the Project, and (b) are bound in writing by obligations of confidentiality at least as restrictive as the obligations hereunder.  Entrepreneur shall promptly notify Start-Up of any unauthorized release of, access to, or use of Confidential Information.

**2.2   Equitable Relief**.  Entrepreneur acknowledges and agrees that due to the unique nature of the Confidential Information, any breach of this agreement may cause irreparable harm to Start-Up for which damages are not an adequate remedy, and, accordingly, Start-up shall be entitled to seek equitable relief in addition to all other remedies available at law.  Entrepreneur further agrees that no bond or other security shall be required in obtaining any equitable relief.

**2.3   No License; Improvements**.  All right, title, and interest in and to the Confidential Information, including all intellectual property rights thereto and therein, are owned by Start-Up and nothing in this Agreement shall grant Entrepreneur any ownership rights in or to the Confidential Information.  Any and all enhancements, improvements, discoveries, derivatives and modifications, data and work product, whether or not patentable, made by Entrepreneur in performance of its obligations under this Agreement or made to the Confidential Information, exclusively or with any other person or entity ("**Improvements**"), shall be solely owned by Start-Up.  Start-Up's ownership of the Improvements include all intellectual property rights, including any patents and the right to pursue the same. Entrepreneur hereby assigns all right, title, and interest in the Improvements to Start-Up.  Entrepreneur shall reasonably assist Start-Up in recording and perfecting Start-Up's rights in and to the Improvements.  Notwithstanding the foregoing, and for clarity, any technology owned or controlled by Entrepreneur prior to the Effective Date of this Agreement and not based

on or derived from any Confidential Information ("**Pre-existing Technology**") shall remain Entrepreneur's property and Start-Up shall have no rights or interests in such Pre-existing Technology.

**3.     Term and Termination.**

**3.1     Term**.  The term of this Agreement shall begin on the Effective Date and shall continue until the Project is complete (the "**Term**") unless earlier terminated pursuant to Section 3.2.

**3.2     Termination.**  This Agreement may be terminated as follows:

**(a)**     by Start-Up, immediately upon providing written notice to Entrepreneur, in the event that Entrepreneur fails to complete the Project substantially as contemplated by this Agreement; or

**(b)**     by Entrepreneur or Start-Up upon ten (10) days' written notice to the other Party, provided that the Project is not substantially complete as of the time such written notice is provided.

In the event of a termination pursuant to this Section 3.2, Start-Up shall have no obligation to issue the Equity Award.

**3.3     Survival**.  In the event this Agreement is terminated, (a) the provisions of Section 1.2, Section 2.2, Section 2.3, and Articles 3 – 4, inclusive, shall survive indefinitely, and (b) the provisions of Section 2.1 shall survive for two (2) years following such termination.  The termination of this Agreement shall not impair any right or obligation of any party accruing prior to the effective date of such expiration or termination.

**4.     Miscellaneous.**

**4.1     Representations and Warranties**.

**(a)**     Entrepreneur hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to complete the Project hereunder.

**(b)**     Start-Up hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to grant the Equity Award as contemplated by this Agreement.

**4.2     Independent Contractor**.  The Parties shall not be considered partners, co-venturers, agents, employees or representatives of each other.  The Parties shall remain in all respects independent contractors, and neither Party shall have any right or authority to make or undertake any promise, warranty or representation, to execute any contract or otherwise to assume any obligation in the name of or on behalf of the other Party.  Neither Party's employees are, nor shall they be deemed to be, employees of the other Party.

**4.3    Notices**.  All notices and other communications required or permitted hereunder shall be in writing and deemed to have been given when hand delivered, sent by facsimile or email, with confirmation of receipt, or mailed by registered or certified mail or overnight courier with tracking capabilities, as follows or as a Party may otherwise notify to the other in accordance with this Section 4.3 (provided that such notice of change of address or recipient shall be deemed given only when received):

If to Startup-Up:

GoNoGo

3507 Palmilla Drive

Suite 3155

San Jose, CA 95134

davidcares33@gmail.com

Attn: David Levesque

If to Entrepreneur:

Jamil Houston

15709 S. Ball Ave.

Gardena, CA 90248

sm@chocolatechix.com

Attn: Jamil Houston

**4.4    Start-Up Property; Return**.  Promptly upon the expiration or termination of this Agreement, and earlier if requested by Start-Up, Entrepreneur shall deliver to Start-Up (and shall not keep in Entrepreneur's possession or deliver to anyone else) all Confidential Information of Start-Up (including all embodiments thereof) and all software, documentation, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, or any other work product whatsoever, developed by Entrepreneur as part of or in connection with the Project or otherwise belonging to Start-Up.

**4.5    Assignment; No Third Party Beneficiaries**.  No Party may assign this Agreement without the prior written consent of the other Party.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer on any person or entity other than the parties hereto or their respective successors, heirs, and permitted assigns, any benefits, rights or remedies.

**4.6    Governing Law, Jurisdiction and Attorney Fees**.  This Agreement shall be governed by and interpreted in accordance with laws of the State of Delaware without giving effect to any conflict of laws provisions.   Any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement shall be brought in any court of general jurisdiction in the State of Delaware.  The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover its reasonable attorneys' fees and costs.

**4.7    Entire Agreement, Amendment and Waiver**.  This Agreement contains the sole agreement between the Parties with respect to the subject matter hereof and it supersedes all prior agreements and understandings with respect thereto, whether oral or written.   No amendment, supplement or other

EAST\109559361.10

Doc ID: 266c44483a676bbc6960b436535750bb3b4afa99

modification to any provision of this Agreement shall be binding unless in writing and signed by the Parties. No waiver of any rights under this Agreement shall be effective unless in writing signed by the Party to be charged. A waiver of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

**4.8    Severability**. If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

**4.9    Headings**. The headings in this Agreement are intended solely for convenience or reference and shall be given no effect in the construction or interpretation of this Agreement.

**4.10    Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have duly executed this Agreement as of the Effective Date.

GoNoGo

*David Levesque*

_____
Authorized Signature

Name:  David Levesque

Title:    Founder

Jamil Houston

*Jamil Houston*

_____
Authorized Signature

Name:  Jamil Houston

Title:    Creative Director

EAST\109559361.10

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 68 of 146
Doc ID: 266c44483a676bbc6960b436535750bb3b4afa99

 **HELLOSIGN**

| | |
|---|---|
| **TITLE** | Gusher ESA - Startup and Entrepreneur |
| **FILE NAME** | Gusher Equity Sha... Entrepreneur.pdf |
| **DOCUMENT ID** | 266c44483a676bbc6960b436535750bb3b4afa99 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was signed on gusher.co**

## Document History

**SENT**
**08 / 04 / 2020**
01:43:40 UTC

Sent for signature to David Levesque (davidcares33@gmail.com) and Jamil Houston (sm@chocolatechix.com) from tech@gusher.co
IP: 3.228.220.225

**VIEWED**
**08 / 04 / 2020**
01:43:44 UTC

Viewed by Jamil Houston (sm@chocolatechix.com)
IP: 76.90.14.167

**SIGNED**
**08 / 05 / 2020**
01:09:57 UTC

Signed by Jamil Houston (sm@chocolatechix.com)
IP: 76.90.14.167

**VIEWED**
**08 / 05 / 2020**
17:52:50 UTC

Viewed by David Levesque (davidcares33@gmail.com)
IP: 73.231.146.21

**SIGNED**
**08 / 05 / 2020**
17:53:35 UTC

Signed by David Levesque (davidcares33@gmail.com)
IP: 73.231.146.21

**COMPLETED**
**08 / 05 / 2020**
17:53:35 UTC

The document has been completed.

Powered by **HELLOSIGN**

# EXHIBIT 6

# EQUITY SHARING AGREEMENT

THIS EQUITY SHARING AGREEMENT (this "**Agreement**"), is entered into by and between GoNoGo , a Delaware Corporation (the "**Start-Up**"), and Marissa Land , an Individual, and United States resident ("**Entrepreneur**"), as of 11 Oct 2020 (the "**Effective Date**"). Start-Up and Entrepreneur may each hereafter be individually referred to as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Start-Up and Entrepreneur are members of Gusher, a web-based collaboration platform for early-stage companies ("**Gusher**"); and

WHEREAS, in connection with the commercial launch of Start-Up (the "**Launch**"), Start-Up desires to engage various entrepreneurs to perform services for Start-Up in exchange for a portion of Start-Up's equity upon the Launch; and

WHEREAS, Start-Up desires to engage Entrepreneur, through Gusher, to complete the Project (as defined below), and Entrepreneur desires to complete the Project, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the adequacy of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

1. **Project.**

1.1 **Scope of Project**. During the Term of this Agreement, Entrepreneur shall

1.1.1 Write digital ad copy

; 1.1.2 Optimize placement and conversion

; 1.1.3 Develop landing pages and funnels

; 1.1.4 Organize the annual digital marketing budget; 1.1.5 Work with team as needed; 1.1.6 Put on sales hat when asked; 1.1.7 Be on time for all meetings;

for Start-Up (the "**Project**").

Case: 23-05006   Doc# 30   Filed: 06/29/23   Entered: 06/29/23 16:45:27   Page 71 of
146
Doc ID: d81cf274afb5d97036d0ea2fe427f4cd7a8ce08e

**1.2    Equity Award**.  Upon the Launch, Start-up shall issue to Entrepreneur, one point five zero zero zero (1.500%) of Start-Up's issued and outstanding common stock, on a fully-diluted basis (the "**Equity Award**"), subject to commercially reasonable restrictions on transferability.

**2.    Confidentiality and Non-Use; Improvements.**

**2.1    Confidentiality and Non-Use**.  In connection with the Project, Start-Up has disclosed or may disclose to Entrepreneur certain non-public information, including, without limitation, information relating to Start-Up's business plans, technology, product plans, products, developments, inventions, processes, designs, drawings, formulae, markets, software (including source and object code), hardware, agreements with third parties, services, customers, marketing or finances, whether in tangible or intangible form (collectively, "**Confidential Information**").  Entrepreneur shall use the Confidential Information solely in connection with the Project and shall not without the express written permission of Start-Up reverse engineer, reverse compile or otherwise attempt to derive the composition or underlying information, structure or ideas of any Confidential Information.  Entrepreneur shall hold the Confidential Information in strict confidence and shall not disclose any Confidential Information to any person or entity; provided, that Confidential Information may be disclosed to Gusher Co. and to those employees or contractors of Entrepreneur who (a) have a need to know the Confidential Information in connection with the Project, and (b) are bound in writing by obligations of confidentiality at least as restrictive as the obligations hereunder.  Entrepreneur shall promptly notify Start-Up of any unauthorized release of, access to, or use of Confidential Information.

**2.2    Equitable Relief**.  Entrepreneur acknowledges and agrees that due to the unique nature of the Confidential Information, any breach of this agreement may cause irreparable harm to Start-Up for which damages are not an adequate remedy, and, accordingly, Start-up shall be entitled to seek equitable relief in addition to all other remedies available at law.  Entrepreneur further agrees that no bond or other security shall be required in obtaining any equitable relief.

**2.3    No License; Improvements**.  All right, title, and interest in and to the Confidential Information, including all intellectual property rights thereto and therein, are owned by Start-Up and nothing in this Agreement shall grant Entrepreneur any ownership rights in or to the Confidential Information.  Any and all enhancements, improvements, discoveries, derivatives and modifications, data and work product, whether or not patentable, made by Entrepreneur in performance of its obligations under this Agreement or made to the Confidential Information, exclusively or with any other person or entity ("**Improvements**"), shall be solely owned by Start-Up.  Start-Up's ownership of the Improvements include all intellectual property rights, including any patents and the right to pursue the same. Entrepreneur hereby assigns all right, title, and interest in the Improvements to Start-Up.  Entrepreneur shall reasonably assist Start-Up in recording and perfecting Start-Up's rights in and to the Improvements.  Notwithstanding the foregoing, and for clarity, any technology owned or controlled by Entrepreneur prior to the Effective Date of this Agreement and not based

Doc ID: d81cf274afb5d97036d0ea2fe427f4cd7a8ce08e

on or derived from any Confidential Information ("**Pre-existing Technology**") shall remain Entrepreneur's property and Start-Up shall have no rights or interests in such Pre-existing Technology.

**3.    Term and Termination.**

**3.1    Term**.  The term of this Agreement shall begin on the Effective Date and shall continue until the Project is complete (the "**Term**") unless earlier terminated pursuant to Section 3.2.

**3.2    Termination**.  This Agreement may be terminated as follows:

**(a)**    by Start-Up, immediately upon providing written notice to Entrepreneur, in the event that Entrepreneur fails to complete the Project substantially as contemplated by this Agreement; or

**(b)**    by Entrepreneur or Start-Up upon ten (10) days' written notice to the other Party, provided that the Project is not substantially complete as of the time such written notice is provided.

In the event of a termination pursuant to this Section 3.2, Start-Up shall have no obligation to issue the Equity Award.

**3.3    Survival**.  In the event this Agreement is terminated, (a) the provisions of Section 1.2, Section 2.2, Section 2.3, and Articles 3 – 4, inclusive, shall survive indefinitely, and (b) the provisions of Section 2.1 shall survive for two (2) years following such termination.  The termination of this Agreement shall not impair any right or obligation of any party accruing prior to the effective date of such expiration or termination.

**4.    Miscellaneous.**

**4.1    Representations and Warranties**.

**(a)**    Entrepreneur hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to complete the Project hereunder.

**(b)**    Start-Up hereby represents and warrants that it has the power and authority to execute and deliver this Agreement and to grant the Equity Award as contemplated by this Agreement.

**4.2    Independent Contractor**.  The Parties shall not be considered partners, co-venturers, agents, employees or representatives of each other.   The Parties shall remain in all respects independent contractors, and neither Party shall have any right or authority to make or undertake any promise, warranty or representation, to execute any contract or otherwise to assume any obligation in the name of or on behalf of the other Party.  Neither Party's employees are, nor shall they be deemed to be, employees of the other Party.

**4.3    Notices**. All notices and other communications required or permitted hereunder shall be in writing and deemed to have been given when hand delivered, sent by facsimile or email, with confirmation of receipt, or mailed by registered or certified mail or overnight courier with tracking capabilities, as follows or as a Party may otherwise notify to the other in accordance with this Section 4.3 (provided that such notice of change of address or recipient shall be deemed given only when received):

If to Startup-Up:

GoNoGo

3507 Palmilla Drive

Suite 3155

San Jose, CA 95134

davidcares33@gmail.com

Attn: David Levesque

If to Entrepreneur:

Marissa Land

617 Virginia Street

#13

El Segundo, CA 90245

marissaland01@gmail.com

Attn: Marissa Land

**4.4    Start-Up Property; Return**.  Promptly upon the expiration or termination of this Agreement, and earlier if requested by Start-Up, Entrepreneur shall deliver to Start-Up (and shall not keep in Entrepreneur's possession or deliver to anyone else) all Confidential Information of Start-Up (including all embodiments thereof) and all software, documentation, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, or any other work product whatsoever, developed by Entrepreneur as part of or in connection with the Project or otherwise belonging to Start-Up.

**4.5    Assignment; No Third Party Beneficiaries**.  No Party may assign this Agreement without the prior written consent of the other Party.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer on any person or entity other than the parties hereto or their respective successors, heirs, and permitted assigns, any benefits, rights or remedies.

**4.6    Governing Law, Jurisdiction and Attorney Fees**. This Agreement shall be governed by and interpreted in accordance with laws of the State of Delaware without giving effect to any conflict of laws provisions.  Any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement shall be brought in any court of general jurisdiction in the State of Delaware. The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover its reasonable attorneys' fees and costs.

**4.7    Entire Agreement, Amendment and Waiver**.  This Agreement contains the sole agreement between the Parties with respect to the subject matter hereof and it supersedes all prior agreements and understandings with respect thereto, whether oral or written.  No amendment, supplement or other

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 74 of
146
Doc ID: d81cf274afb5d97036d08a2fe427f4cd7a8ce08e

modification to any provision of this Agreement shall be binding unless in writing and signed by the Parties. No waiver of any rights under this Agreement shall be effective unless in writing signed by the Party to be charged. A waiver of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

**4.8    Severability**.  If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

**4.9    Headings**.  The headings in this Agreement are intended solely for convenience or reference and shall be given no effect in the construction or interpretation of this Agreement.

**4.10    Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have duly executed this Agreement as of the Effective Date.

GoNoGo

*David Levesque*

_____
Authorized Signature

Name:  David Levesque

Title:    Founder

Marissa Land

*Marissa Land*

_____
Authorized Signature

Name:  Marissa Land

Title:    Digital Marketing Manager

 **HELLOSIGN**

| | |
|---|---|
| **TITLE** | Gusher ESA - Startup and Entrepreneur |
| **FILE NAME** | Gusher Equity Sha... Entrepreneur.pdf |
| **DOCUMENT ID** | d81cf274afb5d97036d0ea2fe427f4cd7a8ce08e |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was signed on gusher.co**

## Document History

| | | |
|---|---|---|
| **SENT** | **10 / 11 / 2020**<br>04:13:01 UTC | Sent for signature to David Levesque (davidcares33@gmail.com) and Marissa Land (marissaland01@gmail.com) from tech@gusher.co<br>IP: 3.228.220.225 |
| **VIEWED** | **10 / 11 / 2020**<br>04:13:04 UTC | Viewed by Marissa Land (marissaland01@gmail.com)<br>IP: 70.93.242.238 |
| **SIGNED** | **10 / 11 / 2020**<br>04:22:12 UTC | Signed by Marissa Land (marissaland01@gmail.com)<br>IP: 70.93.242.238 |
| **VIEWED** | **11 / 30 / 2020**<br>19:17:52 UTC | Viewed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| **SIGNED** | **11 / 30 / 2020**<br>19:18:17 UTC | Signed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| **COMPLETED** | **11 / 30 / 2020**<br>19:18:17 UTC | The document has been completed. |

Powered by **HELLOSIGN**

# EXHIBIT 7

---------- Forwarded message ---------
From: **David Levesque** <davidcares33@gmail.com>
Date: Mon, Mar 8, 2021 at 10:42 AM
Subject: Notice of vBIO
To: Dr Lucas Nyabero <DrNyabero@elarawellness.com>


Dear Lucas,

As the relationship between Sonaphi and vBIO has unfolded, unfortunately, vBIO won't be able to use your services anymore.

Understanding that, as of today March 8, 2021, we are providing you with 2 weeks notice of termination from vBIO.

Rest assured that all arrearage and equity will be provided to you.

I will be setting a meeting with you in the next few days to discuss the next steps.

Sincerely,
David

David Levesque
518-320-2613
davidcares33@gmail.com
Book a time to talk

# EXHIBIT 8

---------- Forwarded message ---------
From: **David Levesque** <davidcares33@gmail.com>
Date: Mon, Mar 8, 2021 at 8:42 AM
Subject: Notice of vBIO
To: Marissa L <marissaland01@gmail.com>


Dear Marissa,

As the relationship between Sonaphi and vBIO has unfolded, unfortunately, vBIO won't be able to use your services anymore.

Understanding that, as of today March 8, 2021, we are providing you with 2 weeks notice of termination from vBIO.

Rest assured that all arrearage and equity will be provided to you.

I will be setting a meeting with you in the next few days to discuss the next steps.

Sincerely,
David
David Levesque

518-320-2613
davidcares33@gmail.com
Book a time to talk

# EXHIBIT 9

---------- Forwarded message ---------
From: **David Levesque** <davidcares33@gmail.com>
Date: Mon, Mar 15, 2021 at 3:44 PM
Subject: Notice of vBIO transition
To: Firas Abras <firas.abras@gmail.com>

Dear Firas,

It looks like I missed sending this to you last week.
I am sending it today March 15th.

Here is the letter of termination. Please confirm receipt.

Firas,

As the relationship between Sonaphi and vBIO has unfolded, unfortunately, vBIO
won't be able to use your services anymore.

Understanding that, as of today March 15, 2021, we are providing you with 5 day
notice of termination from vBIO.

Rest assured that all arrearage and equity will be provided to you.

I will be setting a meeting with you in the next few days to discuss the next steps.

Sincerely,
David

David Levesque
www.sonaphi.com
518-320-2613
davidcares33@gmail.com
Book a time to talk

# EXHIBIT 10

---------- Forwarded message ---------
From: **David Levesque** <davidcares33@gmail.com>
Date: Mon, Mar 8, 2021 at 10:40 AM
Subject:
To: Astrid Stuckelberger <astrid.stuckelberger@gmail.com>

Dear Astrid,

As the relationship between Sonaphi and vBIO has unfolded, unfortunately, vBIO won't be able to use your services anymore.

Understanding that, as of today March 8, 2021, we are providing you with 2 weeks notice of termination from vBIO.

Rest assured that all arrearage and equity will be provided to you.

I will be setting a meeting with you in the next few days to discuss the next steps.

Sincerely,
David
David Levesque
www.sonaphi.com
518-320-2613
davidcares33@gmail.com
Book a time to talk

# EXHIBIT 11

---------- Forwarded message ---------
From: **David Levesque** <davidcares33@gmail.com>
Date: Mon, Mar 8, 2021 at 10:40 AM
Subject: Notice of vBIO
To: SEMANTIX <jamil@semantixcreative.com>


Dear Jamil,

As the relationship between Sonaphi and vBIO has unfolded, unfortunately, vBIO won't be able to use your services anymore.

Understanding that, as of today March 8, 2021, we are providing you with 2 weeks notice of termination from vBIO.

Rest assured that all arrearage and equity will be provided to you.

I will be setting a meeting with you in the next few days to discuss the next steps.

Sincerely,
David

David Levesque
www.sonaphi.com
518-320-2613
davidcares33@gmail.com
Book a time to talk

# EXHIBIT 12

**This report is presented with deep respect and gratitude to the entire VBio-Sonaphi team.** Thank you for your openness during the past couple of weeks of assessment interviews especially during this intense time of high-level decision-making and continued challenging world events. You are an incredibly talented team, and you came together in ways that made it exciting, yet with volatility that decreased the capacity to accurately discern your collaborative compatibilities.  The team tensions were created by multiple factors (like many start-ups), some that can be shifted, and others that may not be as easily resolved. Due to the urgent need to address the team's financial crisis, this assessment identifies strengths, weaknesses, and what's required going forward from both the CEO and each team member.  Additionally, new solutions and processes will be presented that are intended to assist in effective transformation and transitions individually and collectively, whether the team remains together, under Sonaphi or not.

1. **High level decision currently made:**
   a. CEO has decided to go forward until Jan 31 with the team.
   b. Due to the urgency of the situation it requires new criteria and policies that the entire team must/is expected to follow.
   c. Moving forward on the team under the Sonaphi umbrella will necessitate the entire team cooperating and following the new policies.
   d. This is to ensure long term sustainability for the financial health of the company.

   *RATIONALE:*
   ☐ The following high level decisions options were on the table and a decision needed to be made this second week of January 2021- it will be revisited at the end of this month:
      1. Combine forces with Sonaphi with contracts signed (as individual contract employees, and work as a team within the umbrella of Sonaphi), getting paid when?
      2. Remain together as a separate start-up?
      3. Separate as factions of the team ~ creating other start-ups (who decides to go where?) – some may decide on 1. Or 2. Above.
      4. No longer a team – each member goes a separate way completely – finding a new job, retiring, etc.?
   *NOTE:*  Optimal results are possible no matter what one of those four choices you decide. Whatever that is, make the choice as individuals within a team via consent and then commit to it without regret, resentment, blame or shame.  This is when true leadership kicks in by learning from the strengths, weaknesses, triumphs, and mistakes of individuals within the team and the team itself, as well as valuing each and the ultimate choices make.

2. **Overview of assessment report**
   a. **Strengths and weaknesses overview of entire team and company**

   ☐ ***STRENGTH Greatest Assets* =** Team Member's Expressed the following:
      1. Fantastic, dynamic team - Team Member's Expressed the following:
         ● "Love the diversity"… "Each with their gifts" – "rich talent"
         ● "Entrepreneurial Management" (vs. Corporate Top-Down)
         ● "Most members cohesive with heart, fun with everyone in it to win"
         ● "Sense of being able to contribute"…"to do something great for our world"
      2. Motivated team members with an overall collaborative spirit – Committed, flexible, and willing to grow and learn.

Case: 23-05006     Doc# 30     Filed: 06/29/23     Entered: 06/29/23 16:45:27     Page 88 of 146

3. Each member seems to be connected with the vision and willingness to go the extra mile to make it work.
4. There is a foundational support for ethical considerations and the desire to create a product that will be competitively unique, while serving the greater public ethically.
5. There is a willingness to shift from the strategic visionary aspect to the tactical nitty-gritty, necessary to manifest the ultimate results and impactful outcome.
6. Highly experienced professionals with cultural, gender, and age diversity.
7. There is a great capacity for role flexibility and expansion (taking on unexpected, but necessary tasks outside of primary titles).
8. Many members of this team bring significant networking capacities including other countries, recognized health organizations, international leaders, and potential partners ~ globally.

☐ **WEAKNESSES Greatest Challenges =**
1. Inability to meet critical deadlines.
2. A call for increased Individual/Team Accountability to match urgent financial needs.
3. Prioritized goals frequently changed causing impression that "nothing is getting done" – demoralizing the team.
4. The Peter Principal may be playing a role – Some team members are matched to roles far beyond their current capacities or in roles that require greater clarity.
5. Salary/Compensation seems inequitable and may need to be revised - based upon market value, years and depth of experience, skills/talents/capacities, balanced with the needs of the company.
6. Respect and Trust issues – triangulated dialogue and feelings of betrayal
7. Too many meetings without necessary processes and guidelines for effective task completion and reporting
8. Unstructured protocol for meetings encourages interrupted dialogue, inability to complete agenda items and the sense of "wasting time."
9. Lateness, blame and shame, rudeness, and interrupted speech during meetings.
10. Concerns expressed by some members – asking "Is there potentially prejudice?" ("Are some members being reprimanded or rudely treated more than others based on culture/color versus merit?") ~ my observation is probably not.
11. Due to the CEO's initial request for feedback, some members currently seem resistant to the authority he was asked to take on – this may create an atmosphere of defiance and disrespect versus collaborative leadership-followship.

☐ *Potential Explanation for the Challenges listed above: (matched numbers)*

1. **Were clear deadlines established?**
   ☐ Did the goals and outcomes change midstream – how did they shift?
   ☐ If so, how were the deadlines reconfigured?
   ☐ In what ways were tasks prioritized? What would make this process more effective?
   ☐ Meeting interruptions and multiple types of meetings within one could severely impact the completion of deadlines.
   ☐ **The notion of team members taking directions from the CEO of a start-up is critical for an organization in financial crisis** – as challenging as this might be for experienced team members, it is critical to the flow and completion of projects to do so, while still having a voice to suggest alternative solutions and processes.

J. Anastasia                                                                     01-14-2021

Page PAGE \* MERGEFORMAT 2

**2. Was each member held accountable for their assignments; if so how?**
   - ☐ What were the pain points identified relative to the entire team when tasks/steps toward goals were not completed?
   - ☐ If one role's tasks were contingent on another, how was that taken into consideration in the evaluation of accountability and completion?
   - ☐ If team members were not completing the necessary prioritized tasks at hand, why was this happening?
   *NOTE:* When this occurs and there are no reasonable explanations, this is a signal to STOP and consider serious choices regarding performance and the capacity to finish projects. Ultimately, if projects are not completed as articulated in a contract, the Funders have a legal right to stop payments ~ no one gets paid and the company loses their capacity to survive.
   - ☐ How did communication play a role in this? Were people actively listening or were they interrupting?

**3. What were the goals of the Funders and did that match the team's perception?**
   - ☐ If contracts were shifted midstream, this also plays a major role in reducing the capacity for a team to complete tasks, assignments, and to finish projects.
   - ☐ New and important data, i.e. relative to ethical considerations for research dramatically shifted the focus (potentially affecting reputation and the ultimate efficacy of the product itself).

**4. & 5. Most start-up teams do not begin with 11+ members ~ this is huge to manage for any CEO, let alone a new one.**
   - ☐ Due to the way the team came together, there was little to no vetting of how members' personalities, backgrounds, skills/talents, would congeal collaboratively.
   - ☐ People were assigned titles that might have been too broad for their skill set or not necessarily the "critical path" roles needed out of the gate.
   - ☐ Salary Compensation is a huge topic and due to the other more urgent issues at hand, this was not addressed, leading to inequitable pay, i.e. those with >25+ years receiving almost the same as members with <5 years, etc.

**6. Through 10. Governance and Meeting Practices**
   - ☐ Missing Governance practices ~ including CORE Principles of consent, transparency, and dynamic representation (double-linking), principles of relational conduct.
   - ☐ Meeting structure (4 or more types) and effective protocol (with room for input – visionary and tactical).

**11. Leadership ~ Humility and capacity to mentor and follow, when needed.**
   - ☐ Team members with leadership capacities took on extra responsibilities regarding personnel management, conflict resolution, etc. which was greatly needed and appreciated at the time. In contrast, this beneficial action also unintentionally blurred titles and roles, creating potential triangulation, some resistance to taking direction from the CEO, and feelings of betrayal, the fear of failure and stressed-related emotional outbursts.
   - ☐ This disruption to TRUST may have temporarily undermined the emergence of the greatest capacities of the CEO and each team member to manifest the full vision of this company.

J. Anastasia                                                                 01-14-2021

Page PAGE \*
MERGEFORMAT 2

☐ If these nuanced aspects of leadership were addressed and roles were more clearly articulated and reset, each team member could benefit, creating a most balanced and cohesive team.

**b. & c. What is required of the CEO _AND_ each team member?**

**1. MEETINGS**
_FOR TEAM MEMBERS:_
**BE ON TIME, PREPARED, and PRESENT for meetings** – this demonstrates an honoring of other people's time and effort, as well as your own. When even one person is late, others feel obligated to REPEAT themselves – this is unnecessary. Of course, there are exceptions to being late, i.e. a true emergency – if this occurs, it is the individual's responsibility to catch up through summary notes with an outreach call/email to a colleague, if details are needed. Also see bolded sentences below.
_FOR CEO:_
**BE ON TIME, PREPARED, and PRESENT for meetings** ~
with fewer meetings that are scheduled more accurately to the time needed (1-1.5 hours). Allow for 1 minute check-in each with NO shaming or blaming – simply do not be distracted by the individual entering late (no check-in for that person either, unless an emergency). **If it happens too often, then the team may wish to consider asking the person who is late to leave the team altogether.** If lateness is due to scheduling within differing time zones, it is important to consider 2-3 meetings at different time zones Monday and Wednesday or M-W-F.

_NOTE:_ These practices are especially important for start-ups and are not intended to be insulting, but respectful to all.

**2. New meeting policies and protocol (see below under "New Policies").**
_FOR TEAM MEMBERS:_ **Review and practice**
_FOR CEO:_ **Implement new meeting policies and protocol.**

**3. MORE RESPECTFUL and EFFECTIVE COMMUNICATIONS**
_FOR TEAM MEMBERS & CEO:_
☐ Share issues/concerns or "withholds" truthfully without emotional attacks.
☐ When providing feedback, consider potential solutions, if possible.
   _Note:_ While it is important to bring up issues and concerns that you would genuinely like to resolve, it's also easy to fall into the trap of criticizing others when not walking in their shoes. Additionally, if you truly wish for people to hear and see you, and follow-up on your suggestions, ask then to summarize what they think you were requesting. Oftentimes we think we are communicating effectively, only to discover that the person misinterpreted or misunderstood what we had intended to convey.
☐ Request a "personnel" meeting when the situation is affecting workflow.
☐ **Invite TRUST** – Do not let others who betray shift your focus for greatest truth, efficacy, and healthy collaborative contributions.
☐ **Try NOT to TRIANGULATE – this undermines TRUST.**
☐ Practice deep listening and feedback to avoid repetition of issues.
☐ If you need help, ASK as soon as humanly possible (minimize fear of failure or embarrassment) no matter what your level of seniority.
☐ No blame and shame of other team member, including the CEO.
☐ Invite curiosity, humility, confidence without rigidity or rudeness.

☐ Ask for feedback – "How am I doing with communicating more effectively?"…"How can I contribute to the team in ways that are considered balanced and fair?"

***NOTE:*** This team is fortunate to have a CEO who is open to hearing concerns, even if it has not yet been handled or was handled in a way in the past that you didn't appreciate. Addressing these concerns with the whole team, without shame or blame, will have a greater chance of being heard and addressed for the betterment of the whole. As many organizations experience, when issues are addressed in silos, it only serves to pit one person or group against another and certainly harms rather than benefits the overall team and ultimately the desired results/outcomes. Joining a team involves both individual responsibility as well as collaborative attention/team consciousness (how each person affects the whole). Each individual can improve and experience the growth of the group toward a genuine 'dream team,' without letting anyone go (or be fired). Simultaneously, if people are not contributing enough to the whole, perhaps it is not a good fit – than the team can help to discern that, provide suggestions or potentially effective solutions. With this type of collaborative discernment, individuals begin to recognize that they are in the exact right place and need to grow OR they need to move on because it is not the right fit for them (OR, if it gets really extreme, where work is not completed on a regular basis or attitudes are so disruptive that the team is unable to function effectively, then they may indeed need to be fired).

4. **Resist signing contracts or any legal documents without truly understanding your individual and team's responsibilities**, target dates of completion, specificity of deadlines as well as the "partner's" past track record of fulfillment and overall culture.
   ***FOR TEAM MEMBERS:***
   Review contract and know what you are mutually agreeing to between individual team members with the team and the team with the Funders.
   ***FOR CEO:***
   Review contract and know what you are mutually agreeing to for individual team members with the team and the team with the Funders.

5. **Revisit Roles, Titles, and Tasks ~ See section "3, & 4. M.** Supplemental Section: ASSESMENT FOR THE CEO – DAVID"
   ***NOTE:*** Written assessment summaries for each team member were shared in a single document "Part II - Final ASSESSMENT REPORT FOR SONAPHI – VBio TEAM for CEO David L. ~ 01-14-2021" with the CEO, David Levesque. Only after each member consents to share their individual assessment, will it be shared with the entire team (there is no obligation to do so).

3. **& 4. Summary of rationale & Presenting the new Policies and Procedures:**

   A. **EFFECTIVE NEW MEETING policies/protocols –**
      1. **Ensure that your internet is robust enough to allow for Zoom video and audio to be ON. *NOTE:*** This is each team member's financial responsibility.

      2. **Be completely present with your video on** so that you can be sure that you are actively listening and engaged for more concise, fun, and productive meetings.

J. Anastasia                                                                                    01-14-2021

Page PAGE \*
MERGEFORMAT 2

3. **Use the equivalent of a Native American Talking Stick** – select something that is **symbolic of YOU** and let people know what that is. **Use it to raise your hand visually** when you wish to speak. Whomever holds the talking Stick has the floor while everyone else is actively listening (not thinking of what they need to say). You can determine the amount of time each person is allotted to speak to provide enough time for everyone to be heard, even if people pass on their turn. Allow for a few moments of silence (at least 5-10 seconds) to take in the new information.

4. **Rotate or ask if someone would like to be a timekeeper with a bell** or chime or gentle noise when each person's time is up. Most "workflow meetings" are best when concise and held to timeframes so that people can get back to work.
   - ❑ If people wish to hold a brainstorming session or strategy/vision meeting, timeframes to speak per person may be extended to allow for creative flow.
   - ❑ OR if someone wishes to have an extended dialogue about an issue, ask for it to be "taken off-line," unless it is absolutely pertinent to the entire group.

   *NOTE:* If individuals are not being respectful about the time to speak, it is completely appropriate for the facilitator/CEO/or initiator of the meeting to place that individual on MUTE until the next person begins. Some facilitators request that everyone else place themselves on MUTE when another person is speaking – that then requires each person to remember to UNMUTE themselves when it is their turn to speak. That is a very effective practice and keeps people fully engaged.

B. **CEO with team Action Items Summary for immediate and long-term future**:
1. Create a summary of the critical decision made (continuing under Sonaphi or split):
   - ❑ What does that mean logistically?
   - ❑ What are the new expected outcomes and specifically when are the deliverable?
2. Begin coordinated efforts to complete the research test study with the ethical considerations addressed (see detailed explanation of research below).
3. Reorganize Meetings (see details in item C.)
4. Hire the necessary personnel to fill the gaps in team (i.e. high level/managerial experienced programmer, a high-level Program Manager to take on the detail task management overseeing that the CEO is currently doing, others, etc.)
5. Consider implementing new forms of dynamic governance.

C. **CEO with team Action Items Details:**
1. **Reorganize the facilitation of meetings (fewer and more specificity of meeting type)**
   a. **Split meeting designation into 4 types**
      1. **Vision/Strategy Meetings** – ONLY participants are circle reps (you call department leads) speak for their group and the summary from these meetings get reviewed by each member if they chose to.

      2. **Work-Flow Meetings** – entire team members with agenda allowing 5-10 minutes for each department to give a summary of what was completed from previous meeting, what's working and what isn't, with requests for resources and/or deadline extensions if needed.

Case: 23-05006     Doc# 30     Filed: 06/29/23     Entered: 06/29/23 16:45:27     Page 93 of 146

3. **Potential Adoption of New Governance** – implementation of new processes relative to the organizational governing principles/blueprint, constitution, guidelines and practices the organization wished to adopt, i.e. healthy dynamic governance includes 3 foundational principles of Transparency, Consent, and Dynamic Representation ("double-linking").

4. **Personnel Issues/Mediation/Conflict Resolution** – these should be facilitated by a professional and with the implementation of the other meeting structures could be minimized.

b. **Specific guidelines established for meeting facilitation** (especially for Work-Flow – 2-3x/week as needed one scheduled to accommodate USA time zone and one to address opposite zones)

1. Prior to mtgs - **Equipment must be stable/strong enough Wi-Fi for face-to-face meetings**.

2. Prior to Mtgs. - **Team members requested to be fully present visually during meetings**.

3. Prior to Mtgs. - **Agenda with prioritized items** encouraged to be **sent out prior to meeting** and **requests to add agenda items completed the day before** – to integrate those items in prioritized fashion.

4. **Breathing/Grounding Exercise** <5 minutes – helping to bring people into their bodies & room. Perhaps add the singing or other creative exercises that help to create resonance.

5. **Check-in** for each member with the equivalent of a "talking stick" and moments of silence (facilitating deep listening and NO interruptions) – how are they doing (could include work or personal comments OR "pass"-don't need to speak) not more than 30 seconds to a minute a piece (unless an extreme emergency/concern).

   *Note:* Request that there be a timekeeper with a gentle bell allowing the final sentences to be completed, as these meetings are intended to help to manifest – get things done, met deadlines, while honoring people. The facilitator, ONLY when obviously needed, can mute someone if someone is disruptively speaking too much and forgetting to allow for others to be heard.

6. **Address Agenda items** – priority items first, and if time permits others. During Workflow meetings, ensure each department (or circle) have an opportunity to summarize where they are since last meeting, what's working, what's not and what they need help with. The last agenda item which most effectively addresses completion of tasks and goals is "Action Items" (per department – 1-2 week goals and items to be completed by the next meeting).

7. **Check-out Round** – "How did this meeting go?" in one sentence or word per person. Sometimes when the meeting seemed to flow well, another question to ask is, "In one word, describe how you feel or how was this for you?"

D. **Company Culture Mindset (David's recommended list/Joyce's in parenthesis)**
   1. Open *(yet discerning)*
   2. Fast *(with quality)*
   3. No excuses *(legitimate emergencies ONLY)*
   4. Flexible *(and commit when needed)*
   5. Focused
   6. Success oriented *(strong work ethic with work-life balance)*

Page PAGE \* MERGEFORMAT 2

J. Anastasia                                                                 01-14-2021

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 94 of 146

7. Optimistic *(with a strong sense of what is real – seeking truth behind situations)*
8. Understand cause and effect, *(consciously taking responsibility/)*understanding for your part in every situation.
9. Learn from doing *(and/or active listening, silence, and being authentically present)*
10. Accountability *(matched to clear objectives/tasks/goals)*
11. Be confident *(with humility)*
12. Earn the feeling of confidence from others so they feel they can depend on you, *(experiencing)* that you are doing your job well.
13. Respect for self and others; *(engender trust through honesty, integrity, and mutual honor.)*
14. Understand each interaction is a 2-way street ~ understand your part in it.
15. Ask, how can I?

E. **Code of conduct ~ (David's recommended list/*Joyce's parenthesis*)**
1. Follow priorities in the order set by CEO David Levesque *(with collaborative input from team leads, when possible and appropriate).*
2. Use Google Suite for Word processing, spreadsheets, presentations. Also, learn how to use it if you don't know.
3. *With any new software, especially task management software recommended for the team, take the time to learn it as soon as it is uploaded.*
4. Team members **WILL NOT** be compensated for hours not worked via salary or equity.
5. Pause C-Suite in terms of collaborating on performance evaluations and team member challenges.
6. No more meetings/discussions around reasons **not** to comply with policy.
7. Uphold your agreements and your contracts.

F. **Do's/Don'ts ~ (David's recommended list/*Joyce's parenthesis*)**
6. **Do's**
   1. Get daily feedback from people outside the organization *(to provide a fresh perspective and a continual rolling network ~ be discerning about effective contacts and time spent)*
   2. Costumer discovery ~ (*be discerning about effective contacts and time spent by asking pertinent questions or hearing their story)*
   3. Discussions *(perhaps use "Dialogue" instead ~ this involves deep listening practices)*
   4. Mentors *(seek them out and serve as one ~ each learning from each other. "When the student is ready the teacher/mentor suddenly appears").*
   5. Be to work early *(without compromising dynamic work-life balance).*
   6. Pre-sell and get licensing agreements *(this is where meticulous understanding is critical ~ remember "The devil is in the details" ~ understanding the nuances is vital)*
   7. Get up to speed on skills required for your position *(You-Tube is a wonderful resource for that AND most of what is needed is open-source, free content!)*
   Don'ts
   1. Push back because David is following organizational policies *(be respectful of the CEO ~ who you asked to serve in this role, help to allow him to grow into it)*
   2. Be respectful and kind to vendors, investors, partners, etc. ~ *(Remember that "these are the hands that feed you" ~ And know that they are discerning of where they share their resources; there are multiple options for them, so each member can help to make it worthwhile for them to believe in this team!)*

Page PAGE \\*
MERGEFORMAT 2

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 95 of 146

G.  **BE GREAT LEADERS OF YOURSELVES AND YOUR DEPARTMENTS, BY ALSO BEING GREAT FOLLOWERS/COLLABORATORS WHEN NEEDED**
    (and I don't mean to 'follow blindly' – the opposite)
    1.  Once a need to reprioritize tasks is identified (particularly by the CEO), it is important to DO SO with openness regarding the rationale, flexibility, and a bit less resistance (especially for team members in a new start-up).

    2.  These shifts in priority and focus are typically initiated by Funders with strings and micromanagement attached. If these requests are not navigated carefully by the CEO and team overall, funding can simply and easily be pulled, even with signed contracts.

    3.  That means that the authority the team gives to the CEO includes following directions when it is the optimal choice. Please take care not to POWER OVER THIS even if you are an excellent manager of your own department .

    4.  This can be discussed in dialogue meetings yet be aware there are many aspects, behind-the-scenes (and sometimes hidden unknowingly), to decision-making processes for CEOs.

    5.  **Training relative to most effective team communication, leadership practices, governance (important for future company sustainability)**

    *NOTE:* In an ideal scenario, it would be best to receive Funding with no strings attached, no micromanaging, yet with a witnessing of the completion of final products, goods and/or services. THIS, as you probably know, IS RARE!

H.  **SHIFT FROM STRATEGY & VISION TO TACTICAL RESULTS AND COMPLETION OF PROJECTS when needed:**
    1.  This is so important for the long-term sustainability of a start-up.
    2.  This is where many start-ups hit a wall and disappear!

I.  **Assist CEO in prioritizing appropriate tasks in writing –** create a list with a concise one-sentence rationale for each, including dependencies regarding other departments or outside agencies.

J.  **TIME TRACKING via Excel spreadsheet ~ DOCUMENT professional time worked - date/timeframes/tasks**:
    1.  Especially for start-ups, it is essential that each individual be responsible to track time, identify how much they are willing to contribute prior to payments, and back-pay owed.
    2.  It is important to record concisely the dates, timeframes and the types of tasks worked on and completed. This helps to identify how long projects might take in the future with each individual's time management capacities, as well as personal accountability.

    ☐   **MY RECOMMENDATION:**
    1.  Track time each scheduled "pay-check distribution" in simple excel spreadsheets with ethical accuracy (in some cases, contractors might use three different hourly rates based upon their tasks OR one flat rate for a total project. **These will differ based upon individual experiences, training, and education**).

J. Anastasia                                                                01-14-2021

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 96 of 146

2. This must be worked out with the CEO and CFO, and under certain governance practices, consented to by the whole team.

☐ **BENEFITS OF THIS PRACTICE:**

People don't get paid until that timesheet is complete and it addresses accountability – what was contributed when and what was completed. Soft skills that require hours of interactions, interviews, etc. must be carefully considered relative to compensation as a different aspect of "task completion", i.e. some tasks would fall under HR or COO, which address the effective management of people.

K. **ASSISTING CEO/ENTIRE TEAM to incentivize people to contribute to the whole:**

1. As an essential part of joining a start-up, **I recommend honoring individuals and teams per month or quarter via nominations** and consent by the entire team OR if several people are nominated, do rank voting.

2. Determine what people would appreciate as an award/gift/bonus that can be added as a budget item. These nominations will consider several aspects that the team might focus on: Completion of assignments, being a great team player (define), excellent communicator, pitching in with extra duties, idea-generator, non-complaining ethical witness "place-holder" or solution-generator, and more (Each team member can come up with criteria that is most important for this team to "Evolve," "Succeed," "Become a World Class Company," etc.)

L. **CRITICAL CURRENT REQUEST** to keep in dynamic balance based upon circumstances:

1. Each team member must be willing to be patient through this next trial phase as the funders continue to evaluate "the team's performance" – the key will be to remain committed to quality ethics while getting the product out as quickly as possible.

2. All hands must be 'on-deck' and the funders must also be willing to follow-through on their contract agreements to pay the necessary back-pay to keep motivation sustained and your balanced economic support building.

M. SUPPLEMENTAL Section: ASSESMENT FOR THE CEO – DAVID"
**NOTE:** *Written assessment summaries for each team member were shared in a single document "Part II - Final ASSESSMENT REPORT FOR SONAPHI – VBio TEAM for CEO David L. ~ 01-14-2021" with the CEO, David Levesque. Each member will receive their individual assessment and only after consenting to distribute it, will it be shared with the entire team (there is no obligation to do so).*

1. CEO David's Greatest Assets =
   ☐ Transparent, passionate, persistence
   ☐ In many ways, extremely organized
   ☐ Engaging and caring personally
   ☐ Networking Ease – connecting ideas, people, and vision
   ☐ Professional intelligent with diverse education
   ☐ Task-and-results-oriented (critical for a CEO)
   ☐ Effective regrouping of team and offering alternative options
   ☐ Capacity to take in constructive feedback
   ☐ Building a culture of dynamically balancing work/home life for greatest health

Case: 23-05006   Doc# 30   Filed: 06/29/23   Entered: 06/29/23 16:45:27   Page 97 of 146

2. **Areas to consider addressing = CEO David**
   - Implementing a more effective task management tool
   - Time/meeting management and facilitation
   - Recognizing and shifting away from 'blaming/shaming'
   - Re-prioritizing essential tasks to match goals/mission/vision
   - Reassign certain Roles/tasks with more optimal match to team members
   - Minimizing distractions to recenter essential focus of the team
   - Resist signing contracts or any legal documents without truly understanding your and your team's responsibilities, target dates of completion, specificity of deadlines as well as the "partner's" past track record of fulfillment and overall culture.
   - Create clear concise naming/versioning (initials who-date-timestamp)/ archiving documents to track changes (everyone's responsibility to help understand why decisions are made over time)
   - Explore methods to hold people accountable – i.e. require time sheet with dates and time blocks indicating the tasks in process completed.  NOTE:  This can be tracked to the task management software like Team Gantt (in the future, prior to receiving paycheck – this is standard practice in effective start-ups and larger organizations).  Each member can manage back when deadlines need to be extended, for appropriate reasons ONLY, and with consent from the greater team.

3. **Additional Assets** to keep in dynamic balance based upon circumstances:
   - Flexible – Too flexible?
   - Idea generator – too many ideas distract focus? (when is it needed or not?)
   - Open (with no boundaries) – the need for boundaries
   - Critical Eye – too critical (focus on what has been done toggling to what needs to be done)
   - Trust – Lack of Trust
   - Effectively Oversee Task Completion – Micromanage (gauge who needs/wants more guidance)
   - Willingness to hear people's opinions – Need for active listening, discerning best solutions with consent and implementation (trying those top solutions – revising, when needed)

4. RECOMMENDATIONS:
   a. **MEETING ORGANIZATION/PROTOCOL/FACILITATION**
   (See Summary of rationale & Presenting the new Policies and Procedures: A. Effective New Meetings and C. CEO with team Action Items Details.)

   b. **SUMMARY ACTION ITEMS FOR IMMEDIATE AND LONG-TERM FUTURE**
   (See Summary of rationale & Presenting the new Policies and Procedures B. CEO with team Action Items Summary for immediate and long-term future).

   c. **Minimize or eliminate Shame/Blame** – best results are created by honoring and identifying/ recognizing the genuinely completed tasks/results wanted.  When frustrated, if tasks are not complete, identify the prioritized goal and the steps needed through more effective management software, i.e. Team Gantt that you initially populate together.  Identify WHY tasks have not been completed – whether they are contingent on other people completing their tasks OR an overall issue with the mission, time constraints and prioritization.  Potentially implement a merit system that allows people to have first dibs at a series of tasks – the

J. Anastasia                                                                 01-14-2021

Page PAGE \* MERGEFORMAT 2

better the performance, the closer they get to addressing the tasks they'd prefer to do.

d. **Match tasks and roles to the most effective communication/personality styles and skills/experiences**.
   1. LIST ALL ROLES AND TASKS NEEDED FIRST, then match them to the personnel – include where people excel and where people will have a minimal risk challenge/growth opportunity.
   2. Additionally, let the team know that those matches will be addressed first, and then when additional tasks naturally emerge that many might not wish to do, they must be willing to take them on and complete them as a team contribution. This includes the following potential examples (all essential for everyday operations):
      - Follow-through on participants,
      - Record keeping for the research project,
      - Taking out the garbage if in a brick-and-mortar location,
      - Note-taking for team meetings essential for group summaries,
      - Meeting timekeeper, etc.
      *Note:* Distribute these additional tasks as fairly as possible.

e. **Reorganize/Reassign roles, if needed.**
   1. If people have been placed into roles that are too far beyond their expertise, consider creating a co-lead position such that the risk will not harm the overall company – this is not about shaming someone or identifying people as incompetent, simply that they have too much of a learning curve in their current role (especially with time-sensitive financial deadlines).
   2. Catching this early is CRITICAL, so that people can grow into that role eventually, i.e. It is unhealthy for a start-up to place an individual straight out of school, with perhaps even some experience, in the role of CFO.
      *Note:* I would highly recommend addressing this immediately. As a direct example, the situation of not have an account already established as a business account for the receipt and distribution of contract payments/salaries would have been automatically created by an individual fully versed in Finance – this inadvertently created a great deal of angst and distrust because of the promises that were made. This is not the team member's fault because "you cannot know what you do not know." possible.

f. **GIVE ACKNOWLEDGEMENT and CREDIT WHERE CREDIT IS DUE for unique contributions, ideas or solutions ~ whether it be a team member, a team lead, a vendor, the Funders, or an outside consultant.**
   The true original meaning of competition = "To strive together for…" ~ that is a wonderful motto going forward.

5. Additional Observations & Recommendations FOR CEO David AND THE ENTIRE TEAM- regarding Research and NEXT STEPS:
   a. Overall, this is a very competent team in need of a Program Manager to help to bring the vision into the manifested results.
   b. Due to the lingering question of whether this team may want to be a separate start-up - VBIO vs. a team under the umbrella of Sonaphi:

Case: 23-05006    Doc# 30    Filed: 06/29/23    Entered: 06/29/23 16:45:27    Page 99 of 146

⬜ It was not possible to effectively congeal, and also not possible to complete projects with clarity.

⬜ Although the Vision might have been clear, the mission toward that end was split. This makes it extremely difficult to identify priorities.

c. Regarding the research that was requested through the original contract ~ due to the inability to check efficacy KNOWN by the research team, their focus also shifted from "completing the study that was started by the original group."

⬜ It is likely that the split occurred because of the "fatal flaws" within the original design. THIS IS A CRITICAL FACTOR and resulted in what might appear as "not enough work being done." This is not an excuse for work that didn't get done, rather an observation of confusing elements that may have distorted priorities.

⬜ GOING FORWARD, if the new contract is accepted, it will require testing the more accurate request from the research team of the PCR cycles to be shifted to <25 cycles versus the normal.
**NOTE:** This currently cannot be determine as this whole virus and its testing have been patented, which means that it is a BIOweapon. If it were a natural virus, it LEGALLY COULD NOT BE PATENTED; therefore the official make-up of the virus and the ingredients of the test and subsequent vaccines would be required to be listed for the public to see.

⬜ Herein lie the CONSTRAINTS for the research team - If they went forward with what is prescribed, they would actually be creating an experiment that VALIDATES INVALID/INACCURATE results and eventually the entire process would be discredited.

d. **How to go forward?**
**POTENTIAL ACTION STEPS TO COMPLETE A TESTING EXPERIMENT THAT FOUNDATIONALLY IS MORE ETHICAL:**

1. *Locate, as quickly as possible, a lab that is willing to identify the PCR cycles used such that the comparative data is accurate to the voice-resonance analysis OR hire or contract a Lab tech familiar with more accurate COVID testing (etc.) OR immediately negotiate for the proposed University or MIT-related data after discovering where the monies came from and at least overall ethical accuracy of that data.*

2. *The research team is extremely capable of next steps - and a mini-pilot can be conducted, versus a full-fledged study with statements added to the RIB (Identifying the Broad Management Problem, then the Preliminary Research, then defining the research problem) reflecting the constraints relative to use of restricted and potentially inaccurate COVID data. If this is identified, then the ethical concerns are out on the table and addressed as much as is humanly possible.*
*NOTE: It is my belief that there are very powerful organizations that are trying to stop any research that addresses these ethical concerns and hence may deem your team members as "WHISTLEBLOWERS" - which you DO NOT have to announce.*

3. *RECRUITMENT of test subject participants must be fully focused, organized, with personal follow-through. Monies for advertisements and personnel (and/or time designated by existing personnel) MUST be set aside for this process (as experienced multiple times by many professional researchers) - it requires personnel who are people-oriented and are quick and concise simultaneously (<5 minutes per call) with an excellent phone script*

J. Anastasia

01-14-2021

*pre-approved by the team (with a courteous and respectful phone presence). FAQ's relative to the overall experiment itself must be articulated in a way where the risks for participants are minimized - i.e. time is needed, assuring people that their data is secure, etc. Many participants wish to see the results - you may not be able to give them specifics, yet you might be able to share overall research when you're done. People love this - also, offering Amazon gift cards can truly make a difference if a large number of participants are required - and this must be carefully accounted for and recorded/anonymized (i.e. the person must sign for it so that you can prove that you gave them what you agreed to).*

4. *Ensure that there is a separate DATA analysis team - to avoid conflict of interest issues - these all might be taken care of if there is a partnership with a University or pre-established organization (the Canadian group?)*
**NOTE:** COVID Research since January 2020 - Check funding source for the research for testing, etc. and any conflicts of interest, i.e. who owns related patents that are illegal if this virus is, indeed, natural. If it is patented, then the coronavirus, and subsequent testing would be considered a genetically engineered bioweapon and the services and product you offer will be created and marketed in a different way. This may prevent securing a greater understanding of the efficacy of the current tests out there ~ this is the disclaimer that can be added. The gift of the product is to truly help those who have symptoms related to the harm created by COVID (regardless of the origin), as long as this isn't used against people. The second most critical aspect of the core of your team's vision is to ensure client-use anonymity ~ not to the cloud perhaps but to a proprietary platform.

5. **Additional critical issues:**
   a. Changing contracts midstream is not healthy and could be extremely disruptive. It engenders mistrust and fear. This is not advisable for the future unless it is with mutually consented by the entire team.
   b. People were unaware of the details of the previous contract signed – it is critical to be very aware of what the team is currently signing and what they are legally committing to complete with specific deadlines.
   c. It is important to support the team and their negotiations with Sonaphi.
   d. Issues that can be resolved now regarding the accuracy of COVID tests and what is intended to be used will be critical going forward ethically, marketing-wise, as well as the sustainability of the product. This has the greatest potential to be used much more widely for health diagnostics of the entire human body.
   e. Addressing miscommunications as soon as they are identified will help to rebuild trust at the highest levels.

5. **Q&A**


**START-UP BUSINESS ASSESSMENT and REPORT ~ December 2020-January 2021**

**Administered and Completed by:**
Transformational Leadership Consultant/CEO Lead By Wisdom ~ Joyce Anastasia, MA/MFA
Author of the book: Extraordinary Leadership During Extraordinary Times (or on Amazon)
Contact: joyceanastasia@gmail.com OR 415-322-9442 (cell/text)

Page PAGE \* MERGEFORMAT 2

J. Anastasia                                                                                   01-14-2021

# EXHIBIT 13


# Commercial Offer
# For Chief Product and Technology Officer

EJAF/vBio-20201222-01

Dec 22, 2020

Client: VBIO

Address: San Jose, California, USA





Contact Name: David Levesque
Email Id: davidcares33@gmail.com and/or david@sonaphi.com
Mobile No: +1 (518) 320 -2613

Dear David,

Greetings!

<u>**Commercial offer for Consultancy Engagement**</u>

Thank you for giving us the opportunity to demonstrate our solution offering and for accepting that the demonstrated solutions fits your business requirement.

Thank you once again for the opportunity and look forward to having vBio as one of our clientele.
Yours sincerely,

For **Eyad Mahfouz Trading LLC Company. (EJAF TECHNOLOGY)**

Sd/-

**Firas Abras**
**General Manager**

The header has a logo image and company info.



**Eyad Mahfouz Trading LLC Co**

p: +971 (0)4 295 2930 / f:+971 (0)4 295 2932 / sales.dubai@ejaftech.com

Jordan, Iraq, Lebanon, UAE

P.O. Box 93384, 901, 9th Floor, Wasl Business Central, Port Saeed St., Deira, Dubai, UAE

**Stated Requirement**

**vBio** is a startup aiming to help the transform health by launching a product (mobile apps) that detect certain health conditions via vocal biomarkers.

**vBio** seeks consultancy services to help leading and managing its technology and products strategy and execution for its platform.

**Scope of Work:**

Under this proposal, Ejaf Technology agrees to supply to vBio a resource to work as part of the vBio team on the stated requirements in a contract between EJAFtech (Eyad Mahfouz Trading LLC) and vBio on time and material basis.

**Objectives & Key Results for consultant:**

Lead design and implementation of the product roadmap by understanding customers needs and company priorities.

1. The Company hereby retains Consultant for the role of Chief Technical Officer, and Consultant agrees to perform duties including but not limited to:

   1. Identify team skills required to implement the roadmap
   2. Design the initial architecture
   3. Create a team roadmap - tasks for team members, needs for new members
   4. Select development and project management tools used by the team
   5. Write code when necessary
   6. Work with external technical teams to interface with our platform
   7. Collaborate and work with team as needed
   8. Be on time for all meetings
   9. Complete tasks on time
   10. Ensure security, scalability, and compliance
   11. Track time on tasks
   12. Meet collaboratively identified objectives and key results

   for the Company (collectively the "Services") as directed by the CEO.

2. Consultant is expected to work 240 full time days per year. Consultant will receive 10 paid vacation days and 10 paid Holidays. Consultant can ask for up to 10 more days off unpaid.

3. Consultant will earn equity according to the terms and schedule set forth in the Gusher.co equity service agreement, launch of a commercial, even if it is not generating revenue, available software solution for health assessment or first revenue, that is already signed by both parties. Additional equity will be granted based on a new vesting schedule to be decided on by the team.

4. Consultant will work from the location of their choice.

5. Consultant may have an expense budget in addition to their salary that covers expenses in the normal course of work such as travel, conferences, and other fees to be determined.

6. Consultant is expected to and will be supported in continuous improvement of the skills required to perform with the team as negotiated with the company. Such skills include but are not limited to:
   - Communication
   - Emotional Intelligence
   - Physical, Mental, Emotional, and Financial Health
   - Health literacy

- Personal awareness, addition of new awarenesses, and removal of behaviors and beliefs that impede personal and professional growth
- Professional development

7. Consultant will maintain their own personal computer and smartphone with the resources to perform the tasks assigned. Computer will have working video and audio for video conferencing. Phone will be a smartphone able to run mobile apps. Security and privacy protocols will be followed by the Consultant in accordance with HIPAA and any other Company wide protocols. If special hardware, software, or training is required for the work the company will pay for it.

8. Consultant shall invoice Company on the second and fourth Monday of each month for services performed pursuant to this Agreement. Company shall pay Consultant's invoice within the terms and guidelines of this agreement, in full, within 5 business days of the date of Consultant's invoice.

9. Either party may terminate this Agreement at any time by giving thirty (30) days written notice to the other party. No termination shall prejudice Consultant's rights to payments for Services completed prior to the effective date of termination. This contract will continue until either party cancels said contract with 30-day written notice.

10. This Agreement may be terminated at any time by either party for breach or neglect of duty by the other not remedied within 5 days after written notice by either party.

11. Proprietary information ownership and disclosure agreements are covered in the Gusher.co equity service agreement the Consultant has signed.

12. Consultant does not have, and is not granted by this Agreement, any express or implied right or authority to assume or create any obligations on behalf of, or in the name of, Company; or to bind Company to, or enter into, directly or indirectly, any contract, agreement or undertaking with any third party. If Company wishes to grant such authority to Consultant, Company shall issue such authority to Consultant in writing prior to Consultant taking any such action.

13. This Agreement shall be governed by and construed in accordance with the laws of the State of California and respective State(s) of operation.

14. All notices hereunder shall be in writing, and shall be deemed given upon delivery via email, to the addresses set forth below: David Levesque, vBio Inc., davidcares33@gmail.com

## Commercial Consideration

| Summary of Services | |
|---|---|
| | Agreed Rate |
| Consultancy Services (Hourly Rate in US Dollars) | $78.13 per hour |
| Expenses (must be authorized by vBio prior) | Actual |

- **Section B: General Terms and Conditions**

    **Validity:**
    - ✓ This AGREEMENT is valid until both sides agree to change it or cancel in writing.

    **Prices:**
    - ✓ All prices are US Dollars.

    **Delivery:**





**Eyad Mahfouz Trading LLC Co**
p: +971 (0)4 295 2930 / f:+971 (0)4 295 2932 / sales.dubai@ejaftech.com

Jordan, Iraq, Lebanon, UAE     P.O. Box 93384, 901, 9th Floor, Wasl Business Central, Port Saeed St., Deira, Dubai, UAE

   ✓ Resource will deliver services per agreement with vBio remotely.

**Payment terms:**
   ✓ 100% upon invoicing (invoice + time card), unless arrangements are meade.

**Warranty Terms:**
   ✓ No warranty on services.

**Special terms: Payment by wiretransfer to our UAE bank account. Work started as of September 22nd, 2020. The consultant will be submitting a list of the hours worked since 9/22/2020.**

**Non Payment**
The contractor / vendor retains the right to complete the contracted services using resources from any of their office or associate companies. Payment MUST be paid upon submission of time card and approved expenses (if any). Payment must not be held back beyond 15 days of proforma invoice.

**M/s Eyad Mahfouz Trading LLC Co**
**Signature:**

**vBio**
**Signature:** *David Levesque*

| | |
|---|---|
| **Name:** | Firas Abras |
| **Title:** | General Manager |
| **Date:** | Dec 22, 2020 |

David Levesque
CEO
**Date:** 03 / 02 / 2021

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Firas contract |
| **FILE NAME** | 2020 Dec 22 EJAFT...ras Contract.docx |
| **DOCUMENT ID** | 0b7c138ca4e4a899f2c1c0771009dcb7660454e7 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| ↗ SENT | **03 / 03 / 2021**<br>00:18:27 UTC | Sent for signature to David Levesque (davidcares33@gmail.com) from davidcares33@gmail.com<br>IP: 50.209.162.174 |
| 👁 VIEWED | **03 / 03 / 2021**<br>00:18:43 UTC | Viewed by David Levesque (davidcares33@gmail.com)<br>IP: 50.209.162.174 |
| ✎ SIGNED | **03 / 03 / 2021**<br>00:19:00 UTC | Signed by David Levesque (davidcares33@gmail.com)<br>IP: 50.209.162.174 |
| ✓ COMPLETED | **03 / 03 / 2021**<br>00:19:00 UTC | The document has been completed. |

Powered by **HELLOSIGN**

# EXHIBIT 14

## CONSULTING CONTRACT BETWEEN vBio INC, AND Astrid Stuckelberger

THIS SERVICES AGREEMENT MADE THIS 7th DAY OF JANUARY 2021, BETWEEN vBio INC, (THE "COMPANY") AND **Astrid Stuckelberger** (THE "CONSULTANT").

1. The Company hereby retains Consultant for the role of Head of Clinical and Public Health Research, and Consultant agrees to perform duties including but not limited to:

- Manage and Design research methodology and protocols for each sites
- Implement research collaborations and validation (clinical and public health)
- Develop the company research roadmap
- Write research presentation, trial summaries and readouts
- Develop scientific background material for different groups (policy, health professionals and the public)
- Monitor research and standards of care in our clinical areas of interest
- Manage the ethical and regulatory process in each country and support PIs
- Develop new research topics
- Present the science of bioacoustics related to Sonaphi and results at conferences, webinars
- Support data science team
- Collaborate with the chief scientist and chief medical officer on R&D
- Support communication with clinicians and all partners
- Collaborate and work with team as needed
- Work with external vendors
- Be on time for all meetings
- Deliver goals and tasks with agreed deadlines

for the Company (collectively the "Services") as directed by the CEO.

2. As compensation for Services rendered by the Consultant pursuant to this Agreement, Company shall pay Consultant $12,500 per month if Consultant is working 40 hours per week. If the consultant works fewer hours the payment will be calculated on an hourly basis accordingly. Payments will be made on the second and fourth Friday. Consultant shall start earning income from the first business day after 9/22/20. Payment to Consultant will begin once the Company is funded.

3. Contractor agrees to receive deferred payment of the arrearage since 9/22/20 at monthly simple interest rate of 20%. All arrearage plus interest is payable at any time, and is due in full when the Company receives funding. (See details in section 11.1)

3.1 Optional Loan-Back: In order to further assist the Company to manage cash flow, at Consultant's sole discretion, Consultant may offer to defer a fraction of ongoing compensation under the same terms as Section 3.

4. Consultant is expected to work 235 full time days per year. Consultant will receive 5 paid sick days, 15 paid vacation days and 10 paid Holidays. Consultant can ask for up to 10 more days off unpaid.

5. Consultant will earn equity according to the terms and schedule set forth in the Gusher.co equity service agreement, launch of a commercial, even if it is not generating revenue, available software solution for health assessment or first revenue, that is already signed by both parties. Additional equity equal to double the launch equity will be granted over a two year vesting period. Launch equity is 2.00%.

6. Company will provide Consultant with a financial incentive plan based on company performance, to be negotiated within three months of the signing of this agreement.

7. Consultant may have an expense budget in addition to their salary that covers expenses in the normal course of work such as travel, conferences, and other fees to be determined.

8. Consultant is expected to and will be supported in continuous improvement of the skills required to perform with the team as negotiated with the company. Such skills include but are not limited to:

    1. Communication
    2. Emotional Intelligence
    3. Physical, Mental, Emotional, and Financial Health
    4. Health literacy
    5. Personal awareness, addition of new awarenesses, and removal of behaviors and beliefs that impede personal and professional growth
    6. Professional development

9. Consultant will work from the location of their choice. Consultant will maintain their own personal computer and smartphone with the resources to perform the tasks assigned. Computer will have working video and audio for video conferencing. Phone will be a smartphone able to run mobile apps. Security and privacy protocols will be followed by the Consultant in accordance with HIPAA and any other Company wide protocols. If special hardware, software, or training is required for the work the company will pay for it.

10. Consultant shall invoice Company on the second and fourth Monday of each month for services performed pursuant to this Agreement. Company shall pay Consultant's invoice within the terms and guidelines of this agreement, in full, within 5 business days of the date of Consultant's invoice.

11. Either party may terminate this Agreement at any time by giving two (2) weeks written notice to the other party. No termination shall prejudice Consultant's rights to payments for Services completed prior to the effective date of termination, as calculated by section 3.

    11.1 **Full Compensation:** All compensation and reimbursement of expenses become due upon termination by either party. It is agreed that compensation includes Consultant's full accrued compensation dating back to the Sonaphi Contract Date of September 22, 2020, or to the date of hire if hired more recently. Payment terms may be negotiated upon termination, but in no event does the due date extend beyond thirty (30) days after the Company receives $1.5M of total accrued revenue plus investment, or changes ownership, or changes of structure, whichever is first. The Company agrees to inform the Consultant within fifteen (15) days of any such changes, and it is the responsibility of the Consultant to provide accurate contact information. Failure to pay compensation and reimbursements within thirty (30) days will result in the Company paying 20% per month over the base pay, i.e., $10,000 per month base pay, becomes $12,000 per month for the months in arrears. All Arrearage plus increase is payable at any time.

12. Consultant is engaged by the Company as an independent contractor, and not as an employee. As such, Consultant is solely responsible for and will make proper and timely payment of any and all taxes on amounts paid to Consultant by Company, including, if applicable, estimated state and federal income taxes, self employment taxes, state disability insurance taxes and the like. Consultant will not receive or participate in any of Company's employee health insurance or any other employee benefit programs, and Consultant will not be covered by Company's insurance policies.

13. Proprietary information ownership and disclosure agreements are covered in the Gusher.co equity service agreement the Consultant has signed.

14. Consultant does not have, and is not granted by this Agreement, any express or implied right or authority to assume or create any obligations on behalf of, or in the name of, Company; or to bind Company to, or enter into, directly or indirectly, any contract, agreement or undertaking with any third party. If Company

wishes to grant such authority to Consultant, Company shall issue such authority to Consultant in writing prior to Consultant taking any such action.

15. This Agreement shall be governed by and construed in accordance with the laws of the State of California and respective State(s) of operation.

16. All notices hereunder shall be in writing, and shall be deemed given upon delivery via email, to the addresses set forth below:

**Company:**

Printed Name:   David Levesque

Signature:

Date:

Title: CEO - Chief Executive Officer, vBio Inc.

davidcares33@gmail.com

**Consultant:**

Printed Name: Astrid Stuckelberger

Signature:

Date:

Title: Head of Clinical and Public Research

# EXHIBIT 15

## CONSULTING CONTRACT BETWEEN vBio INC, AND
### Jamil Houston

THIS SERVICES AGREEMENT MADE THIS 15TH DAY OF DECEMBER 2020, BETWEEN vBio INC, (THE "COMPANY") AND Jamil Houston (THE "CONSULTANT").

1. The Company hereby retains Consultant for the role of Chief Branding Officer, and Consultant agrees to perform duties including but not limited to:

    1. Develop Brand <u>Platform</u> & Appearance- colors, shapes messaging
    2. Develop UI/UX design and implementation
    3. Understand the effects of design on behavior
    4. Collaborate and work with teams as needed
    5. Be on time for all meetings
    6. Complete tasks on time
    7. Wear the sales hat whenever the opportunity arises
    8. Develop the Creative Workflow Process
    9. Manage outside resources as needed to support company objectives
    10. Be the Keeper of the Company and product purpose and promise

for the Company (collectively the "Services") as directed by the CEO.

2. As compensation for Services rendered by the Consultant pursuant to this Agreement, Company shall pay Consultant $12,500 per month if Consultant is working 40 hours per week. If the consultant works fewer hours the payment will be calculated on an hourly basis accordingly. Payments will be made on the second and fourth Friday. Consultant shall start earning income from the first business day after 9/22/20. Payment to Consultant will begin once the Company is funded. Bonuses will be paid according to the company's operating agreement.

3. Contractor agrees to receive deferred payment of the arrearage since 9/22/20 at monthly interest rate of 20%. All arrearage plus interest is payable at any time, and is due in full when the Company receives funding. (See details in section 11.1)

    3.1 Optional Loan-Back: In order to further assist the Company to manage cash flow, at Contractor's sole discretion, Contractor may offer to defer a fraction of ongoing compensation under the same terms as Section 3.

4. Consultant is expected to work 230 full time days per year. Consultant will receive 15 paid vacation days, 5 sick days and 10 paid Holidays. Consultant can ask for up to 10 more days off unpaid.

5. Consultant will earn 2.5% equity at the launch of a commercial product, even if it is not generating revenue, available software solution for health assessment or first revenue,

Doc ID: ed6d72b119b0b8e0ef6e5b92f106a3e8a9d93bad

that is already signed by both parties. The Consultant will be granted additional equity at double the amount of their launch equity (in this case 2.5%) over a 2-year vesting period. The terms of this contract with regards to equity agreement amount governs over all contracts on Gusher.co.

6. Company will provide a plan for a financial incentive plan to employees based on company performance to the Consultant to be negotiated within three months of the signing of this agreement.

7. Consultant may have an expense budget in addition to their salary that covers expenses in the normal course of work such as travel, conferences, and other fees to be determined.

8. Consultant is expected to and will be supported in continuous improvement of the skills required to perform with the team as negotiated with the company. Such skills include but are not limited to:

   1. Communication
   2. Emotional Intelligence
   3. Physical, Mental, Emotional, and Financial Health
   4. Health literacy
   5. Personal awareness, addition of new awarenesses, and removal of behaviors and beliefs that impede personal and professional growth
   6. Professional development

9. Consultant will work from the location of their choice. Consultant will maintain their own personal computer and smartphone with the resources to perform the tasks assigned. Computer will have working video and audio for video conferencing. Phone will be a smartphone able to run mobile apps. Security and privacy protocols will be followed by the Consultant in accordance with HIPAA and any other Company wide protocols. If special hardware, software, or training is required for the work the company will pay for it.

10. Consultant shall invoice Company on the second and fourth Monday of each month for services performed pursuant to this Agreement. Company shall pay Consultant's invoice within the terms and guidelines of this agreement, in full, within 5 business days of the date of Consultant's invoice.

11. Either party may terminate this Agreement at any time by giving two (2) weeks written notice to the other party. No termination shall prejudice Consultant's rights to payments for Services completed prior to the effective date of termination, as calculated by section 3.

   11.1 **Full Compensation:** All compensation and reimbursement of expenses become due upon termination by either party. It is agreed that compensation includes Consultant's full accrued compensation dating back

Doc ID: ed6d72b119b0b8e0ef6e5b92f106a3e8a9d93bad

to the Sonaphi Contract Date of September 22, 2020, or to the date of hire if hired thereafter. Payment terms may be negotiated upon termination, but in no event does the due date extend beyond thirty (30) days after the Company receives $1.5M of revenue or investment, changes ownership, or changes structure, whichever is first. The Company agrees to inform the Consultant within 15 days of any such changes, and it is the responsibility of the Consultant to provide accurate contact information. Failure to pay compensation and reimbursements within thirty (30) days will result in the Company paying 20% per month over the base pay (i.e. $10,000 per month base pay, becomes $12,000 per month for the months in arrears). All Arrearage plus increase is payable at any time.

12. Consultant is engaged by the Company as an independent contractor, and not as an employee. As such, Consultant is solely responsible for and will make proper and timely payment of any and all taxes on amounts paid to Consultant by Company, including, if applicable, estimated state and federal income taxes, self employment taxes, state disability insurance taxes and the like. Consultant will not receive or participate in any of Company's employee health insurance or any other employee benefit programs, and Consultant will not be covered by Company's insurance policies.

13. Proprietary information ownership and disclosure agreements are covered in the Gusher.co equity service agreement the Consultant has signed.

14. Consultant does not have, and is not granted by this Agreement, any express or implied right or authority to assume or create any obligations on behalf of, or in the name of, Company; or to bind Company to, or enter into, directly or indirectly, any contract, agreement or undertaking with any third party. If Company wishes to grant such authority to Consultant, Company shall issue such authority to Consultant in writing prior to Consultant taking any such action.

15. This Agreement shall be governed by and construed in accordance with the laws of the State of California and respective State(s) of operation.

16. All notices hereunder shall be in writing, and shall be deemed given upon delivery via email, to the addresses set forth below:

**Company**
David Levesque
vBio Inc.
davidcares33@gmail.com

The foregoing Agreement is agreed to by:

David Levesque: *David Levesque*

Doc ID: ed6d72b119b0b8e0ef6e5b92f106a3e8a9d93bad

Title: CEO

Company: vBIO Inc.

Date:      12 / 14 / 2020


Consultant name: Jamil Houston

Consultant signature:

Title: Chief Branding Officer

Company:    Semantix

Date:    12 / 14 / 2020

4

Doc ID: ed6d72b119b0b8e0ef6e5b92f106a3e8a9d93bad


| TITLE | vbio agreement |
|---|---|
| FILE NAME | vBio Inc Contract...nt Jamil.docx.pdf |
| DOCUMENT ID | ed6d72b119b0b8e0ef6e5b92f106a3e8a9d93bad |
| AUDIT TRAIL DATE FORMAT | MM / DD / YYYY |
| STATUS | • Completed |

Document History

| | | |
|---|---|---|
| SENT | **12 / 14 / 2020**<br>19:11:42 UTC | Sent for signature to David Levesque (davidcares33@gmail.com) and Jamil Houston (jamil@semantixcreative.com) from davidcares33@gmail.com<br>IP: 73.231.146.21 |
| VIEWED | **12 / 14 / 2020**<br>19:14:30 UTC | Viewed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| VIEWED | **12 / 14 / 2020**<br>19:14:33 UTC | Viewed by Jamil Houston (jamil@semantixcreative.com)<br>IP: 172.90.134.74 |
| SIGNED | **12 / 14 / 2020**<br>19:14:45 UTC | Signed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| SIGNED | **12 / 14 / 2020**<br>19:15:45 UTC | Signed by Jamil Houston (jamil@semantixcreative.com)<br>IP: 172.90.134.74 |
| COMPLETED | **12 / 14 / 2020**<br>19:15:45 UTC | The document has been completed. |

# EXHIBIT 16

## CONSULTING CONTRACT BETWEEN vBio INC, AND
## Ayesha Khan

THIS SERVICES AGREEMENT MADE THIS 15TH DAY OF DECEMBER 2020, BETWEEN vBio INC, (THE "COMPANY") AND Ayesha Khan (THE "CONSULTANT").

1. The Company hereby retains Consultant for the role of UI/UX Designer, and Consultant agrees to perform duties including but not limited to:

   1. Support marketing team in creating consistent branding across all mediums: website, app, slide decks, whitepapers, etc.
   2. Create remarkable, clickable visuals for ads and presentations
   3. Create stories that move people: video, audio, photo, text
   4. Use human centered design strategies
   5. Design with human nature in mind - psychology, biology, hierarchy of needs
   6. Continuous learning about sales and marketing and graphic design
   7. Work with the team as needed
   8. Be on time for all meetings

for the Company (collectively the "Services") as directed by the CEO.

2. As compensation for Services rendered by the Consultant pursuant to this Agreement, Company shall pay Consultant $10,833 per month if Consultant is working 40 hours per week. If the consultant works fewer hours the payment will be calculated on an hourly basis accordingly. Payments will be made on the second and fourth Friday. Consultant shall start earning income from the first business day after 9/22/20. Payment to Consultant will begin once the Company is funded. Bonuses will be paid according to the company's operating agreement.

3. Contractor agrees to receive deferred payment of the arrearage since 9/22/20 at monthly interest rate of 20%. All arrearage plus interest is payable at any time, and is due in full when the Company receives funding. (See details in section 11.1)

   3.1 Optional Loan-Back: In order to further assist the Company to manage cash flow, at Contractor's sole discretion, Contractor may offer to defer a fraction of ongoing compensation under the same terms as Section 3.

4. Consultant is expected to work 235 full time days per year. Consultant will receive 10 paid vacation days, 5 sick days and 10 paid Holidays. Consultant can ask for up to 10 more days off unpaid.

5. Consultant will earn 2.0% equity at the launch of a commercial product, even if it is not

generating revenue, available software solution for health assessment or first revenue, that is already signed by both parties. The Consultant will be granted additional equity at double the amount of their launch equity (in this case 2.0%) over a 3-year vesting period. The terms of this contract with regards to equity agreement amount governs over all contracts on Gusher.co.

6. Company will provide a plan for a financial incentive plan to employees based on company performance to the Consultant to be negotiated within three months of the signing of this agreement.

7. Consultant may have an expense budget in addition to their salary that covers expenses in the normal course of work such as travel, conferences, and other fees to be determined.

8. Consultant is expected to and will be supported in continuous improvement of the skills required to perform with the team as negotiated with the company. Such skills include but are not limited to:

   1. Communication
   2. Emotional Intelligence
   3. Physical, Mental, Emotional, and Financial Health
   4. Health literacy
   5. Personal awareness, addition of new awarenesses, and removal of behaviors and beliefs that impede personal and professional growth
   6. Professional development

9. Consultant will work from the location of their choice. Consultant will maintain their own personal computer and smartphone with the resources to perform the tasks assigned. Computer will have working video and audio for video conferencing. Phone will be a smartphone able to run mobile apps. Security and privacy protocols will be followed by the Consultant in accordance with HIPAA and any other Company wide protocols. If special hardware, software, or training is required for the work the company will pay for it.

10. Consultant shall invoice Company on the second and fourth Monday of each month for services performed pursuant to this Agreement. Company shall pay Consultant's invoice within the terms and guidelines of this agreement, in full, within 5 business days of the date of Consultant's invoice.

11. Either party may terminate this Agreement at any time by giving two (2) weeks written notice to the other party. No termination shall prejudice Consultant's rights to payments for Services completed prior to the effective date of termination, as calculated by section 3.

Doc ID: 6e4a53d5139e47f0e2866c7935fd48eba0905496

11.1 **Full Compensation:** All compensation and reimbursement of expenses become due upon termination by either party. It is agreed that compensation includes Consultant's full accrued compensation dating back to the Sonaphi Contract Date of September 22, 2020, or to the date of hire if hired thereafter. Payment terms may be negotiated upon termination, but in no event does the due date extend beyond thirty (30) days after the Company receives $1.5M of revenue or investment, changes ownership, or changes structure, whichever is first. The Company agrees to inform the Consultant within 15 days of any such changes, and it is the responsibility of the Consultant to provide accurate contact information. Failure to pay compensation and reimbursements within thirty (30) days will result in the Company paying 20% per month over the base pay (i.e. $10,000 per month base pay, becomes $12,000 per month for the months in arrears). All Arrearage plus increase is payable at any time.

12. Consultant is engaged by the Company as an independent contractor, and not as an employee. As such, Consultant is solely responsible for and will make proper and timely payment of any and all taxes on amounts paid to Consultant by Company, including, if applicable, estimated state and federal income taxes, self employment taxes, state disability insurance taxes and the like. Consultant will not receive or participate in any of Company's employee health insurance or any other employee benefit programs, and Consultant will not be covered by Company's insurance policies.

13. Proprietary information ownership and disclosure agreements are covered in the Gusher.co equity service agreement the Consultant has signed.

14. Consultant does not have, and is not granted by this Agreement, any express or implied right or authority to assume or create any obligations on behalf of, or in the name of, Company; or to bind Company to, or enter into, directly or indirectly, any contract, agreement or undertaking with any third party. If Company wishes to grant such authority to Consultant, Company shall issue such authority to Consultant in writing prior to Consultant taking any such action.

15. This Agreement shall be governed by and construed in accordance with the laws of the State of California and respective State(s) of operation.

16. All notices hereunder shall be in writing, and shall be deemed given upon delivery via email, to the addresses set forth below:

**Company**
David Levesque
vBio Inc.

davidcares33@gmail.com

The foregoing Agreement is agreed to by:

David Levesque:   *David Levesque*

Title: CEO

Company: vBIO Inc.

Date:   12 / 14 / 2020


Consultant's Company:   Ayesha Kham

Consultant name:   Ayesha Khan

Consultant signature:

Title:   UI UX Designer

Date:   12 / 14 / 2020

4

Doc ID: 6e4a53d5139e47f0e2866c7935fd48eba0905496

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | vbio agreement |
| **FILE NAME** | vBio Inc Contract...t Ayesha.docx.pdf |
| **DOCUMENT ID** | 6e4a53d5139e47f0e2866c7935fd48eba0905496 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| SENT | **12 / 14 / 2020**<br>21:19:22 UTC | Sent for signature to David Levesque<br>(davidcares33@gmail.com) and Ayesha Khan<br>(ayeshakay786@gmail.com) from davidcares33@gmail.com<br>IP: 73.231.146.21 |
|  VIEWED | **12 / 14 / 2020**<br>21:19:41 UTC | Viewed by Ayesha Khan (ayeshakay786@gmail.com)<br>IP: 73.162.77.112 |
| SIGNED | **12 / 14 / 2020**<br>21:20:22 UTC | Signed by Ayesha Khan (ayeshakay786@gmail.com)<br>IP: 73.162.77.112 |
|  VIEWED | **12 / 14 / 2020**<br>21:20:39 UTC | Viewed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| SIGNED | **12 / 14 / 2020**<br>21:20:54 UTC | Signed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| COMPLETED | **12 / 14 / 2020**<br>21:20:54 UTC | The document has been completed. |

Powered by **HELLOSIGN**

# EXHIBIT 17

## CONSULTING CONTRACT BETWEEN vBio INC, AND Dr. Lucas K Nyabero

THIS SERVICES AGREEMENT MADE THIS 15TH DAY OF DECEMBER 2020, BETWEEN vBio INC, (THE "COMPANY") AND Dr. Lucas K Nyabero (THE "CONSULTANT").

1. The Company hereby retains Consultant for the role of Chief Customer Success Officer (Chief Revenue Officer) and Consultant agrees to perform duties including but not limited to:

   Work with marketing to generate enough revenue to be cash flow positive in 12 months after launch.

   1. Develop sales system
   2. Train sales team
   3. Develop pricing strategy
   4. Work with marketing and financial team to develop projections and path to goals
   5. Target $100k one month after study completion
   6. Attend weekly team meetings
   7. Collaborate and work with team as needed
   8. Be on time for all meetings
   9. Complete tasks on time

   for the Company (collectively the "Services") as directed by the CEO.

2. As compensation for Services rendered by the Consultant pursuant to this Agreement, Company shall pay Consultant $12,500 per month if Consultant is working 40 hours per week. If the consultant works fewer hours the payment will be calculated on an hourly basis accordingly. Payments will be made on the second and fourth Friday. Consultant shall start earning income from the first business day after 9/22/20. Payment to Consultant will begin once the Company is funded.

3. Contractor agrees to receive deferred payment of the arrearage since 9/22/20 at monthly simple interest rate of 20%. All arrearage plus interest is payable at any time, and is due in full when the Company receives funding. (See details in section 11.1)

   3.1 Optional Loan-Back: In order to further assist the Company to manage cash flow, at Consultant's sole discretion, Consultant may offer to defer a fraction of ongoing compensation under the same terms as Section 3.

Doc ID: 32d9f56f2f01657d8549f7b9384f10f5b609a6d5

4. Consultant is expected to work 231 full time days per year. Consultant will receive 5 paid sick days, 15 paid vacation days and 10 paid Holidays. Consultant can ask for up to 10 more days off unpaid.

5. Consultant will earn equity according to the terms and schedule set forth in the Gusher.co equity service agreement, launch of a commercial, even if it is not generating revenue, available software solution for health assessment or first revenue, that is already signed by both parties. Additional equity equal to double the launch equity will be granted over a three year vesting period. Launch equity is _2.5%_.

6. Company will provide Consultant with a financial incentive plan based on company performance, to be negotiated within three months of the signing of this agreement.

7. Consultant may have an expense budget in addition to their salary that covers expenses in the normal course of work such as travel, conferences, and other fees to be determined.

8. Consultant is expected to and will be supported in continuous improvement of the skills required to perform with the team as negotiated with the company. Such skills include but are not limited to:

   1. Communication
   2. Emotional Intelligence
   3. Physical, Mental, Emotional, and Financial Health
   4. Health literacy
   5. Personal awareness, addition of new awarenesses, and removal of behaviors and beliefs that impede personal and professional growth
   6. Professional development

9. Consultant will work from the location of their choice. Consultant will maintain their own personal computer and smartphone with the resources to perform the tasks assigned. Computer will have working video and audio for video conferencing. Phone will be a smartphone able to run mobile apps. Security and privacy protocols will be followed by the Consultant in accordance with HIPAA and any other Company wide protocols. If special hardware, software, or training is required for the work the company will pay for it.

10. Consultant shall invoice Company on the second and fourth Monday of each month for services performed pursuant to this Agreement. Company shall pay Consultant's invoice within the terms and guidelines of this agreement, in full, within 5 business days of the date of Consultant's invoice.

Doc ID: 32d9f56f2f01657d8549f7b9384f10f5b609a6d5

11. Either party may terminate this Agreement at any time by giving two (2) weeks written notice to the other party. No termination shall prejudice Consultant's rights to payments for Services completed prior to the effective date of termination, as calculated by section 3.

   11.1 **Full Compensation:** All compensation and reimbursement of expenses become due upon termination by either party. It is agreed that compensation includes Consultant's full accrued compensation dating back to the Sonaphi Contract Date of September 22, 2020, or to the date of hire if hired more recently. Payment terms may be negotiated upon termination, but in no event does the due date extend beyond thirty (30) days after the Company receives $1.5M of total accrued revenue plus investment, or changes ownership, or changes of structure, whichever is first. The Company agrees to inform the Consultant within fifteen (15) days of any such changes, and it is the responsibility of the Consultant to provide accurate contact information. Failure to pay compensation and reimbursements within thirty (30) days will result in the Company paying 20% per month over the base pay, For example, $10,000 per month base pay, becomes $12,000 per month for the months in arrears. All Arrearage plus increase is payable at any time.

12. Consultant is engaged by the Company as an independent contractor, and not as an employee. As such, Consultant is solely responsible for and will make proper and timely payment of any and all taxes on amounts paid to Consultant by Company, including, if applicable, estimated state and federal income taxes, self employment taxes, state disability insurance taxes and the like. Consultant will not receive or participate in any of Company's employee health insurance or any other employee benefit programs, and Consultant will not be covered by Company's insurance policies.

13. Proprietary information ownership and disclosure agreements are covered in the Gusher.co equity service agreement the Consultant has signed.

14. Consultant does not have, and is not granted by this Agreement, any express or implied right or authority to assume or create any obligations on behalf of, or in the name of, Company; or to bind Company to, or enter into, directly or indirectly, any contract, agreement or undertaking with any third party. If Company wishes to grant such authority to Consultant, Company shall issue such authority to Consultant in writing prior to Consultant taking any such action.

15. This Agreement shall be governed by and construed in accordance with the laws of the State of California and respective State(s) of operation.

Doc ID: 32d9f56f2f01657d8549f7b9384f10f5b609a6d5

16. All notices hereunder shall be in writing, and shall be deemed given upon delivery via email, to the addresses set forth below:

**Company:**

Printed Name:  David Levesque

Signature: *David Levesque*

Date:  12 / 15 / 2020

Title: CEO - Chief Executive Officer, vBio Inc.

davidcares33@gmail.com

**Consultant:**

Printed Name:  Dr. Lucas K Nyabero

Signature: *NyaberoLucasK*

Date:  12 / 15 / 2020

Title: Chief Customer Success Officer (Chief Revenue Officer), vBio Inc.

DrNyabero@ElaraWellness.com

 **HELLOSIGN**

<span style="float:right">Audit Trail</span>

| | |
|---|---|
| **TITLE** | vbio agreement |
| **FILE NAME** | M A S T E R CONSU...7 DL reviewed.pdf |
| **DOCUMENT ID** | 32d9f56f2f01657d8549f7b9384f10f5b609a6d5 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **12 / 15 / 2020**<br>15:37:00 UTC | Sent for signature to David Levesque<br>(davidcares33@gmail.com) and Lucas Nyabero<br>(drnyabero@elarawellness.com) from davidcares33@gmail.com<br>IP: 73.231.146.21 |
| **VIEWED** | **12 / 15 / 2020**<br>15:37:47 UTC | Viewed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| **SIGNED** | **12 / 15 / 2020**<br>15:38:02 UTC | Signed by David Levesque (davidcares33@gmail.com)<br>IP: 73.231.146.21 |
| **VIEWED** | **12 / 15 / 2020**<br>15:39:26 UTC | Viewed by Lucas Nyabero (drnyabero@elarawellness.com)<br>IP: 172.58.110.134 |
| **SIGNED** | **12 / 15 / 2020**<br>15:40:59 UTC | Signed by Lucas Nyabero (drnyabero@elarawellness.com)<br>IP: 172.58.110.134 |
| **COMPLETED** | **12 / 15 / 2020**<br>15:40:59 UTC | The document has been completed. |

# EXHIBIT 18

## CONSULTING CONTRACT BETWEEN vBio INC, AND
## Marissa Land

THIS SERVICES AGREEMENT MADE THIS 15TH DAY OF DECEMBER 2020, BETWEEN vBio INC, (THE "COMPANY") AND Marissa Land (THE "CONSULTANT").  It is important to note the terms of this contract governs over contract on Gusher.co.

1. The Company hereby retains Consultant for the role of Senior Marketing Director,  and Consultant agrees to perform duties including but not limited to:

- Partner with Jamil to develop and implement a cohesive marketing plan and budget to increase brand awareness: short-term, mid-term, and long-term.
- Develop, implement, and monitor marketing campaigns that meet business objectives and drive leads/revenue.
- Develop go to market message, brand, and targets
- Conduct global, actionable market and competitive research for use by sales, creative/marketing, and executive teams
- Develop and understand buyer and user personas and deliver on the insights
- Identify competitor strategies and positioning, and devise counter-strategies
- Align closely with Sales as the enterprise strategy evolves
- Be an advocate for customers
  - Manage the user centered design process
  - Engage customers to inform product roadmap and customer success objectives
- Identify necessary skills and team members, and help with hiring
- Organize digital marketing budget
- Be a driver of digital transformation
- Drive digital strategy
- Write digital ad copy
- Optimize placement and conversion
- Develop landing pages and funnels
- Work with team as needed
- Put on sales hat when asked
- Be on time for all meetings
- Complete tasks on time

for the Company (collectively the "Services") as directed by the CEO.

2. As compensation for Services rendered by the Consultant pursuant to this Agreement, Company shall pay Consultant $11,250 per month if Consultant is working 40 hours per week. If the consultant works fewer hours the payment will be calculated on an hourly basis accordingly. Payments will be made on the second and fourth Friday.

Doc ID: bcff688bf1ca2b21451c8c8a6c814f08b4144962

Consultant shall start earning income from 10/12/20. Payment to Consultant will begin once the Company is funded. Bonuses will be paid according to the company's operating agreement.

3. Contractor agrees to receive deferred payment of the arrearage since 10/12/20 at monthly interest rate of 20%. All arrearage plus interest is payable at any time, and is due in full when the Company receives funding (See details in Section 11.1).

    3.1 Optional Loan-Back: In order to further assist the Company to manage cash flow, at Consultant's sole discretion, Consultant may offer to defer a fraction of ongoing compensation under the same terms as Section 3.

4. Consultant is expected to work 235 full time days per year. Consultant will receive 15 paid vacation days, 5 sick days and 10 paid Holidays. Consultant can ask for up to 10 more days off unpaid.

5. Consultant will earn 2.0% equity at the launch of a commercial product, even if it is not generating revenue, available software solution for health assessment or first revenue, that is already signed by both parties. The Consultant will be granted additional equity at double the amount of their launch equity (in this case 2.0%) over a 3-year vesting period. The terms of this contract with regards to equity agreement amount governs over all contracts on Gusher.co.

6. Company will provide a plan for a financial incentive plan to employees based on company performance to the Consultant to be negotiated within three months of the signing of this agreement.

7. Consultant may have an expense budget in addition to their salary that covers expenses in the normal course of work such as travel, conferences, and other fees to be determined.

8. Consultant is expected to and will be supported in continuous improvement of the skills required to perform with the team as negotiated with the company. Such skills include but are not limited to:

    1. Communication
    2. Emotional Intelligence
    3. Physical, Mental, Emotional, and Financial Health
    4. Health literacy
    5. Personal awareness, addition of new awarenesses, and removal of behaviors and beliefs that impede personal and professional growth
    6. Professional development

9. Consultant will work from the location of their choice. Consultant will maintain their own personal computer and smartphone with the resources to perform the tasks assigned. Computer will have working video and audio for video conferencing. Phone

Doc ID: bcff688bf1ca2b21451c8c8a6c814f08b4144962

will be a smartphone able to run mobile apps. Security and privacy protocols will be followed by the Consultant in accordance with HIPAA and any other Company wide protocols. If special hardware, software, or training is required for the work the company will pay for it.

10. Consultant shall invoice Company on the second and fourth Monday of each month for services performed pursuant to this Agreement. Company shall pay Consultant's invoice within the terms and guidelines of this agreement, in full, within 5 business days of the date of Consultant's invoice.

11. Either party may terminate this Agreement at any time by giving two (2) weeks written notice to the other party. No termination shall prejudice Consultant's rights to payments for Services completed prior to the effective date of termination, as calculated by section 3.

   11.1 **Full Compensation:** All compensation and reimbursement of expenses become due upon termination by either party. It is agreed that compensation includes Consultant's full accrued compensation dating back to the Sonaphi Contract Date of October 12, 2020, or to the date of hire if hired thereafter. Payment terms may be negotiated upon termination, but in no event does the due date extend beyond thirty (30) days after the Company receives $1.5M of revenue or investment, changes ownership, or changes structure, whichever is first. The Company agrees to inform the Consultant within 15 days of any such changes, and it is the responsibility of the Consultant to provide accurate contact information. Failure to pay compensation and reimbursements within thirty (30) days will result in the Company paying 20% per month over the base pay (i.e. $11,250 per month base pay, becomes $13,500 per month for the months in arrears). All Arrearage plus increase is payable at any time.

12. Consultant is engaged by the Company as an independent contractor, and not as an employee. As such, Consultant is solely responsible for and will make proper and timely payment of any and all taxes on amounts paid to consultant by Company, including, if applicable, estimated state and federal income taxes, self employment taxes, state disability insurance taxes and the like. Consultant will not receive or participate in any of Company's employee health insurance or any other employee benefit programs, and Consultant will not be covered by Company's insurance policies.

13. Proprietary information ownership and disclosure agreements are covered in the Gusher.co equity service agreement the Consultant has signed.

14. Consultant does not have, and is not granted by this Agreement, any express or implied right or authority to assume or create any obligations on behalf of, or in the name of, Company; or to bind Company to, or enter into, directly or indirectly, any contract, agreement or undertaking with any third party. If Company wishes to grant such authority to Consultant, Company shall issue such authority to Consultant in writing prior to Consultant taking any such action.

Doc ID: bcff688bf1ca2b21451c8c8a6c814f08b4144962

15. This Agreement shall be governed by and construed in accordance with the laws of the State of California and respective State(s) of operation.

16. All notices hereunder shall be in writing, and shall be deemed given upon delivery via email, to the addresses set forth below:

**Company**
David Levesque
vBio Inc.
davidcares33@gmail.com

The foregoing Agreement is agreed to by:

David Levesque:  *David Levesque*

Title: CEO

Company: vBIO Inc.

Date:   12 / 14 / 2020




Consultant's Company:

Consultant name: Marissa Land

Consultant signature:  *[signature]*

Title: Senior Marketing Director

Date:   12 / 14 / 2020

Doc ID: bcff688bf1ca2b21451c8c8a6c814f08b4144962

4

Doc ID: bcff688bf1ca2b21451c8c8a6c814f08b4144962


| | |
|---|---|
| **TITLE** | vbio agreement |
| **FILE NAME** | vBio Inc Contract... Marissa.docx.pdf |
| **DOCUMENT ID** | bcff688bf1ca2b21451c8c8a6c814f08b4144962 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History


SENT

**12 / 14 / 2020**
21:10:58 UTC

Sent for signature to David Levesque
(davidcares33@gmail.com) and Marissa Land
(marissaland01@gmail.com) from davidcares33@gmail.com
IP: 73.231.146.21


VIEWED

**12 / 14 / 2020**
21:11:24 UTC

Viewed by Marissa Land (marissaland01@gmail.com)
IP: 70.93.242.238


SIGNED

**12 / 14 / 2020**
21:12:07 UTC

Signed by Marissa Land (marissaland01@gmail.com)
IP: 70.93.242.238

👁
VIEWED

**12 / 14 / 2020**
21:12:26 UTC

Viewed by David Levesque (davidcares33@gmail.com)
IP: 73.231.146.21

✍
SIGNED

**12 / 14 / 2020**
21:12:46 UTC

Signed by David Levesque (davidcares33@gmail.com)
IP: 73.231.146.21

✓
COMPLETED

**12 / 14 / 2020**
21:12:46 UTC

The document has been completed.

Powered by ⊽ HELLOSIGN

DocuSign Envelope ID: 7E4A4AE4-627A-4AD3-A67B-CA662DBB697A

**EXHIBIT B**

**[Joint Stipulation for Dismissal – Adversary Proceeding]**

BN 76409142v3

1  ANTHONY J. NAPOLITANO (SBN: 227691)
      anapolitano@buchalter.com
2  NICHOLAS S. COUCHOT (SBN: 331971)
      ncouchot@buchalter.com
3  GRAHAM G. LAMBERT (State Bar No. 303056)
      glambert@buchalter.com
4  BUCHALTER, A Professional Corporation
   1000 Wilshire Boulevard, Suite 1500
5  Los Angeles, CA 90017-2457
   Telephone:    (213) 891-0700
6  Facsimile:    (213) 896-0400

7  Attorneys for Plaintiffs
   SONAPHI, LLC, RESONANT TECHNOLOGIES
8  GROUP, LLC and MARK HINDS

9                UNITED STATES BANKRUPTCY COURT

10        NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE DIVISION)

| | |
|---|---|
| 11  In re | Case No. 5:22-bk-51048 |
| 12  DAVID LEVESQUE, | Chapter 7 |
| 13          Debtor. | |
| 14  —————————————— | Adv. Proc. No. 5:23-ap-05006 |
| 15  SONAPHI, LLC, RESONANT TECHNOLOGIES GROUP, LLC, and MARK HINDS, | **STIPULATION FOR DISMISSAL OF THE PLAINTIFFS' CLAIMS UNDER 11 U.S.C. §§ 523 AND 727 AGAINST THE DEFENDANT WITH PREJUDICE** |
| 16  | |
| 17          Plaintiffs, | |
| 18      vs. | |
| 19  DAVID LEVESQUE, | |
| 20          Defendant. | |

21

22

23

24

25

26

27

28  BN 77094574v1

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

STIPULATION FOR DISMISSAL OF THE PLAINTIFFS' CLAIMS UNDER 11 U.S.C. §§ 523 AND 727
AGAINST THE DEFENDANT WITH PREJUDICE

**TO THE HONORABLE STEPHEN L. JOHNSON, UNITED STATES BANKRUPTCY JUDGE, THE DEFENDANT, HIS COUNSEL AND ALL PARTIES IN INTEREST:**

This *Stipulation for Dismissal of Plaintiffs' Claims Under 11 U.S.C. §§ 523 and 727 Against the Defendant With Prejudice* (the "Stipulation") is entered into effective as of June 16, 2023 by Sonaphi, LLC, Resonant Technologies Group, LLC, and Mark Hinds (collectively, the "Plaintiffs"), on the one hand, and David Levesque (the "Defendant", together with the Plaintiffs, the "Parties"), on the other hand, by and through their respective counsel of record as follows:

### RECITALS

A.      On November 19, 2022, the Defendant filed a voluntary bankruptcy petition commencing the chapter 7 bankruptcy case designated as *In re David Levesque*, Case No. 5:22-bk-51048 (the "Bankruptcy Case") in the United States Bankruptcy Court, Northern District of California.

B.      On February 13, 2023, the Plaintiffs filed their *Complaint for: (I) Objection to Discharge Pursuant to 11 U.S.C. § 727; and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* [Adv. Dkt. No. 1] in the Bankruptcy Case against the Defendant commencing the above-captioned adversary proceeding (the "Adversary Proceeding").

C.      On March 16, 2023, the Defendant filed his *Motion to Dismiss Adversary Complaint with Prejudice* [Adv. Dkt. No. 9] (the "Initial Motion to Dismiss").  On March 17, 2023, the Defendant refiled the Initial Motion to Dismiss [Adv. Dkt. No. 12] due to an apparent defective noticing issue.

D.      On April 6, 2023, the Plaintiffs timely filed their *First Amended Complaint for: (I) Objection to Discharge Pursuant to 11 U.S.C. § 727; and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* [Adv. Dkt. No. 17] as a matter of right under Rule 7015 of the Federal Rules of Bankruptcy Procedure (incorporating Rule 15(a) of the Federal Rules of Civil Procedure).  As a result, the Initial Motion to Dismiss was rendered moot.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**STIPULATION FOR DISMISSAL OF THE PLAINTIFFS' CLAIMS UNDER 11 U.S.C. §§ 523 AND 727 AGAINST THE DEFENDANT WITH PREJUDICE**

E.    On April 20, 2023, the Defendant timely filed his *Motion to Dismiss First Amended Adversary Complaint* (the "FAC Complaint") [Adv. Dkt. No. 18].

F.    The Parties subsequently executed a *Settlement Agreement and Mutual Release* on June __, 2023, resolving all claims, causes of action, and disputes that have been or could be asserted in the Adversary Proceeding.

G.    Accordingly, the Parties desire to dismiss this Adversary Proceeding and hereby enter into this stipulation of dismissal pursuant Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure (made applicable to this adversary proceeding by virtue of Rule 7041 of the Federal Rules of Bankruptcy Procedure), seeking the dismissal of the Plaintiffs' claims with prejudice as to the Defendant.

**NOW, THEREFORE**, the Plaintiffs, by and through their counsel of record, and the Defendant, by and through his counsel of record, hereby stipulate and agree as follows.

## STIPULATION

Based upon the foregoing, and subject to Court approval, the Parties stipulate and agree as follows:

1.    The Plaintiffs and the Defendant hereby agree that all of the Plaintiffs' claims against the Defendant as set forth in the FAC Complaint shall be dismissed with prejudice in accordance with Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure (made applicable to this Adversary Proceeding by Rule 7041 of the Federal Rules of Bankruptcy Procedure) and Rule 7041 of the Federal Rules of Bankruptcy Procedure;

2.    Neither the Plaintiffs nor the Defendant shall be deemed to be a prevailing party, and each party shall bear its own attorneys' fees and costs in connection with the Bankruptcy Case and the Adversary Proceeding;

3.    Each individual whose signature appears below represents and warrants that he or she is authorized to enter into the instant Stipulation on behalf of his or her respective clients;

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**STIPULATION FOR DISMISSAL OF THE PLAINTIFFS' CLAIMS UNDER 11 U.S.C. §§ 523 AND 727 AGAINST THE DEFENDANT WITH PREJUDICE**

1    4. This Stipulation may be executed in facsimile or electronic counterparts and shall

2    be deemed complete and effective as if it were executed as one original document; and

3    5. The Parties consent to the entry of an order approving this Stipulation by the

4    Bankruptcy Court.

5    DATED: June 16, 2023                    BUCHALTER, a Professional Corporation

6

7                                            By:   /s/ Anthony J. Napolitano
                                                    ANTHONY J. NAPOLITANO
8
                                            Attorneys for Plaintiffs SONAPHI, LLC,
9                                           RESONANT TECHNOLOGIES GROUP, LLC, and
                                            MARK HINDS
10

11

12
     DATED: June 16, 2023                    LAW OFFICES OF MICHAEL JAY BERGER
13

14
                                            By:
15                                                  MICHAEL J. BERGER
                                            Attorneys for Defendant DAVID LEVESQUE
16

17

18

19

20

21

22

23

24

25

26

27

28   BN 77094574v1                          4

**STIPULATION FOR DISMISSAL OF THE PLAINTIFFS' CLAIMS UNDER 11 U.S.C. §§ 523 AND 727
AGAINST THE DEFENDANT WITH PREJUDICE**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

## CERTIFICATE OF SERVICE

I declare that I am over the age of 18 years; NOT a party to the within action; and that my address in 1000 Wilshire Blvd., Suite 1500, Los Angeles, CA 90017-1730.  On June 16, 2023, I

served a true and correct copy of:

**STIPULATION FOR DISMISSAL OF THE PLAINTIFFS' CLAIMS UNDER 11 U.S.C. §§ 523 AND 727 AGAINST THE DEFENDANT WITH PREJUDICE**

**BY NOTICE OF ELECTRONIC FILING**: I caused to be served the above-described

document(s) by means of electronic transmission of the Notice of Electronic Filing through the

Court's transmission facilities, to the following parties and/or counsel who are registered ECF

Users:

**Michael Jay Berger**   michael.berger@bankruptcypower.com, michael.berger@ecf.courtdrive.com
**Nick Couchot**   ncouchot@buchalter.com

**Anthony Napolitano**   anapolitano@buchalter.com, marias@buchalter.com

*and all other parties registered on CM/ECF to receive notice.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 16, 2023

*/s/ Anthony J. Napolitano*
Anthony J. Napolitano, Esq.

BN 77094574v1

5

**STIPULATION FOR DISMISSAL OF THE PLAINTIFFS' CLAIMS UNDER 11 U.S.C. §§ 523 AND 727 AGAINST THE DEFENDANT WITH PREJUDICE**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

DocuSign Envelope ID: 7E4A4AE4-627A-4AD3-A67B-CA662DBB697A

# EXHIBIT C

## [Notice of Dismissal – Labor Action]

BN 76409142v3

**NOTICE OF DISMISSAL**

*To Whom It May Concern:* **Steve Nguyen, Deputy Labor Commissioner**

DIR-DLSE-Wage Unit

100 Paseo de San Antonio, Room 120

San Jose, CA 95113

SNguyen@dir.ca.gov

*From:* **David Levesque**, Claim CM-886714

I, David Levesque, dismiss claim **CM-886714.**

Date: _____

Signature:_____

David Levesque